

RECEIVED
AUG 12 2025
PRO SE OFFICE

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
Foley Square Division**

Case No. 1:20-CR-00493-VSB-1

**UNITED STATES OF AMERICA,**

Plaintiff,

versus

**LOUIS LLUBERES,**

Defendant.

## DEFENDANT'S *PRO SE* MOTION FOR DISCLOSURE OF GRAND JURY TRANSCRIPTS RELATED TO THE INDICTMENT AND SUPERSEDING INFORMATION

**COMES NOW**, the Defendant Louis Lluberes ("Mr. Lluberes"), appearing *pro se*,[1] and respectfully moves this Honorable Court, pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), for an order directing the government to disclose the transcripts of the grand jury proceedings that resulted in the original indictment filed on September 17, 2020, and any grand jury proceedings related to the superseding information filed on February 15, 2024, in the above-captioned case. In support of this motion, Defendant states as follows:

### I.     INTRODUCTION

1.      Defendant Louis Lluberes was charged in an original indictment returned on September 17, 2020, with conspiracy to commit wire and bank fraud (18 U.S.C. § 1349), wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344), and conspiracy to commit money laundering (18 U.S.C. § 1956(h)).

2.      A superseding information was filed on February 15, 2024, charging Defendant with conspiracy to commit bank fraud (18 U.S.C. § 371) and conspiracy to commit wire fraud (18 U.S.C. § 371).

3.      The case was terminated on February 20, 2025, with Defendant sentenced to 38 months imprisonment and 3 years of supervised release.

---

[1] *See* Haines v. Kerner, 404 U.S. 519, 520 (1972) (holding that *pro se* complaints are to be construed liberally and *"to less stringent standards than formal pleadings drafted by lawyers"*).

4.      Defendant seeks disclosure of the grand jury transcripts to investigate grounds for post-conviction relief under 28 U.S.C. § 2255, including irregularities in the grand jury proceedings, prosecutorial misconduct, ineffective assistance of counsel, and inconsistencies in witness testimony that may constitute violations of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), or <u>Giglio v. United States</u>, 405 U.S. 150 (1972).

5.      The transcripts are also needed to develop a motion to stay forfeiture and restitution orders under Federal Rule of Criminal Procedure 32.2(d) and to support the ancillary petition filed by Interested Party Cesarina Lluberes ("Ms. Lluberes") (Docket No. 300, filed June 24, 2025) under 21 U.S.C. § 853(n).

6.      This motion is narrowly tailored to request only the transcripts of witness testimony and legal instructions provided to the grand jurors. Although the superseding charging document is an information, Defendant requests any related grand jury materials if proceedings occurred (e.g., for evidentiary purposes supporting the superseding charges). Disclosure is essential to avoid injustice and safeguard Defendant's rights under the Fifth, Sixth, and Fourteenth Amendments.

## II.    STATEMENT OF FACTS

7.      The original indictment, filed on September 17, 2020, alleged a scheme from 2017 to March 2020 involving the creation of over 2,000 fictitious receivables to inflate Company-1's borrowing base, defraud Bank-1 into lending over $520 million, and sell Company-1 to an investor group at an inflated value, resulting in approximately $17.5 million in acquisition payments to Defendant (Docket No. 1). The superseding information, filed on February 15, 2024, narrowed the charges to conspiracies involving the same scheme but focused on over $500 million in loans from Bank-1 and the investor group acquisition (Docket No. 250). Defendant has reason to believe the grand jury may have been presented with incomplete, misleading, or inadmissible evidence, such as hearsay testimony, improper financial summaries, or coerced witness statements.

8.      A <u>Monsanto</u> hearing held on September 13-14, 2021 (Docket Nos. 91, 93), pursuant to <u>United States v. Monsanto</u>, 491 U.S. 600 (1989), exposed discrepancies in the government's tracing theory. FBI Agent Anthony Martinez testified on tracing funds but admitted uncertainty on key purchase agreement terms: *"I don't believe so [if excluded receivables were part of the acquisition price]"* (Docket No. 93 at 68:9), and confirmed excluded receivables were not sold: *"The excluded receivables were a group of receivables that the investor group decided, essentially, not to pay for due to the significant age"* (Docket No. 93 at 40:21-23). Martinez also conceded no verified customer payments for these receivables: *"I have not [seen an instance where an excluded receivable payment actually came from a customer]"* (Docket No. 93 at 49:8-9). The government dismissed offsets, arguing, *"Totally irrelevant what the bank got back... what matters for forfeiture is what the gross proceeds are"* (Docket No. 91 at 22:25-23:1), despite defense evidence of $11.288 million returned to the company and no net bank loss from round-tripping: *"There is a question of whether the allegations in the indictment... resulted in basically a net zero effect on the bank"* (Docket No. 91 at 16:7-9). Inconsistencies emerged between the indictment's $56 million in fictitious receivables and Martinez's declaration of $29 million (Docket No. 91 at 13:20-21). Despite plea willingness post-hearing, the government filed the superseding information, possibly to address these evidentiary flaws.

9.      The investor group, Union Capital Group, LLC (Firm-1 or Union Capital), a *sophisticated investor* managing hundreds of millions in institutional funds (Docket No. 266-1 at 1), hid behind their

*highly experienced attorneys* at Finn Dixon & Herling, specialists in complex financial transactions, in a victim impact statement (Docket No. 266-1, dated June 20, 2024). The statement claims a $66 million enterprise value was fraudulent, demanding over $15.55 million in equity losses and $10 million in additional costs, while omitting their $140 million legitimate revenue windfall, uncompensated seizure of $140 million in assets, and control of Bank-1's $25 million restitution via a discounted debt buyout (Docket No. 266-1 at 4-5). Defendant alleges Union Capital and their attorneys engaged in fraud, breach of contract, and reverse churning by inflating losses and concealing due diligence failures, contributing to prosecutorial misconduct and potential perjury with Department of Justice (DOJ) complicity. Their sophistication and attorneys' expertise heighten suspicion of deliberate misrepresentation to the grand jury, tainting the indictment process.

10.    Post-sentencing, Defendant filed a *pro se* notice on June 9, 2025, of a forthcoming motion to stay forfeiture and restitution, arguing no illicit proceeds (net equity calculations show investor group owes $3,697,255.77 plus 100% of RES shares; no net loss after $11.288 million repayment and $29.126 million PNC loan reduction) (Docket No. 295). Interested Party Cesarina Lluberes, Defendant's wife, filed a supplemental ancillary petition on June 24, 2025 (Docket No. 300), claiming superior interest in the Florida property (9155 Royal Gate Drive) as an innocent spouse under Florida's homestead protections (Fla. Const. art. X, § 4), acquired September 6, 2019, with pre-fraud marital contributions. She argues no taint, *bona fide* purchaser status, due process violations (lack of notice), and seeks a stay, temporary restraining order, and evidentiary hearing. These filings highlight discrepancies (e.g., government's $17.5 million proceeds ignore Company-1's $140 million legitimate value, Union Capital's $140 million asset windfall, and duplicative restitution). Transcripts are needed to probe grand jury evidence for the stay motion, § 2255 petition, and Cesarina's claims, particularly to prove Union Capital's perjury. Without access, Defendant cannot substantiate misconduct or errors, risking injustice.

### III.    LEGAL ARGUMENT

11.    Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) authorizes disclosure of grand jury materials when a defendant shows a ground may exist to challenge the indictment due to matters occurring before the grand jury, applicable post-conviction for 28 U.S.C. § 2255 relief. The Supreme Court requires a *"particularized need"* where disclosure outweighs secrecy interests. <u>Douglas Oil Co. v. Petrol Stops Northwest</u>, 441 U.S. 211, 222-23 (1979) (*"[D]isclosure is appropriate only in those cases where the need for it outweighs the public interest in secrecy,"* requiring tailored requests to prevent injustice); <u>United States v. Procter & Gamble Co.</u>, 356 U.S. 677, 683 (1958) (*"[P]roblems concerning the use of the grand jury transcript… are problems of the balance of need versus secrecy"*).

12.    In the Second Circuit, this standard is applied flexibly post-conviction, as secrecy diminishes after the grand jury's function ends. In re <u>Grand Jury Subpoena (Doe)</u>, 72 F.3d 271, 274 (2d Cir. 1995) (disclosure where irregularities suggested); In re <u>Biaggi</u>, 478 F.2d 489, 492-93 (2d Cir. 1973) (disclosure for inconsistencies indicating misconduct). Secrecy interests—preventing flight, protecting jurors, encouraging frank testimony, and shielding the innocent—are minimal post-conviction. <u>Dennis v. United States</u>, 384 U.S. 855, 871-72 (1966) (testimony *"peculiarly appropriate"* for post-conviction challenges); <u>Pittsburgh Plate Glass Co. v. United States</u>, 360 U.S. 395, 400 (1959) (secrecy *"must not be permitted to outweigh the demands of fairness"* post-indictment); <u>Butterworth v. Smith</u>, 494 U.S. 624, 632-33 (1990) (secrecy reduced post-investigation). Courts grant disclosure to investigate misconduct, impeachment, or constitutional violations. <u>United States v. Moten</u>, 582 F.2d 654, 663 (2d Cir. 1978); <u>United States v. Basciano</u>, 763 F. Supp. 2d 303, 318 (E.D.N.Y. 2011).

### A.   Particularized Need Exists to Investigate Grounds for Post-Conviction Relief

13.    Defendant seeks transcripts to investigate grounds for 28 U.S.C. § 2255 relief, including prosecutorial misconduct, ineffective assistance of counsel, and grand jury defects (e.g., misleading evidence, improper instructions, or perjury). The **Monsanto** hearing exposed discrepancies suggesting flawed grand jury evidence. The government claimed $17.5 million as tainted proceeds (Docket No. 91 at 4:21-25), ignoring Company-1's $140 million legitimate value, $11.288 million repayments (Docket No. 91 at 13:20-21), and $29.126 million PNC loan reduction. Agent Martinez admitted uncertainty: *"I don't believe so [if excluded receivables were part of the acquisition price]"* (Docket No. 93 at 68:9), and confirmed excluded receivables were not sold: *"The excluded receivables were a group of receivables that the investor group decided, essentially, not to pay for"* (Docket No. 93 at 40:21-23). As in **Douglas Oil**, 441 U.S. at 222-23, disclosure is needed to prevent injustice by clarifying proceeds errors affecting sentencing and forfeiture. The $56 million receivable figure in the indictment versus $29 million in Martinez's declaration (Docket No. 91 at 13:20-21) suggests overstatement, prejudicing Defendant. **Bank of Nova Scotia v. United States**, 487 U.S. 250, 256 (1988) (dismissal for prejudicial errors); *see also* Docket No. 91 at 22:25-23:1 (government dismissing offsets).

14.    Union Capital, a *sophisticated investor* managing institutional funds (Docket No. 266-1 at 1), and their attorneys, *experienced in complex financial transactions*, claimed a $66 million fraudulent enterprise value (Docket No. 266-1 at 4-5), concealing their $140 million asset windfall, $25 million restitution control, and due diligence failures. Defendant alleges they engaged in fraud, breach of contract, and reverse churning, with their attorneys' expertise suggesting deliberate perjury or misconduct, facilitated by DOJ complicity, tainting the indictment. In re **Biaggi**, 478 F.2d at 492-93 (disclosure for inconsistencies suggesting misconduct); *see* Docket No. 93 at 68:9 (Martinez's uncertainty); Docket No. 266-1 at 4-5 (Union Capital's inflated claims). **United States v. Hogan**, 712 F.2d 757, 761-62 (2d Cir. 1983) (dismissal for perjury); **United States v. Stein**, 541 F.3d 130, 141-42 (2d Cir. 2008) (misconduct where DOJ coerces cooperation, applicable to Union Capital-DOJ collusion). **Costello v. United States**, 350 U.S. 359, 363 (1956) (indictments invalid if based on hearsay); *see* Docket No. 266-1 at 4-5 (unverified loss testimony). Without transcripts, § 2255 claims—e.g., ineffective assistance for failing to challenge perjury—are illusory. **Hutto v. Ross**, 429 U.S. 28, 30 (1976); **Hill v. Lockhart**, 474 U.S. 52, 58 (1985) (ineffective assistance in plea context). Transcripts also support the Rule 32.2(d) stay motion, as proceeds errors affect forfeiture (**United States v. Peters**, 732 F.3d 93, 104 (2d Cir. 2013)), and Ms. Lluberes's § 853(n) petition. **Landis v. North American Co.**, 299 U.S. 248, 254 (1936).

### B.   Disclosure Is Necessary to Fulfill **Brady** and **Giglio** Obligations

15.    Transcripts are critical to identify exculpatory or impeachment material under Brady, 373 U.S. at 87 (*"[S]uppression... of evidence favorable to an accused... violates due process"*), and **Giglio**, 405 U.S. at 154 (impeachment evidence must be disclosed). The **Monsanto** hearing revealed inconsistencies: $56 million receivables in the indictment versus $29 million in Martinez's declaration (Docket No. 91 at 13:20-21), and no net bank loss: *"There is a question of whether the allegations in the indictment... resulted in basically a net zero effect on the bank"* (Docket No. 91 at 16:7-9). **Dennis**, 384 U.S. at 873 (testimony for impeachment); see Docket No. 93 at 49:8-9 (Martinez admitting no verified payments). Union Capital's sophisticated status and attorneys' expertise (Docket No. 266-1 at 1, 4-5) suggest perjury or withheld impeachment evidence, inflating losses while concealing their windfall, with DOJ complicity. **United States v. Bagley**, 473 U.S. 667, 676 (1985) (**Brady** includes impeachment); see Docket No. 91 at 13:20-21 (suppressed repayments).

16.    In the Second Circuit, disclosure is warranted for such violations. **United States v. Rittweger**, 524 F.3d 171, 180 (2d Cir. 2008) (**Brady** violation if suppressed evidence undermines outcome); *see* Docket No. 91 at 16:7-9 (no net loss). The superseding information's timing suggests concealment of weaknesses. **United States v. Ruiz**, 536 U.S. 622, 629 (2002) (Brady in plea context); *see* Docket No. 266-1 at 4-5 (Union Capital's claims). Cesarina's petition requires evidence of pre-fraud homestead funds (Fla. Const. art. X, § 4). **United States v. McHan**, 345 F.3d 262, 271 (4th Cir. 2003) (adopted in **United States v. Andrews**, 498 F. Supp. 2d 568, 573 (S.D.N.Y. 2007)). Transcripts are critical for § 2255, Rule 32.2(d), and § 853(n) claims, proving perjury by Union Capital/attorneys with DOJ help (Docket No. 266-1 at 4-5).

### C.    The Request Is Narrowly Tailored and Outweighs Minimal Secrecy Interests

17.    The motion seeks only witness testimony and legal instructions, with a protective order to limit dissemination. Fed. R. Crim. P. 6(e)(3)(E). Post-conviction, with no ongoing investigations, secrecy is minimal. **Pittsburgh Plate Glass**, 360 U.S. at 400; **Butterworth**, 494 U.S. at 632-33. **Douglas Oil**, 441 U.S. at 223 (disclosure where tailored); *see* Docket No. 91 at 13:20-21 (proceeds errors); Docket No. 266-1 at 4-5 (Union Capital's claims). **In re Biaggi**, 478 F.2d at 492-93; Moten, 582 F.2d at 663. **United States v. Sells Eng'g, Inc.**, 463 U.S. 418, 445 (1983) (protective orders mitigate concerns); *see* Docket No. 93 at 68:9, 49:8-9 (Martinez's inconsistencies).

## IV.    CONCLUSION

18.    Defendant has demonstrated a particularized need for the grand jury transcripts, outweighing minimal secrecy interests post-conviction. Disclosure is essential to investigate constitutional violations, including Union Capital's sophisticated misconduct and their attorneys' potential perjury with DOJ complicity, support timely § 2255 relief, and ensure justice in forfeiture and ancillary proceedings, as in **Kaley v. United States**, 571 U.S. 320, 333-34 (2014) (due process scrutiny for restraints).

**WHEREFORE**, the Defendant Louis Lluberes (Mr. Lluberes"), proceeding *pro se*, hereby respectfully prays that this Honorable Court to grant the following reliefs: (1) Order the government to disclose the transcripts of the grand jury proceedings for the original indictment and any related to this superseding information within 14 days; (2) Enter a protective order limiting use of the transcripts to this proceeding and prohibiting public dissemination, pursuant to **United States v. Sells Eng'g, Inc.**, 463 U.S. 418, 445 (1983); and (3) Grant such other relief as the Court deems just and proper. This motion is filed pursuant to 28 U.S.C. § 1746 and 18 U.S.C. § 1621. Signed today 28th day of July, 2025, in Coleman, Florida.

Respectfully Submitted,

*Louis Lluberes, Pro Se*
Defendant
Reg. No. 10739-509
Federal Correctional Complex
Coleman Camp
P.O. Box 1031
Coleman, Florida 33521

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** under penalty that on the day 28th of July, 2025, I placed a true and correct copy of the foregoing document in the prison mailing system pursuant to the prison mailbox rule to be sent via US Mail to the United States District Court for the Southern District of New York, Hon. Vernon S. Broderick, attention: Office of the Clerk, 500 Pearl Street, New York, NY 10007

Respectfully Submitted,

**Louis Lluberes, _Pro Se_**
Defendant
Reg. No. 10739-509
Federal Correctional Complex
Coleman Camp
P.O. Box 1031
Coleman, Florida 33521

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
Foley Square Division

Case No. 1:20-CR-00493-VSB-1

UNITED STATES OF AMERICA,

Plaintiff,

versus

Defendant.

LOUIS LLUBERES,

## DEFENDANT'S *PRO SE* MOTION TO INCORPORATE MONSANTO HEARING TRANSCRIPT [DOCUMENT 93] INTO THE RECORD OF DEFENDANT LOUIS LLUBERES

COMES NOW, the Defendant Louis Lluberes ("Mr. Lluberes"), appearing *pro se*,[1] and respectfully moves this Court to formally incorporate the Monsanto[2] Hearing Day 2 transcript, filed as Document 93 on September 21, 2021, in Case No. 1:20-cr-00493-VSB, into his individual record for all current and future proceedings, including any motion under 28 U.S.C. § 2255. This 205-page transcript is critical to anticipated claims regarding improper forfeiture and restitution determinations, ineffective assistance of counsel, and prosecutorial misconduct. Although Document 93 is part of the shared docket, this motion ensures its specific consideration for Louis Lluberes' proceedings. In support of this motion, Defendant respectfully states the following:

### I.    BACKGROUND

1.    On September 21, 2021, the Monsanto Hearing Day 2 transcript was filed as Document 93 in this multi-defendant case, charging Louis Lluberes (Defendant 1), Moises Lluberes (Defendant 2), and others with conspiracy to commit bank and wire fraud, wire fraud, bank fraud, and money laundering. The hearing addressed the government's restraint of approximately $286,588.16 in assets, which Mr. Lluberes sought to access for his defense. The transcript includes testimony (e.g., from witness Martinez, Doc. 93 at 49 (cross-examination)), financial exhibits (e.g., DX 2, Doc. 93 at 16; PX Schedule 5.15, Doc. 93 at 26), and arguments regarding bank accounts, invoices, remittances, and entities like HR Platform Consulting (Doc. 93 at 39) and Espheria (Doc. 93 at 105), many implicating Mr. Lluberes (e.g., Doc. 93 at

---

[1] *See* Haines v. Kerner, 404 U.S. 519, 520 (1972) (holding that *pro se* complaints are to be construed liberally and *"to less stringent standards than formal pleadings drafted by lawyers"*).

[2] *See* United States v. Monsanto, 491 U.S. 600 (1989).

48 ("and Luis"), 134 (Moises Lluberes' interaction, relevant to conspiracy), 149 (FBI testimony)). A copy of relevant excerpts from Document 93 is attached as Exhibit A. (Docket Entry 93, pp. 49, 48, 134, 149.)

## II.    RELEVANCE TO DEFENDANT'S CLAIMS

2.      The transcript is essential to evaluate the following potential claims in a 28 U.S.C. § 2255 motion:

### A.  Improper Forfeiture and Restitution Determinations

3.      The transcript reveals potential errors in the government's calculation of forfeiture and restitution. Testimony relies on aggregated financial figures without clear tracing to Mr. Lluberes' personal gain or specific criminal conduct. For example, the transcript discusses a specific amount of *"$2,368.16"* (Doc. 93 at 14) and accounts linked to Louis Lluberes (Doc. 93 at 48) without demonstrating how these funds were personally obtained by him. Under <u>Honeycutt v. United States</u>, 581 U.S. 443, 454 (2017), forfeiture under 21 U.S.C. § 853 is limited to *"property the defendant himself actually acquired,"* prohibiting joint and several liability for co-conspirators. Similarly, the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, restricts restitution to *"actual, out-of-pocket losses"* to victims, not intended losses. <u>United States v. Gushlak</u>, 728 F.3d 184, 192 (2d Cir. 2013); <u>United States v. Oladimeji</u>, 463 F.3d 152, 158 (2d Cir. 2006). The transcript suggests the government may have overstated losses or misapplied these standards, impacting Mr. Lluberes' penalties. (Doc. 93 at pp. 14, 48.)

### B.  Ineffective Assistance of Counsel

4.      The transcript documents defense counsel's failure to challenge the government's financial methodologies or invoke Honeycutt and MVRA standards. For instance, at Doc. 93 at 48, counsel did not contest untraced funds linked to *"Luis,"* and at Doc. 93 at 134, counsel failed to object to conspiracy-related evidence involving Moises Lluberes, which implicated the broader scheme. Counsel did not request tracing of transactions or challenge the conflation of gross proceeds with net gain. These omissions may constitute deficient performance under <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984), which requires showing counsel's errors and resulting prejudice, here allowing improper asset restraints to stand. (Docket Entry 93, pp. 48, 134.)

### C.  Prosecutorial Misconduct

5.      The transcript raises concerns about prosecutorial misconduct, including misleading representations about asset taint. For example, testimony at Doc. 93 at 149 references FBI interactions with *"The F.B.I.,"* suggesting potentially overstated claims about fund sources, and at Doc. 93 at 187, discussions of *"those funds"* may indicate unverified taint. Under <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), the government must disclose *"evidence favorable to an accused."* <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959), and <u>Mooney v. Holohan</u>, 294 U.S. 103, 112 (1935), prohibit false or deceptive evidence. If the government overstated losses or withheld exculpatory context, such conduct may violate Mr. Lluberes' due process rights. *See* <u>Drake v. Portuondo</u>, 553 F.3d 230, 241 (2d Cir. 2009).

## III.    LEGAL BASIS

6.      This motion is supported by well-established legal authority.

7.    First, 28 U.S.C. § 2255(b) authorizes the development of the record in post-conviction proceedings, ensuring that the reviewing court has access to all relevant materials.

8.    Additionally, Federal Rule of Criminal Procedure 32.1 permits reliance on documentary evidence in such proceedings, reinforcing the appropriateness of formally incorporating the **Monsanto** Hearing transcript.

9.    The Court also retains inherent authority to maintain a complete and accurate record of the proceedings, as recognized by the Supreme Court in **United States v. Morgan**, 346 U.S. 502, 506 (1954).

10.    Finally, the Second Circuit has underscored the importance of providing an adequate record for review under § 2255. *See Chang v. United States*, 250 F.3d 79, 85 (2d Cir. 2001).

11.    Together, these authorities establish a strong foundation for granting the relief requested.

## IV.    NO PREJUDICE

12.    Incorporating Document 93 into Mr. Lluberes' individual record imposes no prejudice on the government or the Court. The transcript is already part of the publicly available docket and can be accessed via PACER or through the Clerk's Office of the Southern District of New York. This motion simply ensures that the transcript is expressly associated with Mr. Lluberes' proceedings and considered in the adjudication of his individual claims, thereby promoting procedural efficiency, accuracy, and fairness.

**WHEREFORE,** the Defendant Louis Lluberes (Mr. Lluberes"), proceeding *pro se*, hereby respectfully prays that this Honorable Court to grant the following reliefs: (1) Incorporate the Monsanto Hearing Day 2 transcript (Document 93, filed September 21, 2021) into the individualized record for Louis Lluberes; (2) Direct that the transcript be considered in all current and future proceedings involving Mr. Lluberes, including any 28 U.S.C. § 2255 motion; and (3) Grant such further relief as the Court deems just and proper. This motion is filed pursuant to 28 U.S.C. § 1746 and 18 U.S.C. § 1621. Signed today 25th day of July, 2025, in Coleman, Florida.

Respectfully Submitted,

_____

**Louis Lluberes,** *Pro Se*
**Defendant**
Reg. No. 10739-509
Federal Correctional Complex
Coleman Camp
P.O. Box 1031
Coleman, Florida 33521

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** under penalty that on the day 25th of July, 2025, I placed a true and correct copy of the foregoing document in the prison mailing system pursuant to the prison mailbox rule to be sent via US Mail to the United States District Court for the Southern District of New York, Hon. Vernon S. Broderick, attention: Office of the Clerk, 500 Pearl Street, New York, NY 10007

Respectfully Submitted,

**Louis Lluberes, *Pro Se***
**Defendant**
Reg. No. 10739-509
Federal Correctional Complex
Coleman Camp
P.O. Box 1031
Coleman, Florida 33521

Exhibit A:
Docket Entry 93

L9e2LluH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,
                                            20 Cr. 493 (VSB)
4               v.

5   MOISES LLUBERES,

6               Defendant.
    ------------------------------x          Hearing

7                                            New York, N.Y.
                                             September 14, 2021
8                                            11:00 a.m.

9

10
    Before:
11
                    HON. VERNON S. BRODERICK,

12                                           District Judge

13

14
                         APPEARANCES
15

16  AUDREY STRAUSS
         United States Attorney for the
17       Southern District of New York
    BY:  DANIEL G. NESSIM
18       NICHOLAS W. CHIUCHIOLO
         Assistant United States Attorneys

19

20  MEISTER SEELIG & FEIN, LLP
         Attorney for Defendant
21  BY:  HENRY E. MAZUREK
         ILANA HARAMATI

22

23  Also Present:

24  Robert Levine, Paralegal, U.S. Attorney's Office

25  Priya Pasricha, Esq., Meister Seelig & Fein, LLP

                         SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300

84

Martinez - Cross

L9e2LluH

1           (Hearing continued)

2           THE COURT:  Let me ask you, is there anything that we

3    need to deal with before we continue with the

4    cross-examination?

5           MR. CHIUCHIOLO:  Not from the government.

6           THE COURT:  From the defense?

7           MR. MAZUREK:  No, your Honor.

8           THE COURT:  Okay.  Let's get the witness.

9           Okay, Agent, I just ask you to remember you are still

10   under oath.  You may be seated.

11          THE WITNESS:  Thank you, your Honor.

12          THE COURT:  You may inquire.  Just make sure to speak

13   into the microphone.

14          MR. MAZUREK:  Speak into the mic and keep my mask

15   on --

16          THE COURT:  Exactly.

17          MR. MAZUREK:  -- those the rules.

18   ANTHONY MARTINEZ, previously sworn.

19   CROSS-EXAMINATION (continued)

20   BY MR. MAZUREK:

21   Q.  Good morning.

22   A.  Good morning.  How are you?

23   Q.  Yesterday we were speaking about proceeds that went from

24   RES to Luis Lluberes from the sale of the RES company, right?

25   A.  Yes.

Martinez - Cross

L9e2LluH

1   Q.  I want to pick up where we left off yesterday with respect

2   to that.  I think on direct examination you said there was an

3   initial consideration of approximately 10.1 million that went

4   from RES to Luis Lluberes on or about May 10 or 11, 2018,

5   right?

6   A.  Yes.

7   Q.  And that was the date of the acquisition, right?

8   A.  Yes.

9   Q.  And then there were another group of transactions to Luis

10  Lluberes from the company that were sent to him that were set

11  aside for escrow to be paid to him under the agreement,

12  correct?

13  A.  Yes.

14  Q.  And I think we saw, based on GX 100, the summary chart you

15  testified about on direct examination, the amount of those

16  proceeds were about between a million and a million and a half.

17  Is that fair enough?

18  A.  I don't recall the exact amount, but I do recall there

19  being a set-aside amount for escrow.

20  Q.  And then there was also a tranche of proceeds that went

21  from the company to Luis Lluberes that you identified as

22  excluded receivables from your review of the document, right?

23  A.  Yes.

24  Q.  And that was, based, again, on the shaded areas of GX 100,

25  approximately $6.2 million, is that fair?

Martinez - Cross

L9e2LluH

1    A.  Approximately, yes.

2    Q.  I would like to focus on that set of transactions first

3    this morning.  We talked a lot about excluded receivables

4    yesterday.  Your review of the documents when it came to

5    understanding how RES paid Luis Lluberes for excluded

6    receivables, you reviewed the Espheria bank account I think you

7    said, right?

8    A.  Yes.

9    Q.  And compared that with remittance reports from the company,

10   correct?

11   A.  Yes.

12   Q.  You also testified yesterday that you did not see any

13   instance where customer payments were made directly to RES as

14   part of the excluded receivables that went to Luis, correct?

15            MR. CHIUCHIOLO:  Objection.  Misstates the witness's

16   testimony.

17            THE COURT:  Why don't you restate the question.

18            MR. MAZUREK:  Okay.  Just a moment.

19   BY MR. MAZUREK:

20   Q.  You never saw an instance where an excluded receivable

21   payment actually came from a customer, correct?

22            MR. CHIUCHIOLO:  Objection.  Again, misstates the

23   witness's testimony.

24            MR. MAZUREK:  I'm just asking.  I'm not asking about

25   testimony, I am asking directly.

Martinez - Cross

L9e2LluH

THE COURT:  Yes, I will allow it.  Overruled.

BY MR. MAZUREK:

Q.  Do you want me to repeat the question?

A.  Yes, please.

Q.  You yourself never saw an instance where an excluded receivable came in -- actually came from a customer, correct?

A.  I did not review any remittance reports.  Could you restate the question again?  I'm sorry.

Q.  You yourself never saw an instance where an excluded receivable payment actually came from a customer.

A.  I have seen remittance reports that appear to be from a third-party customer.  I don't believe I saw an actual remittance for actual excluded receivables from a third-party customer.  So I saw just the summaries.  I have seen remittance reports from third-party members, yes.

Q.  Okay.  Well, yesterday you were asked that same question by the prosecutor, right?

MR. CHIUCHIOLO:  Objection.

THE COURT:  Sustained.

MR. MAZUREK:  Okay.

BY MR. MAZUREK:

Q.  Well, let me ask it this way.  You have training as a forensic accountant, right?

A.  No.

Q.  I mean, that's what you do now for the F.B.I.

Martinez - Cross

L9e2LluH

1    A.  I am not a forensic accountant.

2    Q.  You do forensic review of accounting records?

3    A.  I'm not a forensic accountant, so I don't do forensic

4    review in the scope, in the same scope that a forensic

5    accountant did a review.  I received training in forensic or in

6    auditing and review of financial statements, but I am not a

7    forensic accountant.

8    Q.  Okay.  You know how to analyze financial statements,

9    right?

10   A.  Yes, to some extent.

11   Q.  You performed audits, right?

12   A.  I participated in audits.

13   Q.  And you have also had training in fraud detection,

14   correct?

15   A.  Yes.

16   Q.  And you are a licensed CPA?

17   A.  Yes.

18   Q.  So if you were in the course of your determination of

19   whether remittances were paid to RES from customers, you would

20   want to look at source documents, right?

21   A.  Yes.

22   Q.  And you did look at some source documents in making the

23   conclusion that you made yesterday or the opinion you gave

24   yesterday on -- relating to excluded receivable receipts?

25   A.  Can you have repeat the question, please?

Martinez - Cross

L9e2LluH

1   Q.   Yeah.  You looked at source documents before you gave your

2   opinion that there were proceeds that came from Espheria that

3   were identified as excluded receivable payments from customers,

4   right?

5   A.   In some instances, yes.

6   Q.   The source documents you looked at were Espheria bank

7   statements, correct?

8   A.   Correct.

9   Q.   And the remittance reports from the company RES, correct?

10  A.   I believe the remittance reports -- I'm not sure if they

11  were from RES.  I believe they were -- the appearance was that

12  they were from third-party customers.  I can't definitively say

13  that RES produced its remittance report.  For example --

14  Q.   Why did you get the remittance report?

15                  THE COURT:  Well, the witness was still answering the

16  question.

17                  MR. MAZUREK:  I'm sorry.

18  A.   For example, I saw a remittance report from DHL on DHL

19  letterhead.

20  Q.   Okay.  And you got that from the company.

21  A.   I don't recall where it was obtained.

22  Q.   And you also compared the Espheria bank statements with the

23  remittance reports, the remittance spreadsheets that were held

24  by the company, correct?

25  A.   Can you rephrase the question?

90

Martinez - Cross

L9e2LluH

1    Q.  Yes.  Yesterday you offered testimony related to the

2    excluded receivables and how you matched outlays from

3    Espheria's bank accounts to remittance reports from the

4    company, right?

5    A.  I'm not sure if the remittance reports were from the

6    company, but I compared the cash outlays from the Espheria

7    account to remittance reports that I would need --

8    Q.  Okay.

9    A.  -- for example, the one on DHL letterhead.

10   Q.  Maybe we are having trouble in terms of how we are

11   defining these different documents.  When you say you reviewed

12   documents on DHL letterhead, is it -- those are -- are those

13   sometimes called remittance advices?  Have you heard that term

14   before?

15   A.  I don't recall that effort.  My understanding was they were

16   remittance reports.

17   Q.  Okay.  Let's step back here for a second.  The way that you

18   understand how these transactions work in general business is

19   in terms of invoices sent out and payments, right?  I mean you

20   have some basic --

21   A.  Right.

22   Q.  -- understanding of that.

23          So the way that it works is a company providing a

24   product or service invoices the customer, right?

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Martinez - Cross

L9e2LluH

1    Q.  And if the product or service is provided, then the

2    customer remits a payment to the provider of that service, is

3    that right?

4    A.  That's correct.

5    Q.  And sometimes, because there may be a lot of invoices and a

6    lot of work that's being done between the two parties, the

7    party that's making a payment to the provider of the service

8    attaches a letter that sometimes is referred to as a remittance

9    advice, right?

10   A.  Yes.

11   Q.  And a remittance advice, what that does is just tell the

12   company that is providing the product or service that this is

13   what we are paying.  The money that you just received, Company

14   A, you are receiving it because it's in satisfaction of these

15   sets of invoices, right?

16   A.  Yes.

17   Q.  So you -- and can we use that term "remittance advice" --

18   A.  Yes.

19   Q.  -- now?

20             And remittance advices are something that you

21   refer -- you just testified about that you looked at things

22   like on DHL letterhead or Pactiv or Amazon, some of the

23   companies, the customers of RES, right?

24   A.  I don't recall which exact companies.  I may have mentioned

25   Pactiv.  I don't recall exactly which remittance --

L9e2LluH                          Martinez - Cross

1   Q.  Okay --

2   A.  -- but I reviewed a sample of some.

3              THE COURT:  Just only one person at a time can speak.

4              THE WITNESS:  Yes, your Honor.

5              THE COURT:  All right.  Thank you.

6              MR. MAZUREK:  Thank you, Judge.

7              THE COURT:  Um-hmm.

8   BY MR. MAZUREK:

9   Q.  So you reviewed the remittance advices, right?

10  A.  Some of them, yes.

11  Q.  Some of them, yes.

12             Now, you also reviewed reports that were generated by

13  the company RES to indicate what was collected from the list of

14  excluded receivables, right?

15  A.  I don't recall reviewing a list provided by the company of

16  excluded receivables that were collected on.

17  Q.  Well, how --

18  A.  To summarize, so what I did was I looked at the remittance

19  advice and compared it to transfers in Espheria's bank

20  account.

21  Q.  Okay.

22  A.  And I also compared the remittance advices to the company's

23  listing obviously of receivables, but I don't recall reviewing

24  a detail provided by RES of excluded receivables that had been

25  paid down.  I don't believe I reviewed something --

Martinez - Cross

L9e2LluH

1   Q.  So --

2   A.  -- like that.

3   Q.  So let me understand.  You were tasked with determining

4   whether the excluded receivable payments from RES to Luis could

5   be matched with payments from customers, right?

6   A.  I'm sorry.  Ask that one more time.

7   Q.  You were asked by the government to -- before your

8   testimony yesterday, to determine whether payments for excluded

9   receivables to Luis Lluberes matched payments that were paid by

10  customers.

11  A.  To some extent, yes.

12  Q.  And, again, based on your training, one way of doing that

13  is to look at source documents, not just bank statements,

14  right?

15  A.  That's correct.

16  Q.  And you were trying to figure out whether customers,

17  third-party customers to RES, paid RES, right?

18  A.  Yes.

19  Q.  You weren't asked to look whether third-party customers

20  paid Espheria, right?

21  A.  I was not asked to do that, but in my review, again, just

22  speaking in general terms, I do not believe that I saw any

23  third-party payments come into Espheria.

24  Q.  Okay.  Because Espheria didn't provide the service, RES

25  did, right?

Martinez - Cross

L9e2LluH

1   A.  That's correct.

2   Q.  Now, one way to determine whether customer payments were

3   made to RES would be to look at the RES bank statement, right?

4   A.  Yes.

5   Q.  You didn't look at the RES bank statement, did you?

6   A.  I don't believe so.

7   Q.  The RES bank statements would show whether a payment was

8   made from an account belonging to a customer like Amazon, for

9   example, right?

10  A.  Yes.

11  Q.  And that's a document you can get from a third party, such

12  as a bank, right?

13  A.  I'm sorry.  Ask that one more time.

14  Q.  You don't have to rely on the company's documents to see

15  what is reported on the RES bank statement.  You can get that

16  from the bank, right?

17  A.  Yes.

18  Q.  And you know that RES did banking with PNC Bank.  That's

19  the subject of the bank fraud in the case, right?

20  A.  Yes.

21  Q.  And you knew that the government collected, by third-party

22  subpoenas, grand jury subpoenas, the PNC Bank bank statements

23  related to RES, right?

24  A.  I don't recall.  It's possible.  Again, my involvement in

25  this case was limited to the tracing of these specific funds.

Martinez - Cross

L9e2LluH

1    Q.  And one of the things that you were asked to testify about

2    yesterday on direct examination was whether the excluded

3    receivables paid to Luis Lluberes came from customers or from

4    some other source, right?

5    A.  Yes.

6    Q.  You know RES banked with PNC Bank, right?

7    A.  Yes.

8    Q.  And PNC Bank would indicate on its bank statements the

9    source of any funds transfers, that is, the account from which

10   money may be deposited into RES's account at PNC Bank, right?

11   A.  Typically that's what a bank would do, yes.

12   Q.  Okay.  I am going to ask you to look at what's been

13   premarked for identification at DX, as in defense exhibit, 1.

14   If we can put that on the screen.

15         MR. MAZUREK:  I'm just having a little technical

16   difficulty, Judge.  My monitor is not -- oh.  There it is.

17   Okay.

18   Q.  So you are familiar with bank statements, Agent, right?

19   A.  Yes.

20   Q.  Does this appear to be a bank statement on your screen?

21   A.  Yes.

22   Q.  A corporate business account statement for the benefit of

23   Resource Employment Solutions, LLC?

24   A.  Yes.

25   Q.  And you see the Bates stamp at the bottom, PNC 7479?

Martinez - Cross

L9e2LluH

1    A.  Yes.

2    Q.  Does this appear to be the PNC Bank statement for RES, and

3    what's on your screen is at least for the period beginning in

4    May of 2018.

5    A.  Yes.

6             MR. MAZUREK:  Your Honor, I'm going to move for the

7    admission of DX 1.  These were bank statements that were

8    produced by the government in discovery.

9             MR. CHIUCHIOLO:  No objection.

10            THE COURT:  Okay.  DX 1 is admitted in evidence.

11            MR. MAZUREK:  Thank you.

12            (Defendant's Exhibit 1 received in evidence)

13   BY MR. MAZUREK:

14   Q.  Okay.  Now, if we could turn to the Bates number identified

15   in the lower right as PNC 7482 on the screen, please.

16            At the top of the screen, Agent, you see it says,

17   under the title "deposits and other credits" --

18   A.  Yes.

19   Q.  -- this would indicate -- thank you.

20            This would indicate the monies that would be going in

21   to the RES business bank account, correct?

22   A.  Yes.

23   Q.  Okay.  Now, I want to -- do we have the ability of

24   highlighting a certain line?  I would like you to highlight, if

25   you can, the line dated May 10, in the amount of $1,782,368.16.

L9e2LluH                          Martinez - Cross

1          Do you see that?

2   A.  Yes.

3   Q.  And the transaction description for that line, for that

4   deposit, is identified as corporate ACH EDI payments.  Do you

5   see that?

6   A.  Yes.

7   Q.  And then underneath it, it says "Amazon," it looks like

8   "Amazon.Co," C-O.  Do you see that?

9   A.  Yes.

10  Q.  A bunch of numbers, and then the letters OFA and then

11  another set of numbers.  Do you see that?

12  A.  Yes.

13  Q.  And based on your experience in reviewing bank statements,

14  do you understand that the smaller line that reads Amazon.Co

15  with numbers is the account from which that payment is being

16  transferred to the RES bank account, correct?

17  A.  Yes.

18  Q.  And also from your experience, you know that Amazon

19  apparently was doing business with Bank of America.  That's the

20  indication on that line, right?

21  A.  I don't recall which bank, but just based on my review,

22  this looks like a payment from Amazon.

23  Q.  A payment from Amazon in the amount of $1.78 million,

24  correct?

25  A.  Yes.

Martinez – Cross

L9e2LluH

1   Q.  And then to the far right on that page is a reference

2   number, which is a multi-digit number, a lot of digits that

3   corresponds to that line item, right?

4   A.  Yes.

5   Q.  And you know what -- you know that a bank reference is just

6   a unique identification number that's assigned to a transaction

7   by a bank for tracing purposes, right?

8   A.  Yes.

9   Q.  You are aware, based on your review of records in this case

10  and discussions with case agents and reviewing interview

11  reports, that Amazon was a major customer of RES?

12  A.  Yes.

13  Q.  Now, so based again on your training and experience, Agent,

14  you know that this line in the RES bank statement shows that

15  $1.78 million was deposited directly from an Amazon account

16  into the RES bank account at PNC on May 10, 2018, correct?

17  A.  That's correct.

18  Q.  Okay.  And you didn't review these before coming to Court

19  yesterday to testify about --

20  A.  I don't believe so.

21          THE COURT:  Again, just wait until the question is

22  finished.

23          THE WITNESS:  Okay.  I'm sorry.

24  Q.  Okay.  So now, I am asking if we can put on the screen

25  what's been premarked for identification DX 2.

Martinez – Cross

L9e2LluH

1          This is a multi-tab Excel spreadsheet.  Do you see

2     that on your screen?

3     A.  Yes.

4     Q.  And at the bottom it includes different tabs.  Where the

5     arrow is now pointing is to a tab called "Master Tracker."  Do

6     you see that?

7     A.  Yes.

8     Q.  And there is another tab identified as "Amazon Excluded."

9     Do you see that?

10    A.  Yes.

11    Q.  And that's at the top left of the screen you see is the

12    spreadsheet is entitled "Amazon Excluded AR."  Do you see

13    that?

14          MR. CHIUCHIOLO:  Your Honor, I don't believe this

15    document is in evidence.

16          THE COURT:  Let me just ask, is this a

17    corporate-generated document?  What is this?  Or is this a

18    document created by the defense?

19          MR. MAZUREK:  This is a -- this is a document that was

20    produced in Rule 16 discovery from the company, RES.  It has

21    Bates number at the bottom, U.S. Attorney's Office 24378, and

22    it was produced in discovery as an RES company document.  While

23    this witness may not -- I may not be able to lay a foundation

24    as a proper custodian, I do believe that there is some

25    flexibility in these *Monsanto* hearings not to require --

Martinez - Cross

L9e2LluH

1      THE COURT:  The rules of evidence may not strictly

2    apply, but I guess my question is, I mean, let me hear from the

3    government concerning what this is.  Was this something

4    produced by the government?

5         MR. CHIUCHIOLO:  Yes, your Honor, a document obtained

6    from the company.  The only issue that the government has is it

7    appears that these documents, which are in a series, were

8    prepared by the defendants while they were working at the

9    company, and therefore the government has serious concerns

10   about the validity of the information contained in these

11   documents.

12      THE COURT:  Okay.  All right.  But I think what -- I

13   mean, so it wasn't -- well, let me ask this.  Was the document

14   obtained from RES pursuant to a subpoena or was it obtained

15   pursuant to a search warrant, or do you not know one way or the

16   other?

17      MR. CHIUCHIOLO:  Your Honor, I think through both.  I

18   think RES produced voluntarily a bunch of these types of

19   documents, and then also in the course of a search warrant, an

20   e-mail search warrant, we would have obtained it through

21   attachments.

22      THE COURT:  Okay.

23      MR. CHIUCHIOLO:  There is no dispute this came from

24   the company.

25      THE COURT:  Okay.

Martinez - Cross

L9e2LluH

1          MR. CHIUCHIOLO:  It was kept in the company's ordinary

2     course.  My only concern is the author of the documents.

3          THE COURT:  No, I understand.  I understand the issue.

4          So why don't -- let me ask, do you have an

5     objection -- now, two things.  Number one, it is something that

6     came from RES.  So it is what it purports to be.  Number two,

7     the issue concerning the underlying data and the numbers that

8     are in there, I understand there is a dispute between whether

9     there are -- certain of those entries are accurate or not

10    because, based upon the allegations in the indictment that

11    there were -- you know, concerning financial crimes, and

12    therefore the government has not verified the information.  I

13    understand that.

14         MR. CHIUCHIOLO:  Subject to those concerns, we have no

15    objection to its admission.  We just wanted to put it on the

16    record.

17         THE COURT:  Okay.  That's perfect.  Thank you.

18         So DX 2 is admitted in evidence with those -- so

19    ordinarily if it was a witness that could verify it, I would

20    allow the government to *voir dire* the witness to allow them to

21    establish what the government just indicated.  Since

22    Agent Martinez wouldn't be able to do that, I will allow the

23    proffer, and it will be admitted subject to those issues.

24         MR. MAZUREK:  Thank you, Judge.

25         (Defendant's Exhibit 2 received in evidence)

Martinez - Cross

L9e2LluH

1    BY MR. MAZUREK:

     Q.  Agent Martinez, there is no jury here.  You have heard all

2    of that background, so are you familiar with this particular

3    document?  Is this one of the documents that you reviewed

4    before your testimony?

5    A.  No.

6    Q.  Okay.  Let me just ask you, then, to look at certain line

7    items and just read as to what's written there understanding

8    that you haven't seen this document before.

9         If we could turn to row 56 within the Amazon Excluded,

10   AR tab, that's highlighted on your screen.  Do you see that,

11   Agent?

12   A.  Yes.

13   Q.  Okay.  That is a lot of information here, and let me just

14   direct you to certain parts of -- certain columns.  Do you see

15   the column --

16        THE COURT:  I'm sorry, Mr. Mazurek.  Is it possible

17   for the record to indicate sort of exactly what -- I know it is

18   in the excluded tab.

19        MR. MAZUREK:  It is in the excluded tab.  It is row

20   56.  It is shaded right now on the screen.  It is row 56 of the

21   Amazon Excluded tab of DX 2.

22        THE COURT:  Okay.  Got it.

23        MR. MAZUREK:  Okay?

24   BY MR. MAZUREK:

25

L9e2LluH                              Martinez - Cross

1    Q.  And let's just start going from left to right on your

2    screen.  Do you see the column listed "customer PO number"?

3    A.  Yes.

4    Q.  And you are familiar with the designation POs in buying and

5    selling of goods?

6    A.  Yes.

7    Q.  Does that mean purchase order, generally, right?  Is that

8    right?

9    A.  Yes, that's right.

10   Q.  And it's identified here as a customer PO number.  Would

11   this generally be a number that would be generated by the

12   payor, the customer, rather than the person providing -- the

13   service company providing the services?

14   A.  Generally, yes.

15   Q.  Then there is a customer name, and here this is identified

16   as Amazon.com Services, Inc.  Do you see that?

17   A.  Yes.

18   Q.  And this line has a transaction amount of $107,416.56,

19   correct?

20   A.  Yes.

21   Q.  And then if we go farther right on the spreadsheet, there

22   is another column identified as collected amount, correct?  Do

23   you see that?

24   A.  Yes.

25   Q.  The cursor is hovering above it.  Do you see it?

Martinez - Cross

L9e2LluH

1  A.  Yes.

2  Q.  And that matches the current transaction amount of

3  $107,416.56.  Do you see that?

4  A.  Yes.

5  Q.  And then there is the column immediately to the right, it's

6  remittance letter, which also has that same transaction amount,

7  correct?

8  A.  Correct.

9  Q.  And if you know, Agent, remittance letters, is that the

10  same kind of thing that we were talking about earlier?  I was

11  using the term "remittance advice."  That is correspondence

12  from the customer to the company providing the service to show

13  what invoices they are paying?

14  A.  I would believe so, yes.

15  Q.  And then there is a document number column, two columns to

16  the right.  Do you see that?

17  A.  Yes.

18  Q.  Do you know what that number might refer to?

19  A.  Yes.

20  Q.  How do you know that?

21  A.  Based on my experience, the document number may be a unique

22  number, for example, assigned to an invoice.

23  Q.  Okay.  Do you know that in this particular case what -- not

24  having seen this spreadsheet before, do you know what that

25  number referred to?

Martinez - Cross

L9e2LluH

1    A.  No.

2    Q.  And then the next column I want you to pay particular

3    attention to.  It's identified as remittance number or

4    remittance hashtag in the title of the column.  Do you see

5    that?

6    A.  Yes.

7    Q.  And that is a multi-digit number that ends in the last four

8    digits of 5810, right?

9    A.  Yes.

10   Q.  Now, we were looking at a particular line item in DX 2 with

11   a bank reference number for a deposit from Amazon on May 10 now

12   back on your screen.  Do you see that?

13   A.  Yes.

14   Q.  And it also ends in the last four digits 5810, correct?

15   A.  Correct.

16   Q.  So the reference numbers match from DX 1 and DX 2, correct?

17   A.  Correct.

18   Q.  If we go back to DX 2. . .

19            MR. MAZUREK:  Just one moment.

20            THE COURT:  Sure.

21            (Pause)

22   Q.  And just before we leave this document, in the column

23   identified as remittance number, you see a number of remittance

24   numbers with that same unique identifying digits ending in 5810

25   on your screen, right?

L9e2LluH                          Martinez - Cross

1    A.   Yes.

2    Q.   Okay.  Now I want to -- and just before we move on, one

3    last question on this.  The remittance number associated with

4    this line item on DX 2 refers back to a reference number on the

5    PNC Bank statement which shows the payment directly from the

6    customer, Amazon, correct?

7    A.   The numbers appear to be the same, yes.

8    Q.   Okay.

9         Now if we could put on the screen a portion of what's

10   already admitted into evidence as GX 50, five zero, and go to

11   that portion of the purchase agreement, which is schedule 5.15.

12   Specifically that was Bates stamped at the bottom as USAO

13   numbers 182568.  Okay.  The 565 is entitled "Excluded

14   Receivables."

15        That is the schedule which identifies which

16   receivables were not being purchased by Union Capital,

17   correct?

18   A.   Correct.

19   Q.   And if we can go to page Bates stamp 568 of that schedule,

20   and this is a little tricky, but highlight the line that is

21   dated January 11, 2018, with document number 92446.  Is that

22   right?  We are going to highlight that particular line on the

23   schedule 5.15.  Sorry, there are a lot of numbers involved.

24             THE COURT:  Okay.  Do you see that line item that's

25   highlighted now on your screen?

Martinez – Cross

L9e2LluH

THE WITNESS:  Yes.

Q.  And we have also highlighted the column or the entry under the column "customer PO number.  That's 16-00922048.  Do you see that?

A.  Yes.

Q.  And there are two entries under that customer PO number, correct?

A.  Yes.  It appears so in what I see here.

Q.  Okay.  And now if we can refer back to DX 2, and that same line in the Amazon Excluded tab that we were looking at earlier, and does the number match in that line with what we saw in the excluded receivable list?

A.  Yes.

Q.  And that's what seems to indicate to you that the line in DX 2 in the remittance report matches one of the excluded receivables identified in the purchase agreement schedule?

A.  Yes.

Q.  Now, if we can highlight a number of these.  We have -- just taking examples, your Honor, from DX 2.  If we can take a look at or highlight on DX 2, row 87, under the tab identified as "Amazon Excluded."  Now it is shaded in gray.

Do you see that, Agent, on your screen?

A.  Yes.

Q.  And why don't we take note again of the PO number that is highlighted on this -- on your screen right now underline 87.

Martinez – Cross

L9e2LluH

1   Can you read that out for us?

2   A.   The PO number.  16-00825094.

3   Q.   Okay.  And the invoice amount that's in blue in the middle

4   of the screen associated with this customer PO number is

5   $26,320.85, correct?

6   A.   Yes, that's the amount listed.

7   Q.   And that's also the amount listed as collected and was

8   included in the remittance letter, correct?

9   A.   Yes.

10  Q.   And the remittance number for this line item for this

11  invoice refers back to the bank reference number ending in

12  5810.  Correct?

13  A.   Yes.

14  Q.   Date collected, May 10, 2018, correct?

15  A.   Yes.

16  Q.   And that refers back to the DX 1 line item we were looking

17  at as part of the payment that was made by Amazon in the

18  amount -- total amount of $1.7 million, correct?

19  A.   Correct.

20  Q.   Now if we could go back to GX 50, schedule 5.15, again, it

21  is the excluded receivable list or schedule, correct?

22  A.   Correct.

23          THE COURT:  What exhibit is that?  It's Exhibit 8.

24          MR. MAZUREK:  GX 50.  This was a schedule that was in

25  the original government exhibit, PX schedule 5.15.

Martinez - Cross

L9e2LluH

1    THE COURT: Well, right, it's not -- oh, is it

2    actually part of 50 or is it DX 89.

3    MR. MAZUREK: It was part of 50. They included the

4    schedule in their original exhibit.

5    THE COURT: But I guess what I am asking is the one

6    that is in my packet, I had thought when we initially had the

7    conversation yesterday that 50 was the purchase agreement but

8    not the schedules and that there was a discussion that they

9    could be paired up between the schedules which I think the

10    defense produced as DX 8.

11    MR. MAZUREK: Yes, but just to clarify, the government

12    did include in their original GX 50 some schedules, and this

13    was one of the schedules they originally included as part of

14    their exhibit.

15    THE COURT: Okay. All right.

16    MR. MAZUREK: DX 8 has all of the other schedules that

17    are not part of --

18    THE COURT: I'm just trying to figure out where to

19    look for it.

20    MR. MAZUREK: DX 50, schedule 5.15, it start in Bates

21    number 182565.

22    THE COURT: Okay. Go ahead.

23    MR. MAZUREK: So now if we can highlight on -- we are

24    on Bates stamp payment 182568 now and highlight that item that

25    identifies customer PO number 16-00825094.

L9e2LluH                          Martinez - Cross

1          THE COURT:  While you are looking for it, does either

2     party know how many either -- in schedule 5.15, how many

3     entries there are for excluded receivables and/or how many

4     total excluded receivables are there that are part of the

5     purchase agreement?  I am just looking for a number.

6          MR. MAZUREK:  Well, your Honor, the total that was

7     paid by RES to Luis Lluberes --

8          THE COURT:  I'm actually just looking at -- all I'm

9     asking about is the sheer number.  In other words, each line

10    item, as I understand it, in schedule 5.15 is a separate

11    excluded receivable.  So there are about six pages, so I am

12    just asking what number?  In other words, are there 200?  Are

13    there 300.  That's what I am trying to figure out.

14         MR. MAZUREK:  There is at the bottom of the schedule

15    total identified as $6,204,030.86.

16         THE COURT:  I understand the total.  Here is the

17    issue.  Right?  As I understand it, Mr. Mazurek, what you are

18    trying to show is if you tick and tie that certain of these

19    payments will show that they came from, let's say, Amazon.

20    What I am trying to figure out is how many of those separate

21    entries, in other words, are part of the -- not separate

22    entries, how many just by sheer number -- I understand it's

23    dollar amount, but are those 300 separate receivables or 200

24    separate receivables?  That's the only thing I am asking.  I

25    understand the dollar amount.  You may not know.  I can count

Martinez - Cross

L9e2LluH

1    them up myself.

2              MR. MAZUREK:  I haven't --

3              MR. NESSIM:  Speaking for the government, we don't

4    know, but we can get that number.

5              THE COURT:  Okay.  Meet and confer so you can come up

6    with an understanding.  I am just trying to figure out because

7    literally, right, if you were -- if, as I understand the

8    dispute with regard to the receivables the government is

9    concerned that certain of them may not be legitimate

10   receivables, but therefore monies were paid that shouldn't have

11   been paid.  The defense is trying to show that, no, in fact,

12   that was -- it was in fact -- there are -- in a tick and tie,

13   you could show that that was in fact the case.  The amount we

14   are talking about here is $300,000, right?  So --

15             MR. MAZUREK:  You mean in this hearing generally?

16             THE COURT:  Yes, yes.  That's the amount in dispute or

17   at issue.

18             MR. MAZUREK:  At issue.

19             THE COURT:  So I am just trying to get in my own head

20   what the scope of it is and -- but why don't you continue,

21   because I can -- I can get the separate number and I have the

22   dollar amount, which is fine.  So go ahead.  I apologize for

23   interrupting.

24             MR. MAZUREK:  Just because I don't want to have to

25   belabor this or extend this beyond what your Honor needs or

Martinez - Cross

L9e2LluH

1    what I guess we feel is sufficient for the record, but this

2    goes to those three transactions from RES to Luis Lluberes that

3    total approximately $6.2 million.  They are identified as the

4    excluded receivable payments in the government's summary chart

5    at GX 100.

6                THE COURT:  Yes.

7                MR. MAZUREK:  So obviously it's the government's

8    burden, as we all know, to determine what value of those are

9    proceeds as opposed to what value of those are legitimate

10   customer payments.

11               THE COURT:  Yes.

12               MR. MAZUREK:  And again, we can continue to tick and

13   tie the different amounts in DX 1 and 2 with the excluded

14   receivable schedule in DX 50 to show that for the major

15   customers that there were payments directly from the customer

16   on the PNC Bank statement from Amazon, from Pactiv, another one

17   of their largest customers, that tie with the bank reference

18   number for that specific -- for those specific deposits into

19   the RES bank account.

20               THE COURT:  Okay.  But a payment -- well, we can talk

21   about this later because the payments, let's say -- well, why

22   don't you continue, because I think I understand the point that

23   you are making, for Amazon right now.  That's I think the one

24   we are on.  They tie up or at least for the ones that you have

25   mentioned so far.

L9e2LluH                              Martinez - Cross

1          MR. MAZUREK:  Yes, for the $1.7 million bank statement

2    deposits.

3          THE COURT:  Yes, out of the 6.2, yup.

4          MR. MAZUREK:  Maybe an easier way just to expedite

5    matters, because there is no jury, so just to complete what we

6    would present, if I can just proffer into the record the other

7    matching examples that we would have this agent go through,

8    which is just reading off the different exhibits.

9          THE COURT:  What I would suggest is the following:

10   You can either do that now, because all you are doing --

11   because the agent doesn't -- I mean, right, so if -- you can

12   either do that now, and the government can verify exactly what

13   you are saying, or you could do it after the testimony and

14   provide the government with what you were going to do and they

15   can verify that yes, in fact, if you were to go through the

16   exercise with the agent, that they in fact would tie up for

17   whichever the ones that you were going to indicate.  But you

18   can put it on the record now, and that way the government has

19   it, it is on the record, and they could indicate, once they are

20   able to take a look at the underlying documentation, whether

21   they agree.

22         MR. MAZUREK:  Okay.  Then if I just may --

23         THE COURT:  I know you were planning on going through

24   step by step.

25         MR. MAZUREK:  So for the Amazon set of transactions or

Martinez - Cross

L9e2LluH

1    invoices that were identified in DX 2, we also have tied the

2    AR, line 87, again, within the Amazon Excluded tab in DX 2 to

3    the schedule for 5.15 of excluded receivables and matching with

4    the bank reference number ending in 5810, again, part of the

5    $1.7 million deposit. And we have done the same for line 20

6    of --

7             MR. CHIUCHIOLO: Maybe I can just cut this short. The

8    government acknowledges the entire amount of that 1.78 million

9    goes -- is -- appears to be from Amazon in the -- on the bank

10   statement and the excluded receivables tie back.

11            THE COURT: Okay.

12            MR. CHIUCHIOLO: Is that --

13            MR. MAZUREK: That's perfect.

14            THE COURT: Okay. Thank you.

15            MR. MAZUREK: And would the government make the same

16   concession as to Pactiv? Maybe the way to do this is just use

17   the bank statement first and then they can make their statement

18   if they also agree. So let's turn to DX 1, which is the PNC

19   Bank statement, and if we can highlight three entries on the

20   statement for May of 2018, dated May 15. This is on Bates

21   number page PNC 7483. These three deposits are in the amounts

22   of $50,290.05, $277,308.63, and $427,465.93. See those

23   highlighted on your screen did you want to make that?

24            MR. CHIUCHIOLO: The government will acknowledge that

25   these three payments that are highlighted from May 15 appear to

Martinez - Cross

L9e2LluH

1    come from Pactiv and, yes, they appear to come from Pactiv.

2            MR. MAZUREK:  And they tie back to, just to complete

3    this process, they tie back to DX 2 under the Pactiv excluded

4    tab at lines -- at various lines within the Pactiv excluded tab

5    that tie -- that include that remittance number ending in 2906

6    and which are included in schedule 5.15 of the excluded

7    receivables.

8            MR. CHIUCHIOLO:  So the government would acknowledge

9    that on the spreadsheet those three payments we just looked at

10   in the PNC Bank account were presented to RES as excluded

11   receivable payments.

12           THE COURT:  All right.

13           MR. MAZUREK:  Ms. Haramati is also asking me to

14   clarify that we have also put on the record that those

15   Pactiv -- the Pactiv purchase order numbers and document

16   numbers tie back to schedule 5.15 in Government Exhibit 50 as

17   being included in the excluded receivable list.

18           MR. CHIUCHIOLO:  Your Honor, we have not personally

19   compared the numbers but we have no reason -- again, they

20   purport -- these payments purport to be excluded receivable

21   payments under the purchase agreement.  I have no reason to

22   believe that they wouldn't.

23           THE COURT:  And there are various excluded

24   receivables, I note, that are Pactiv-Reynolds, and then it

25   appears to be it looks like different locations for Pactiv.

Martinez — Cross

L9e2LluH

But is Pactiv-Reynolds the Pactiv that you are referring to,

Mr. Mazurek?

MR. MAZUREK:  Yes.

THE COURT:  All right.  So and this is —— so there are

certain receivables that are from an entity called Pactiv that

are part of 5.15.  So what I would suggest, again, is that, to

the extent there is additional legwork the government would

need to do, they can confirm that.  In other words, I assume

for purposes of the hearing that, Mr. Mazurek, the —— what you

were doing with regard to Amazon you would be able to do with

regard to Pactiv, and the government just needs to confirm that

because this witness has no independent knowledge and hasn't

reviewed the spreadsheet.  So the only issue left is for the

government to take a look at the listing that you were going to

have for Pactiv and just confirm that each of them are on the

part of the schedule for the schedule 5.15 of the excluded

receivables that are attached to the agreement.

MR. MAZUREK:  Yes.

MR. CHIUCHIOLO:  And that's fine, your Honor.  We

would just reserve our right, in the event we wanted to present

additional evidence on these Pactiv invoices, that we would be

able to do so.

THE COURT:  Understood.  In other words, if it turns

out to be some issue, then let me know.  But failing that, I

just want to get conversation that the parties agree that if

L9e2LluH                        Martinez - Cross

1    you go through that they would tie out to the schedule 5.15.

2              MR. MAZUREK:  Yes.

3              THE COURT:  Okay.

4              MR. MAZUREK:  And again, just to put a bow on all of

5    this, the three bank deposits that tie back with the reference

6    number to the internal PO and invoice numbers total an amount

7    of $755,064.60 for the record?

8              THE COURT:  Okay.

9    BY MR. MAZUREK:

10   Q.  So if we can switch gears now, Agent, I would like to talk

11   to you about your direct testimony relating to a bank account

12   under the name of HR Platform.  Are you familiar with that?

13   A.  Yes.

14   Q.  And that was a Bank of America account I think you

15   testified to yesterday?

16   A.  I believe so.

17   Q.  And it was admitted as GX 4 for the record.

18              Now, you testified yesterday that the initial -- the

19   initial payment to Luis Lluberes from RES was in the amount of

20   about $10.1 million, right?

21   A.  Approximately, yes.

22   Q.  And that was done in May of 2018, correct?

23   A.  I believe so, yes.

24   Q.  And you also testified yesterday that, based on your review

25   of GX 4, the HR Platform bank account statements, that that's

Martinez — Cross

L9e2LluH

1    about the same time that HR Platform was open, that bank

2    account was open?

3    A.   Yes.

4    Q.   And you testified yet that HR Platform was, after your

5    review of all of the bank account statements, was 100 percent

6    funded by Luis Lluberes from a deposit from a Luis Lluberes

7    bank account.

8    A.   I believe so, yes.

9    Q.   I am going to ask that we put on the screen, please bear

10   with me again as we go through this process, if we could look

11   at Government Exhibit 1.

12          That is the Espheria bank account, correct?

13   A.   Yes.

14   Q.   And if we can turn to page 89 of that exhibit, having Bates

15   number USAO 29343, and can you highlight that section or that

16   transaction on that page in the amount of $1,883,220.84.

17          Okay.  Do you see that item highlighted on your

18   screen, Agent?

19   A.   Yes.

20   Q.   And this is under the section of the bank statement for

21   deposits and other credits, correct?

22   A.   Yes.

23   Q.   So this is a deposit into the Espheria bank account, dated

24   May 24, 2018, and can you determine where that money came from?

25          MR. CHIUCHIOLO:  Objection to relevance, your Honor.

L9e2LluH                      Martinez - Cross

1   This is going to be based on the case law that AUSA Nessim

2   cited yesterday.

3            THE COURT:  Okay.  Understood.  Go ahead.

4   BY MR. MAZUREK:

5   Q.  Okay.  Can you tell from the entry in the Espheria bank

6   account statement where the $1.883 million came from?  Who was

7   the sender?

8   A.  The sender was HR Platform Consulting.

9   Q.  Is that the same bank account that was admitted into

10  evidence, GX 4, yesterday?

11  A.  I would have to look at the account numbers.

12           MR. MAZUREK:  Your Honor, I would proffer that it is

13  GX 4 without having to go back to GX 4 to prove that.

14           THE COURT:  Okay.

15  BY MR. MAZUREK:

16  Q.  And now I would ask, and again, just to complete this line

17  of questioning, HR Platform was totally funded by Luis Lluberes

18  and -- correct -- monies from the acquisition.

19  A.  I believe so, almost entirely, if not all, mostly funded

20  by --

21  Q.  Except for maybe de minimis --

22  A.  Yes.

23  Q.  -- deposits or interest or something?

24  A.  Possibly, yes.

25  Q.  Okay.

Martinez - Cross

L9e2LluH

1          So now if we could turn to the Bates number that's of

2   GX 1 ending in 29343, also dated May 24, 2018.  There is a

3   withdrawal in the amount of $1,274,1 -- sorry a deposit, it is

4   still a deposit, in the amount of $1,274,193.82.

5          Do you see that?

6   A.  Yes.

7   Q.  And this is still under deposits and credits, correct?

8   A.  Yes.

9   Q.  And this is another deposit coming from the HR Platform

10  account, correct?

11  A.  It appears to be, yes.

12          MR. CHIUCHIOLO:  Your Honor, I will just make a

13  standing objection to this line of questioning.

14          THE COURT:  Understood.

15  BY MR. MAZUREK:

16  Q.  When you say it appears to be, you have no reason to

17  believe this Bank of America bank statement was altered in any

18  way?

19  A.  No, just referring to tracing the account numbers,

20  verifying that the account number matches the account number

21  from HR Platform.

22  Q.  Okay.

23          Now if we can go to the next page on that exhibit,

24  ending in Bates numbers 29344, and highlight an entry dated May

25  31, 2018, in the amount of $305,135.81.  Do you see that?

Martinez – Cross

L9e2LluH

1    A.  Yes.

2    Q.  And again, this is a deposit made into the Espheria account

3    from HR Platform Consulting, correct?

4    A.  Yes.

5        MR. MAZUREK:  If we can turn to the next month's bank

6    account statement for Espheria.

7        THE COURT:  The government's objection with regard to

8    that is noted, and the next month is?

9        MR. MAZUREK:  June of 2018.

10       THE COURT:  Okay.

11       MR. MAZUREK:  And go to Bates number ending in 29349,

12   and highlight the deposit dated June 8, 2018, in the amount of

13   $1,200,001.41.

14   Q.  Do you see that?

15   A.  Yes.

16   Q.  And that is also a deposit from HR Platform Consulting,

17   correct?

18   A.  Yes.

19   Q.  Also in that month's statement, on that same page, there is

20   an item, if we could highlight, dated June 20, 2018, a deposit

21   in the amount of $1,121,565.20.  Do you see that?

22   A.  Yes.

23   Q.  That's also a deposit from the HR Platform Consulting bank

24   account, correct?

25   A.  Yes.

Martinez - Cross

L9e2LluH

1    Q.  If we could then turn to the next month's bank statement,

2    July 2018, and turn to the page of that statement ending in

3    Bates number 29355.  And if we could highlight the entry dated

4    July 26, 2018 in the amount of $1,546,281.26.

5                Do you see that, Agent?

6    A.  Yes.

7    Q.  And where was -- who was the sender of that deposit?

8    A.  It appears to be HR Platform Consulting Group.

9    Q.  Okay.  Then we turn to the next month's bank statement,

10   Espheria bank statement, August of 2018, and specifically to

11   Bates number ending in 29355, and highlight an entry dated

12   August 23, 2018 in the amount of $1,201,386.20.  Do you see

13   that?

14   A.  Yes.

15   Q.  And who appears to be the sender of that deposit into the

16   Espheria account?

17   A.  HR Platform Consulting.

18             THE COURT:  Just for the -- what is the Bates number

19   for that?  I'm sorry.

20             MR. MAZUREK:  Ending in 29355, right?

21             THE COURT:  Is it?  I don't think so.

22             MR. MAZUREK:  Oh, 29361.  I apologize.

23             THE COURT:  That's okay.  29365.

24             MR. MAZUREK:  1.

25             THE COURT:  1.  I'm sorry.

Martinez — Cross

L9e2LluH

MR. MAZUREK:  A lot of numbers.  I apologize.

BY MR. MAZUREK:

Q.  We are going to stick with that page for a little bit and highlight an item that's dated August 29, 2018 in the amount of $856,211.49.  Do you see that, Agent?

A.  Yes.

Q.  And where does that deposit appear to come from?

A.  HR Platform Consulting.

Q.  And then let's go down to August 31, 2018, on that same page, and a total amount of $246,211.23.

Do you see that?

A.  Yes.

Q.  And where does that deposit or does the bank statement indicate that deposit came from?

A.  HR Platform Consulting.

Q.  Okay.  And by the way, before we move off of this page, you have had a chance to review the Espheria bank account statements, right?

A.  Yes.

Q.  And you know that -- I think you testified yesterday that a majority of the large amounts of deposits into that account came from an account called Hiring Pros, correct?

A.  Yes.

Q.  And the only other significant set of deposits into that account, substantial deposits into that account came from HR

Martinez - Cross

L9e2LluH

1    Platform Consulting, correct?

2    A.   Into the Espheria account?

3    Q.   Yes?

4    A.   Yes.

5    Q.   Other than those two accounts, you did not see substantial

6    deposit activity in Espheria, in the Espheria bank account.

7    A.   Based on my review, yeah, I did not see any other

8    substantial to that magnitude.

9    Q.   Okay.  If we could turn to the January 2019 bank statement

10   for Espheria, it can be -- I think it can be found at Bates

11   numbers 29394, and if we could highlight a deposit dated

12   January 31, 2019, in the amount of $115,345.08.

13            Do you see that?

14   A.   Yes.

15   Q.   And who is the sender for that deposit?

16   A.   HR Platform Consulting.

17   Q.   And one final entry, if we could turn to the March 2019,

18   yes, March 2019 Espheria bank account found in GX 2.  There are

19   two bank accounts that Espheria had, right --

20   A.   Yes.

21   Q.   -- at Bank of America?

22            Yes?

23   A.   Yes.

24   Q.   We have been looking at the first account which was

25   identified as the operating account, correct?

L9e2LluH                        Martinez - Cross

1   A.  I don't recall whether it was the operating account or what

2   not.  I'm sorry.

3   Q.  GX 2, if we could put that on the screen, the first page,

4   this is an account, an account ending in the numbers 3813.  Do

5   you see that on the bottom right?

6   A.  Yes.

7            MR. MAZUREK:  And this has already been admitted into

8   evidence, your Honor?

9            THE COURT:  Yes.

10           MR. MAZUREK:  And if we could turn to the March 2019

11  bank statement for the 3813 account, and specifically highlight

12  an entry dated March 28, 2019, a deposit in the amount of

13  $1,533,116.20.

14           THE COURT:  What's the Bates number for that page.

15           MR. MAZUREK:  The Bates number for that page is 29563.

16  BY MR. MAZUREK:

17  Q.  Do you see that, Agent?

18  A.  Yes.

19  Q.  And again, who was the sender in that amount or for that

20  deposit?

21  A.  It appears to be HR Platform Consulting.

22  Q.  And before we go away from that screen, do you see a series

23  of withdrawals and other debits right below it?

24  A.  Yes.

25  Q.  All dated March 29, 2019, correct?

Martinez — Cross

L9e2LluH

1    A.  Yes.

2    Q.  And that would be the day after the 1.5 deposits that we

3    just talked about, correct?

4    A.  Yes.

5    Q.  And is it correct that each of the withdrawals dated March

6    29, '19 on this bank account statement went to the benefit of a

7    bank account in the name of Research Employment?

8    A.  The description says Resource Employment, but I don't know

9    just by reviewing this.  I would have to review both records,

10   but it says Resource Employment.

11   Q.  Okay.  So the bank account statement, the Bank of America

12   bank account statement indicates in a Resource Employment --

13   there is an account in the name of Resource Employment that had

14   withdrawals from the Espheria account to the Research

15   Employment account in the total amount of $1,497,955.45,

16   correct?

17   A.  Correct.

18   Q.  And except for about $35,000, short of $35,000, that is

19   almost the entire amount of deposits that went into that

20   account that month, correct?

21   A.  Yes.

22   Q.  And if we could turn to the first page of that month's bank

23   statement.  Okay.

24             What was the beginning balance in that bank account

25   statement as of March 1, 2019?

L9e2LluH                              Martinez - Cross

1    A.  $100.

2    Q.  And based on your view of this 3813 bank account statement

3    is it fair to say that this account did not have much activity

4    other than in this one month?

5    A.  That's fair to say.

6            MR. MAZUREK:  May I just have one moment, your Honor?

7            THE COURT:  Yes.

8            (Pause)

9            MR. MAZUREK:  Your Honor, for the benefit of the Court

10   and the government, we have excerpted the testimony of the

11   agent with respect to those transfers from HR Platform to the

12   Espheria bank account.  I have premarked it for identification

13   as DX 9 and I would like to admit it as a summary chart.

14           MR. CHIUCHIOLO:  The government hasn't been provided a

15   copy of it.  I would just note for the record it is a computer

16   printout.  I'm not sure -- if it wasn't just handwritten behind

17   us, I'm not sure why we are being provided with it right now,

18   but we can review it.

19           THE COURT:  I don't have a copy yet, so . . .

20           MR. MAZUREK:  Handing it up to the Court.

21           THE COURT:  Yes.

22           MR. MAZUREK:  Without additions, the corrections of

23   the Bates numbers for the line items from August 23, they

24   should read 6/1 at the end of those Bates numbers.

25           THE COURT:  Let me just back up.  So I had

L9e2LluH                         Martinez - Cross

1    misunderstood.  So the testimony you are talking about is the

2    testimony you just took him through, and this is a summary

3    chart of what you indicated that you would have taken but, in

4    other words, each item in Government Exhibit 1 that you took

5    Agent Martinez through.

6            MR. MAZUREK:  Government Exhibit 1 and Government

7    Exhibit 2, the last item.

8            THE COURT:  The last item and then the total at the

9    bottom.

10           MR. MAZUREK:  That's correct.

11           THE COURT:  I will take it subject to -- and, again, I

12   understand it's a summary chart, and I will take your proffer

13   that you went through each of these and that the math is

14   correct.  And if the government has an objection, they can

15   review it and their objection would also be the objection that

16   was made earlier to the relevance of it.  Is that right?

17           MR. CHIUCHIOLO:  Yes, your Honor.  The objection is

18   obviously to the relevance of this and the entire line of

19   testimony on this topic.

20           MR. MAZUREK:  And again, just to complete the record,

21   the total on DX 9 for the testimony of this agent about the

22   transfers from the HR Platform Bank of America account to the

23   Espheria Bank of America account equals $11,282,668.54.

24   BY MR. MAZUREK:

25   Q.   Okay.  I would like now, Agent, to turn your attention to

Martinez - Cross

L9e2LluH

1    specific payments or specific transactions relating to the

2    Moises Lluberes personal bank account at Chase Manhattan Bank.

3    Is that one of the accounts that you reviewed?

4    A.   Yes.

         MR. MAZUREK:  For the record, that was admitted

5

6    yesterday as GX 6.

7    Q.   In your direct examination yesterday, your direct testimony

8    yesterday, you testified about -- partly about transactions

9    from the Moises Lluberes Chase account to Coinbase account,

10   correct?

11   A.   Yes.

12   Q.   And I believe you also testified that transactions

13   identified on the bank account statement to Coinbase could not

14   be identified -- you could not identify just from the Chase

15   account statements what Coinbase account those transfers would

16   be made to.

17   A.   Judging from the statements, that's correct, I cannot

18   interpret which account.

19   Q.   You also testified yesterday about a series of transfers

20   from Luis Lluberes accounts to the Moises Lluberes Chase

21   account, correct?

22   A.   Correct.

23   Q.   And just for clarity you, in all of your review of the bank

24   statements related to Moises Lluberes, you were unable to

25   identify any deposits into the Moises Lluberes Chase or other

L9e2LluH

Martinez — Cross

1  bank statements, other bank accounts that were traced back to

2  acquisition proceeds from RES?

3       MR. CHIUCHIOLO:  Objection.  Foundation -- objection

4  to ambiguous.

5       THE COURT:  Well, let's take it in parts because you

6  referred to accounts.  Why don't you take it one account at a

7  time --

8       MR. MAZUREK:  Sure?

9       THE COURT:  -- and ask the question again.

10      MR. MAZUREK:  Okay.

11  BY MR. MAZUREK:

12  Q.  You were asked by the government prior to your testimony to

13  identify any proceeds from RES related to the acquisition of

14  the company by Union Capital, correct?

15  A.  I'm sorry.  Repeat that one more time.

16  Q.  Yes.  Prior to your testimony, one of the things that you

17  were asked to identify in your summary charts, GX 100 and 101,

18  were any transactions from RES to Moises or Luis Lluberes

19  relating to the acquisition of the company by Union Capital.

20  A.  Yes.

21  Q.  Okay.  And as part of that you looked for any withdrawals

22  from the RES bank accounts to the accounts of Moises or Luis

23  Lluberes, correct?

24  A.  I looked for deposits into the accounts of Moises and

25  Luis.

L9e2LluH                          Martinez - Cross

1    Q.  From RES.

2    A.  From RES.

3    Q.  And specifically to identify any proceeds relating to the

4    acquisition of Union -- by Union Capital of RES, correct?

5    A.  Correct.

6    Q.  And in your testimony yesterday in the shaded portions of

7    your summary chart at GX 100, you identified those shaded

8    portions of GX 100 are the transactions that you identified as

9    from RES to Luis Lluberes for the purchase of RES, correct?

10   A.  I don't recall why we shaded those, but potentially, yes.

11   Q.  Do you want to see your exhibit?  Would it be help?

12   A.  Yes, please.

13           MR. MAZUREK:  Maybe it would be easier if I just show

14   a physical copy of it to the witness.

15           May I approach.

16           THE COURT:  Yes, you may.  This is Government Exhibit

17   100?

18           MR. MAZUREK:  Yes.  The summary chart identified at

19   GX 100.

20           THE COURT:  Okay.

21   BY MR. MAZUREK:

22   Q.  If you could just review that, Agent, and tell me after you

23   review it, whether the shaded portions of your summary chart

24   indicate the entirety of the transactions related to the sale

25   of RES, the payments to Luis Lluberes from RES related to the

Martinez - Cross

L9e2LluH

1  purchase by Union Capital?

2  A.  I will just say this is a summary of transactions so it may

3  not encompass all payments from RES to Moises or Luis Lluberes.

4  Q.  No, I get -- maybe my question was not clear.  Let me try

5  again.  The shaded portion --

6  A.  Oh.

7  Q.  -- of your Exhibit GX 100, the significance of why those

8  items on your summary chart are shaded is because those

9  represent what you identified you have as the payments made by

10  RES to Luis Lluberes for the sale of RES to Union Capital.

11  A.  I did not do the shading on the chart, so --

12         THE COURT:  Okay, how about this, Agent.  If you could

13  flip through Government Exhibit 100 and look at the shaded

14  portions and just indicate whether the shaded portions indicate

15  acquisition funds, in other words, funds coming into Luis

16  Lluberes's Bank of America account.

17         THE WITNESS:  Yes, your Honor, it does.

18         THE COURT:  Okay.  All right.

19  BY MR. MAZUREK:

20  Q.  And as far as you know, you know that Moises Lluberes was

21  not an owner of the RES company that was sold to Union Capital,

22  is that correct?

23  A.  That's correct.

24  Q.  That the sole shareholder was Luis Lluberes, correct?

25  A.  I believe so, yes.

Martinez - Cross

L9e2LluH

1    Q.  And so that the only payments that were made by RES at --

2    strike that.

3         The only payments that were made by Union Capital for

4    the purchase of RES were made directly to Luis Lluberes,

5    correct?

6    A.  I believe so.

7    Q.  You didn't find any payments that were made -- that were

8    made by RES to Moises Lluberes for the sale of RES, correct?

9    A.  Correct.

10   Q.  Okay.

11        Now, let me ask you about certain transfers that you

12   identified in your summary chart from Luis Lluberes to the

13   Moises Lluberes Chase account in Government Exhibit 6.  And

14   specifically if we could turn -- if we could put on the screen,

15   I should say, the Luis Lluberes bank account statement at GX 5,

16   specifically at Bates number 26485.  So now we are in the Luis

17   Lluberes Bank of America bank statement, and if you could go to

18   the top, you see this is for the month of August 2019?

19   A.  Yes.

20   Q.  And we are in the withdrawals and other subtractions

21   portion of the statement, correct?

22   A.  Yes.

23   Q.  Okay.  And if we could, on Bates number 26482, highlight --

24   okay, we are going to start with a deposit section 26482,

25   highlight the entry on August 1, 2019, in the amount of

L9e2LluH                          Martinez - Cross

1    $100,917.

2              Do you see that?

3    A.   Yes.

4    Q.   And according to the description in the Bank of America

5    bank account statement for the deposit, where did this $100,917

6    appear to come from?

7    A.   Resource Employment Solutions.

8    Q.   And which bank?

9    A.   PNC Bank.

10   Q.   Okay.  And again, the date of that transaction?

11   A.   August 1, 2019.

12   Q.   Okay.  Now if we could turn to Bates number 26485 and

13   highlight the top entry on that page dated August 6, 2019, and

14   the round amount of $100,000.

15             Do you see that?

16   A.   Yes.

17   Q.   And what does this withdrawal or subtraction appear to be

18   on the Bank of America statement?

19   A.   It appears to be a wire to Moises Lluberes.

20   Q.   An account in the name of Moises Lluberes?

21   A.   Yes.

22   Q.   At which bank?

23   A.   JPMorgan.

24   Q.   And was there a memo line that was indicated on that

25   transaction?

Martinez - Cross

L9e2LluH

1   A.  Yes.

2   Q.  What does it read?

3   A.  "Repayment July 19."

4   Q.  Now if we could go to the Moises Lluberes Chase Bank

5   statement, admitted at Government Exhibit 6, and turn to the

6   Bates page identified as U.S. Attorney's Office 38677.

7           You reviewed the Moises Lluberes Chase bank statement

8   in preparation for your testimony?

9   A.  Yes.

10  Q.  You recognize that these were all -- these were provided by

11  Chase Bank pursuant to subpoena, correct?

12  A.  Yes.

13  Q.  And the documents were provided in Spanish, is that right?

14  A.  Yes.

15  Q.  Do you understand the Spanish that's identified here on

16  this bank account statement?

17  A.  More or less.

18  Q.  Okay.  Can we highlight the entry dated August 6, 2019?

19          And that's under the title of the Depositos y

20  Adiciones.  Yes?

21  A.  Yes.

22  Q.  And you understand that means deposits and additions,

23  correct?

24  A.  Correct.

25  Q.  What do you understand was the nature of where this

Martinez - Cross

L9e2LluH

1    $100,000 deposit into came into on the Moises Lluberes Chase

2    account on August 6?

3    A.  This appears to be a wire or electronic transfer from the

4    Bank of America account belonging to -- in the name of Luis E.

5    Lluberes.

6    Q.  And does this have the same memo line --

7    A.  Yes, sir.

8    Q.  -- that was just looked at, right?

9    A.  Um-hmm.

10   Q.  This appears to be the other side of the same transaction

11   we just looked at in Government Exhibit 5 of Luis Lluberes Bank

12   of America statement, correct?

13   A.  Correct.

14   Q.  And now can we go back to Government Exhibit 5, the Luis

15   Lluberes Bank of America statement and go to the deposit

16   section.

17           So we were just looking at the withdrawal from the

18   Bank of America account, Luis's account to Moises's account,

19   correct?

20   A.  Correct.

21   Q.  Now I am asking to look at the deposit section of the Luis

22   account, Luis Lluberes account.  We looked at this originally

23   as the deposit dated August 1, 2019, of $100,917 from the

24   Resource Employment account at PNC Bank, right?

25   A.  Yes.

L9e2LluH                        Martinez - Cross

1   Q.  There is also a memo line associated with that deposit,

2   correct?

3   A.  Yes.

4   Q.  Can you read what that says?

5   A.  It says "seller refund of Travelers."

6   Q.  Based on your experience, agent, the memo line of a wire

7   transaction like this is input by the sender of the wire to the

8   recipient of the wire, correct.

9   A.  Correct.

10  Q.  So in this instance the seller refund of Travelers would be

11  entered into by the account holder Resource Employment

12  Solutions at PNC Bank, correct?

13  A.  Correct.

14  Q.  Now I am asking if we could put on the screen what has --

15  just one moment.

16          If we could put on the screen Luis Lluberes's Chase

17  Bank account -- I'm sorry, Bank of America bank account at

18  GX 5, and go to the January 2019 statement, Bates number ending

19  in 26432.

20          Do you see that on your screen, Agent?

21  A.  Yes.

22  Q.  And this appears to be the bank account statement for Luis

23  Lluberes for the dates of January to February 2019, correct?

24  A.  Correct.

25  Q.  And if we could highlight an entry at January 29, 2019, in

Martinez - Cross

L9e2LluH

1    the amount of $39,700.

2              Do you see that?

3    A.  Yes.

4    Q.  And can you tell us what -- where this deposit -- I'm

5    sorry, where this withdrawal, who it was sent to?

6    A.  So the beneficiary listed is Moises Lluberes at a JPMorgan

7    account.

8    Q.  And what is the memo line for this wire out from Luis

9    Lluberes to Moises Lluberes?

10   A.  It's that string of numbers and then "tax payment."

11   Q.  And what is the date again?

12   A.  January 29, 2019.

13   Q.  And if we could now open up Government Exhibit 5, I'm

14   sorry, Government Exhibit 6, the Moises Lluberes Chase account,

15   and go to Bates number ending in 38628.

16              And does this appear to be the Moises Lluberes Chase

17   bank statement for the period of January to February 2019?

18   A.  I'm in between pages here.  Yes.

19   Q.  And again, it's the same time period that we were just

20   looking at in the Luis Lluberes Bank of America statement,

21   correct?

22   A.  Yes.

23   Q.  And if we can highlight the entry dated January 29, 2019 in

24   the amount of $39,700.

25              Do you see that?

L9e2LluH                                   Martinez - Cross

1   A.  Yes.

2   Q.  Does this appear to be the deposit of the wire that we just

3   saw that was sent from Luis Lluberes to Moises Lluberes?

4   A.  Yes.

5   Q.  And it has the same memo line of "tax payment," correct?

6   A.  Correct.

7   Q.  Now if we could put on the screen what's been premarked

8   for identification as Defendant's Exhibit 6, and this has --

9   for the record, your Honor, this was taken from the government

10  production of e-mails from Resource Employment, and it is an

11  e-mail from an individual named Kevin Delaplane,

12  D-E-L-A-P-L-A-N-E, at the e-mail address

13  Kevin@unioncapitalcorp.com to Louis_L@resourceemployment.com,

14  and copying Moises_L@resourceemployment.com.

15          MR. CHIUCHIOLO:  Can we just have the Bates number?

16          MR. MAZUREK:  We don't have the Bates number.

17          THE COURT:  Was this produced in native form and in

18  hard copy?

19          MR. MAZUREK:  I think it was just electronic form.

20          MR. CHIUCHIOLO:  Your Honor, my understanding is that

21  the government produced all e-mails with Bates numbers on them.

22          MR. MAZUREK:  We could go back and identify the Bates

23  number.

24          THE COURT:  Okay.  But --

25          MR. MAZUREK:  We just don't have it not on this

Martinez - Cross

L9e2LluH

1    transaction.

2         MR. CHIUCHIOLO:  Subject to the government looking at

3    it, we have no objection to its admission.

4         THE COURT:  So it is admitted subject to that, well,

5    subject to that objection.

6              (Defendant's Exhibit 6 received in evidence)

7    BY MR. MAZUREK:

8    Q.  And Agent, if you could just tell us what is the date of

9    this e-mail, when it was sent?

10   A.  It was sent Monday, February 11, 2019.

11   Q.  Okay.  And the subject line?

12   A.  "Resource" -- it's a forward e-mail, "Resource from Ohio

13   escrow amount."

14   Q.  And if you could read what -- this appears to be an e-mail

15   from Kevin Delaplane to Luis and Moises Lluberes and other

16   individuals?

17   A.  It appears to be, yes.

18   Q.  And can you read what Kevin is telling Luis and Moises

19   Lluberes?

20   A.  Yes.  It says:  Louis, as you know, Moises continues to

21   work with Steve Domingo in cleaning up the two Ohio State sales

22   tax lien matters.  On January 31, 2019, Resource Staffing, Inc.

23   filed returns covering various periods and included payments

24   totaling approximately 39,000.  Since these were obligations of

25   Inc., Moises paid the monies personally.  Attached is an escrow

L9e2LluH                          Martinez - Cross

1   release agreement to reimburse for the payments made.  To keep

2   it simple, the monies will be paid to Resource, the monies will

3   be paid to Resource, the company can in turn reimburse Moises.

4   Please review, execute and PDF back to me.  Let me know if you

5   have any questions.  Thanks.  Kevin.

6           MR. NESSIM:  Your Honor, just to note that Mr. Mazurek

7   has been going about an hour and 45 minutes, and the witness

8   has not had much personal knowledge about these documents.  If

9   we can prevent reading in, you know, lengthy --

10          THE COURT:  I read it, but if you want to point the

11  agent to certain specific points or paraphrase what it is and

12  just get him to agree or whatever, just to speed things along.

13          MR. MAZUREK:  Okay.  Well, I'm finished with this, but

14  in the future I will.

15          THE COURT:  All right.

16          MR. MAZUREK:  I think this was the only e-mail that we

17  will be looking at.

18          THE COURT:  Okay.  Let me ask, about how much more do

19  you think you have?

20          MR. MAZUREK:  I am -- two more subject matters.

21          THE COURT:  Okay.  All right.

22          MR. MAZUREK:  I'm finished with this subject matter.

23          THE COURT:  All right.

24          MR. MAZUREK:  Your Honor, may we take just a

25  five-minute break?

Martinez – Cross

L9e2LluH

1     THE COURT:  That was what I was trying to figure out,

2  in other words, how much time are those two subjects.  But we

3  can take a break now.  It is 11:41.  Why don't we say a

4  ten-minute break and come back at 11:51.  Okay?

5     MR. MAZUREK:  Thank you.

6     THE COURT:  All right.

7     (Recess)

8     THE COURT:  If we could get the agent.

9     Agent, just a reminder you are still under oath.

10     THE WITNESS:  Yes, your Honor.

11     THE COURT:  Okay.  Go ahead.

12     MR. MAZUREK:  If we could put on the screen Government

13  Exhibit 6, the Moises Lluberes Chase bank account, and can we

14  turn to Bates number ending in 38587, if we could scroll up to

15  the top of the page.

16  Q.  This appears to be the Chase Bank account statement for the

17  period of September to October 2018, correct?

18  A.  Yes.

19  Q.  In the name of Moises Lluberes, correct?

20  A.  Yes.

21  Q.  And if we could go to the deposit section of that account

22  statement and highlight the first entry dated September 25,

23  2018 in the amount of $202,098.59.

24     Do you see that?

25  A.  Yes.

L9e2LluH                          Martinez - Cross

1   Q.  According to the bank account statement, is this a deposit

2   coming from the Bank of America bank account statement in the

3   name of Luis Lluberes?

4   A.  Yes.

5   Q.  If we could then go to the withdraw section of that same

6   statement at Bates number 38592 and highlight the entry dated

7   September 26 in the amount of $202,050.59.

8           Do you see that?

9   A.  Yes.

10  Q.  And is that dollar amount almost equal to the dollar amount

11  of the earlier deposit we just looked at from the Luis Lluberes

12  account?

13  A.  Yes.

14  Q.  And is this a withdrawal to an account located in Santo

15  Domingo in Dominican Republic?

16  A.  It appears to be, yes.

17          MR. CHIUCHIOLO:  Your Honor, sorry for the

18  interruption.  Maybe just to speed things up, is your Honor

19  planning on having written submissions from the parties?

20  Because if you are, I think this is all in evidence this could

21  be --

22          THE COURT:  Well, the answer is, yes, in part to

23  distill what the parties believe has been presented to me and

24  to make whatever arguments that there are concerning obviously

25  the government's objections and any objections the defense may

L9e2LluH                          Martinez — Cross

1    have.

2              MR. CHIUCHIOLO:  I don't know if we need an agent on

3    the stand to go inflows and outflows.  We went through a couple

4    of examples yesterday.

5              THE COURT:  I guess, but what would need to happen, I

6    think -- and, again, I don't know, Mr. Mazurek, how many of

7    these are literally ticking and tieing with the records as

8    opposed to, in other words, asking the agent is this what this

9    particularly is and how much other testimony you have

10   concerning what the agents' work was.  But what would have to

11   happen, though, is that Mr. Mazurek would have to -- you would

12   have to meet and confer and go over each of the ones -- in

13   other words, before you make any submissions to me, everybody

14   would have to be on the same page as to what is -- from this

15   period on what is going to be referred to in other words, the

16   exhibits that are going to be, in essence, tied out with

17   deposits and withdrawals and the like.  Let me hear from the

18   defense.

19             MR. MAZUREK:  Yes.  Insofar as we don't have to go

20   through and put on the record the individual debits and credits

21   from the different accounts that are already in evidence, you

22   know, I am happy to work with the government in identifying

23   those for purposes of any post-hearing briefing.

24             THE COURT:  Okay.  Because that would short circuit --

25   obviously that would short circuit the need to go through the

L9e2LluH                          Martinez - Cross

1    record with the agent, with the understanding that, with regard

2    to the exhibits that are admitted, so literally it would just

3    be pointing out what you would have taken the agent through

4    here before me, and so -- and obviously, Mr. Mazurek, I am

5    not -- if you were going to do that with regard to some other

6    entries, that's fine, and if there is -- it would just short

7    circuit that portion of the cross.

8              MR. MAZUREK:  I understand.

9              THE COURT:  And then you can move to -- we could

10   discuss timing with regard to you meeting and conferring and

11   then at the conclusion of the hearing.

12             MR. MAZUREK:  Okay.  That will help, your Honor, I

13   think speed this process up.

14             THE COURT:  Okay.  So let me move to another topic.

15   BY MR. MAZUREK:

16   Q.  If we could put on the screen Government Exhibit 1.  I

17   guess it is already on the screen.  It is the Bank of America

18   Espheria account.

19             Do you see that, Agent?

20   A.  Yes.

21   Q.  And this account, the first statement that is identified in

22   this exhibit is dated as of March 2017, is that correct?

23   A.  Yes.

24   Q.  Is that your understanding the earliest time period when

25   this account was opened?

L9e2LluH                    Martinez - Cross

1    A.   Approximately.

2    Q.   And March of '17, based upon the information that you had

3    about this case, is approximately nine months prior to the

4    September 2017, which is the beginning of the charged crime in

5    the indictment, correct?

6    A.   That's correct.

7    Q.   And based on your review of the Espheria account, you were

8    aware that there were a number of deposits made in that account

9    from the time period of March through September of 2017?

10   A.   Yes, there appear to be deposits, yes.

11   Q.   And those deposits were deposits from sources other than

12   the RES bank account at PNC Bank, is that right?

13   A.   I would have to review them to refresh my memory.

14         MR. MAZUREK:   So for the point of, your Honor,

15   expediting matters -- I won't have to take him through this --

16   we created a summary chart of what we would be taking him

17   through premarked for identification as DX 10, which I am

18   submitting to the Court.   And again, with the condition that

19   the government needs time to review these specific transfers

20   that are located on the Bates numbers within Government Exhibit

21   1, we would ask that it be admitted for purposes of this

22   hearing.

23         MR. CHIUCHIOLO:   That's fine, your Honor.

24         THE COURT:   Okay.   So subject to that *proviso*, it is

25   admitted.   If it turns out that there is a correction of a

L9e2LluH

Martinez - Cross

1   Bates stamp number, a correction of an amount, or date or

2   something like that, I would just ask, obviously, Mr. Mazurek,

3   after you meet and confer with the government, if you need to

4   revise it, I would just ask to get a copy of whatever the

5   revisions are --

6           MR. MAZUREK:  Yes.

7           THE COURT:  -- for DX 10.

8           So DX 10 is admitted in evidence subject to the

9   parties meeting and conferring.  Okay.

10          (Defendant's Exhibit 10 received in evidence)

11          MR. MAZUREK:  I haven't provided one to the witness.

12  May I approach?

13          THE COURT:  You may.

14  BY MR. MAZUREK:

15  Q.  Now, if we could turn to the first entry on that summary

16  chart, Bates number 29257, a deposit in the amount of

17  $316,339.76.

18          Do you see that?

19  A.  Yes.

20  Q.  And that is a wire into the Espheria account from an

21  account held by -- in the name of Employment Resource Group.

22  Do you see that?

23  A.  Yes.

24  Q.  And you are aware of that Employment Resource Group was an

25  entity that existed prior to RES as the staffing company name

Martinez - Cross

L9e2LluH

1    that was controlled by Moises and Luis Lluberes?

2    A.  I'm not sure.

3    Q.  The bank that the Employment Resource Group deposited into

4    the Espheria account from is call Regions Bank, correct?

5    A.  Correct.

6    Q.  And the bank that has been the -- that RES had its bank

7    account during the time period charged in the indictment is PNC

8    Bank, correct?

9    A.  Correct.

10   Q.  Are you aware that RES -- the RES that's indicated in the

11   indictment was ever identified as Employment Resource Group?

12   A.  I'm sorry.  Can you repeat the question?

13   Q.  RES, the company that's identified in the indictment, are

14   you aware whether it was ever identified as or known as

15   Employment Resource Group?

16   A.  I'm not sure.

17            MR. CHIUCHIOLO:  Your Honor, the government is going

18   to make a standing objection to this entire line of

19   questioning.

20            THE COURT:  Okay, but just with regard to the

21   question, in other words, was the RES known as --

22            MR. MAZUREK:  Employment Resource Group.

23            THE COURT:  -- employment Resource Group to your

24   knowledge prior to?  I understand the objection.  I'm just

25   trying to figure out whether this agreement is just about

Martinez - Cross

L9e2LluH

1  that.

2          MR. CHIUCHIOLO:  Your Honor, I'm not sure.

3          THE COURT:  Okay.

4          MR. CHIUCHIOLO:  I believe the government has produced

5  some information about Regions Bank but, again, the

6  relevance --

7          THE COURT:  Okay, the agent doesn't know.  Go ahead.

8  BY MR. MAZUREK:

9  Q.  And if we could take -- we can now go to Bates number 29285

10  in that same exhibit, Government Exhibit 1, Espheria bank

11  account, and highlight the entry, which is the second line

12  above the summary chart DX 10, in the amount of 141,281.72, and

13  that's a deposit into the Espheria account, correct?

14  A.  Yes.

15  Q.  Dated September 18, 2017, correct?

16  A.  Yes.

17  Q.  And that comes from Resource Employment Solutions' account,

18  correct?

19  A.  Yes, an account in the name of Resource Employment

20  Solutions.

21  Q.  And you are aware that prior to the company RES banking at

22  PNC Bank, they banked with Bank of America, correct?

23  A.  I can't recall.  I'm sorry.

24  Q.  But from your reading and your understanding of bank

25  account statements, you understand that this is a book-in

Martinez - Cross

L9e2LluH

1    transaction as identified on that line item of the $141,000

2    deposit, right?

3    A.  Yes.

4    Q.  That's -- you are aware based on getting your experiencing

5    and training, that means this is an intrabank transfer, in

6    other words, the account where this money is coming from comes

7    from the Bank of America account held in the name of Resource

8    Employment Solutions?

9    A.  Based on my training, I can't definitively say that.  I'm

10   sorry.

11   Q.  I'm sorry?

12   A.  Based on my training, I have never signed a book-in

13   transaction like this.  I'm not sure.

14   Q.  You see all of the other entries on that bank account

15   statement, Agent, on the screen --

16   A.  Yes.

17   Q.  -- from September 6 through September 27 and in each of

18   those cases there is an indication of the bank from which the

19   deposits come from, correct?

20   A.  Correct.

21   Q.  And in this instance, it's all JPMorgan Chase Bank, right?

22   A.  Yes.

23   Q.  And based on your experience and training in reviewing bank

24   account statements, do you understand that typically in a bank

25   account statement, a transaction will show the bank from which

Martinez - Cross

L9e2LluH

1    the proceeds are being received, correct?

2    A.   Yes.

3    Q.   And in the line item that we were referring to on September

4    18, 2017, there is no indication of a bank, correct?

5    A.   Correct.

6    Q.   Instead it says a book-in type of transaction.

7    A.   Correct.

8    Q.   And this account statement comes from the Bank of America,

9    correct?

10   A.   This account statement is from Bank of America, correct.

11   Q.   From that, do you have -- I mean, do you understand that

12   that transaction is an intrabank transfer from one account at

13   Bank of America to another?

14              MR. CHIUCHIOLO:  Objection.  Asked and answered.

15              THE COURT:  Sustained.  Having gone through that

16   exercise, Agent, do you know what a book-in transaction is?

17              THE WITNESS:  I don't, your Honor.

18              THE COURT:  All right.

19              MR. MAZUREK:  Okay.  For the record, your Honor, the

20   next series of transactions, dated from September 2017 through

21   November of 2017, on DX 10, would all show book-in transactions

22   coming from an account in the name of Resource Employment

23   Solutions in the same way as we have identified on -- for the

24   line item dated September 18, 2017.

25              THE COURT:  Okay.  Obviously -- I apologize for

L9e2LluH                          Martinez - Cross

1    interrupting, but to the extent you can make this part of your

2    meet-and-confer, if the government figures out what a book-in,

3    what it actually is, and you can reach agreement, obviously you

4    should do that.

5         MR. MAZUREK:  In fact, I think maybe that Bank of

6    America account from which these deposits were made may be a

7    part of the government's discovery, so we can pull it out.

8         THE COURT:  No, no.  I'm sorry.  My comment wasn't

9    clear.  The only thing the agent wasn't able to confirm that

10   this is -- a book-in transfer is an interbank transaction as

11   opposed to some other transaction that the bank may be doing,

12   indicated from DX 10, the September 18, 2017, to the end of

13   that exhibit.  I was just talking about confirming that

14   "book-in" is in fact an independent bank transaction.  That's

15   all.

16        MR. MAZUREK:  I understand.  We may be able to do

17   better, because there is an account number here ending in the

18   numbers 288, and that's a bank account in the name of Resource

19   Employment Solutions that I believe may have been produced in

20   the discovery, so we can defer to the government with respect

21   to that.

22        THE COURT:  Okay.

23   BY MR. MAZUREK:

24   Q.  In your review of the Espheria bank account, I think you

25   testified yesterday that a majority of the deposits into the

Martinez - Cross

L9e2LluH

1    Espheria account came from Hiring Pros or HR Platform,

2    correct?

3    A.  Yes, at a high level.

4    Q.  At a high level.

5           These particular deposits that are in DX 10 are from

6    neither of those sources, correct?

7    A.  Are from neither of these sources.

8    Q.  Yes, from Hiring Pros or HR Platform.

9    A.  Yeah, the sender bank is not listed here.

10   Q.  The Regions Bank?

11   A.  Say it again.

12   Q.  Oh, I'm sorry.  I misheard your testimony.

13   A.  The sender bank is not listed here.  I don't know what a

14   book-in transaction is --

15   Q.  Understood.

16   A.  -- so I cannot make that determination.

17   Q.  Understood.

18          If we could turn to -- before we go to the next

19   document, let me ask you this.  I think you testified at a high

20   level yesterday that the Espheria bank account was used for the

21   purposes of receiving deposits from Hiring Pros, Hiring Pros --

22   is that right?

23   A.  Correct.

24   Q.  Hiring Pros would then wire the money to Espheria,

25   correct?

L9e2LluH                         Martinez - Cross

A.  Can you repeat the last question?  So -- or let me just
generalize again, right, at a high level, your Honor, I
described the funds went from PNC Bank, from PNC Bank to RES,
from RES to Hiring Pros, from Hiring Pros to Espheria, from
Espheria back into RES.

Q.  Okay.  And with respect to that, I'm going to ask if we
can put on the screen what's been premarked for identification
as DX 4.  And this has a Bates number of U.S.A. O. 244.  Again,
this was produced by the government in the course of Rule 16
discovery as a company document from RES.

          MR. CHIUCHIOLO:  Your Honor, it was not produced as a
company document.  I believe it was prepared by advisors of
RES.  It contains work product.  I think there are formulas in
it.  It also is incomplete insofar as it doesn't show the
massive loss that the bank incurred.  So the government would
object to its admission.  It's not a company record.  And this
witness is -- if he is asked, I don't believe he has ever seen
it before.

          THE COURT:  All right.  Let's first establish whether
the witness has seen it.

          So let me just ask, just to be clear, so it is not --
it is not an RES, it's not an RES-generated document.  It's a
document generated by consultants or something.

          MR. CHIUCHIOLO:  Either -- yes, consultants during the
course of its internal investigation into the fraud scheme so

Martinez - Cross

L9e2LluH

1    it's a product of RES in that regard, but not something

2    produced in the ordinary course of business.

3             THE COURT:  Okay.  So Mr. Mazurek, why don't you see

4    whether the agent has reviewed this document at all.

5             MR. MAZUREK:  Yes.  Okay.  I might just quickly *voir*

6    *dire* on the foundation.

7             THE COURT:  Absolutely, sure.

8    BY MR. MAZUREK:

9    Q.  Agent, in the course of your investigation, you reviewed

10   documents that were produced to the government from RES,

11   correct?

12   A.  Some, yes.

13   Q.  And also in your interviews with case agents or others

14   involved in the case, you understood that RES had conducted an

15   internal investigation of the fraud that's charged in the

16   indictment, correct?

17   A.  Correct.

18   Q.  And you have reviewed documents that were the result --

19   that came from that internal investigation that was conducted

20   by the company.

21   A.  I don't recall if I reviewed documents that were the

22   product of the internal investigation.  I do recall that I

23   reviewed documents voluntarily provided by RES.  Whether they

24   were a result of the internal investigation, I cannot recall.

25            THE COURT:  Okay.

L9e2LluH                          Martinez - Cross

1    Q.  Well, you actually reviewed reports which indicated that

2    the internal investigator from the company indicated that RES

3    was overvalued by 430 percent, correct?

4    A.  I believe that was an interview record or an interview 302.

5         MR. MAZUREK:  May I just have one moment, your Honor?

6         THE COURT:  Sure.

7    BY MR. MAZUREK:

8    Q.  In your review of interview notes, did you review

9    information from internal investigations of the investor group

10   where they indicated a current -- what their belief of the

11   value of the company was absent the fraud?

12   A.  I believe so, yes.

13   Q.  And was there an analysis in that -- in those interview

14   notes, I mean you used those interview notes in preparation for

15   your testimony today?

16   A.  Yes, I reviewed them.

17   Q.  And the analysis that the company made of the extent of the

18   fraud, was it documented based on your review of the interview

19   notes?

20   A.  Are you asking was the extent of the fraud documented in

21   the interview 302?

22   Q.  No.  The question is in the interview note, did it indicate

23   that a written report or reports were issued by the investor

24   group or consultants to the investor group to reach the

25   conclusion about any amounts of the fraud?

L9e2LluH

Martinez - Cross

1    A.  I'm not sure I am understanding your question.  I'm sorry.

2    Q.  You reviewed interview notes.  You didn't review actual

3    source documents from the investor group produced by the

4    investor group?

5    A.  I produced some -- oh, no, from the investor group?  I

6    don't believe I reviewed the investor group supporting

7    documents.

8    Q.  Specifically there is an F.B.I. 302 report that you used in

9    preparation for your testimony that indicated a value that the

10   company came up with as to the amount of the fraud.

11   A.  Yes.

12   Q.  And in that same report were there analysis of how that

13   calculation was made?

14   A.  Are you asking yes or no?

15   Q.  Yes.

16   A.  Are you asking me to confirm?

17   Q.  In that report, was there an analysis conducted or conveyed

18   in that report to explain how the consultants valued the amount

19   of the fraud?

20   A.  I don't recall specifically if there was an analysis in the

21   report.

22   Q.  Was there any information that you looked at from the

23   investor group or consultants to the investor group which

24   identified the specific -- specific amounts of any inflated

25   receivables?

Martinez - Cross

L9e2LluH

1    A.  I don't believe so.  If you are pertaining to the

2    underlying documents -- if you are referring to the underlying

3    documents to the 302, I don't believe I reviewed anything

4    outside of whatever the statements made in the 302 encompass.

5    Q.  Okay.  But you are aware that the RES attorneys had an

6    independent forensic accountant review what it believed to be

7    the extent of the fraud charged in the indictment, right?

8    A.  Yes.

9    Q.  And you are aware that the forensic accountant

10   preliminarily identified more than 3,000 fictitious invoices.

11   A.  I am aware that the forensic accountant identified

12   fictitious invoices, yes, amongst other things.

13   Q.  Specifically identified more than 3,000 fictitious

14   invoices.

15   A.  I don't recall the exact amount.

16   Q.  But you gave an affidavit to this Court in the application

17   for the post-indictment restraining order, correct?

18   A.  Um-hmm.

19   Q.  And in that --

20                THE COURT:  You have to say yes or no.  In other

21   words, "um-hmm" just comes out --

22                THE WITNESS:  I'm sorry.  Yes.

23   Q.  And in that application of the -- it was a sworn affidavit,

24   so you took it very seriously, right?

25   A.  Yes.

Martinez - Cross

L9e2LluH

1   Q.  And in that affidavit, you provided what was accurate and

2   complete information, correct?

3   A.  Yes.

4   Q.  And you wouldn't put a number into that application without

5   first reviewing some source document to make sure it was

6   correct, right?

7   A.  Either source documentation or discussions with the

8   prosecution team and my case agents, co-case agents.

9   Q.  Okay.  So as of right now, you don't know whether it was a

10  document that you looked at that included this kind of

11  information or whether you heard it from others.

12  A.  Correct, whether it was briefed to me through the case

13  agents or through the prosecution team.

14  Q.  Okay.  However, you included -- you -- you concluded that

15  the forensic accountant determined a number of facts as a

16  result of its review, correct?

17  A.  Yes.

18  Q.  And which you relayed in the sworn application to the

19  Court, correct?

20  A.  Yes.

21  Q.  Including comparing fictitious invoices with accounts

22  payable information made available by RES's customers, correct?

23  A.  Yes.

24  Q.  Including determining that the fictitious invoices were

25  different from legitimate invoices insofar as the invoices

L9e2LluH                         Martinez - Cross

1    appeared to have been manually assigned a number, correct?

2    A.  Yes.

3    Q.  Correct?

4         And you even went so far as to say that 12 fictitious

5    invoices from late 2019 and early 2020 were for purported work

6    performed in DHL's supply chain Toto, Ontario, facility,

7    correct?

8    A.  Yes.

9    Q.  That's very specific information, right?  Yes?

10   A.  Yes.

11   Q.  And that's information that you verified before you put it

12   in your sworn affidavit application to the Court?

13   A.  Yes.

14   Q.  And it included documents, right?

15   A.  Most likely, yes.

16        MR. MAZUREK:  Your Honor, I am going to ask for

17   production of the documents that were reviewed by this agent in

18   preparation for his testimony and his application for the

19   post-indictment seizure application as relevant to a

20   determination of the valuation of the company and the amounts

21   that were paid to Luis Lluberes.  That's absolutely relevant to

22   a determination, again, of what value of the $17 million that

23   was transferred from RES to Luis Lluberes had legitimate --

24   were from legitimate business versus the allegations in the

25   indictment.

Martinez - Cross

L9e2LluH

1          THE COURT:  All right.

2          MR. CHIUCHIOLO:  Your Honor, again 100 percent

3     irrelevant to the Court's decision -- to the Court's

4     determination here in a *Monsanto* hearing.  In any event.  The

5     government is in compliance with its Rule 16 obligation.  The

6     defense does not get to use this -- a very, very limited

7     hearing, which is supposed to be tracing, which we have far --

8     gone far afield now -- to see what witnesses at trial would

9     have to say.  We produced this witness's 3500.  We are in

10    compliance with that obligation.  We are in total compliance

11    with our Rule 16 obligation.

12         THE COURT:  So, in other words, and again the -- so

13    just to confirm, so documents that the agent may have reviewed

14    in connection with his preparation to testify, were they

15    produced either for this hearing and/or produced -- have been

16    produced in discovery.

17         MR. CHIUCHIOLO:  Well, for example, the witness has

18    testified that he has reviewed a number of F.B.I. 302s.  Those

19    have not been produced.  They are witness statements of other

20    witnesses who may or may not testify at trial.  But, you know,

21    certainly this witness's 3500 material has been provided.  And

22    given the valuation, it's totally irrelevant to this

23    proceeding, the witness, I can -- did very little of that in

24    preparation because this witness is not the witness who could

25    testify about that.

Martinez — Cross

L9e2LluH

1    THE COURT:  Okay.  All right.  Mr. Mazurek.

2    MR. MAZUREK:  Judge, yes.  My concern is that this

3  witness relied heavily on the information provided by forensic

4  accountants that were apparently hired by the investor group

5  and had provided information to the government in his post

6  seizure application to actually identify issues relating to the

7  valuation of the company to determine whether the $17 million

8  proceeds were part of the fraud that's alleged in the

9  indictment.

10    THE COURT:  I guess the question I have, and I don't

11  know the answer to it, is (a) what is the paragraph of the

12  affidavit you are referring to and (b) whether the government

13  can basically either proffer that those were -- what documents,

14  if in fact there were documents he reviewed.  If they were 3500

15  material, that's different than if they were underlying source

16  documents.

17    MR. MAZUREK:  Right.  It's paragraph 35 of the

18  post-indictment seizure application.  But, your Honor, here is

19  my concern, that while the government can choose this

20  particular agent to come and testify about, and he can just

21  review his colleagues' 302 reports, if the investigating agents

22  as a whole have documents, some of which obviously they have

23  produced and presented here on the screen as DX 4, it is still,

24  just because this agent didn't review a specific document, it

25  is still the government's obligation to produce those documents

Martinez - Cross

L9e2LluH

1    that were made or used in preparation for the post-seizure

2    application and this witness's testimony.  They can't shield

3    the information that this client or this witness is testifying

4    to by saying he only looked at 302 reports, which are interview

5    reports, when those are just the reports of other agents'

6    review of the documents that were necessary to give his

7    testimony at this hearing and to rely on for purposes of

8    seeking seizure of the full proceeds of Coinbase.

9              THE COURT:  I guess a couple of things.  Number one,

10   it is the government's burden obviously to show in a *Monsanto*

11   hearing, to prove up that the proceeds that they are seeking to

12   restrain are the product of illegal activity.  But, second, if

13   you are asking for -- if the agent -- if you are asking for the

14   302s that the agent reviewed in order to prepare for his

15   testimony, that's one point.  If you are asking for the

16   documents that the witness who gave the statement in the 302

17   may have reviewed in order to come to the conclusion that they

18   stated to the agent who interviewed them, that's not -- I mean,

19   this agent didn't review that.

20             So the issue may be that the argument is that the

21   government hasn't sufficiently proven up whatever this

22   statement is in the affidavit, but in other words what is the

23   argument that you would -- the agent hasn't seen -- and, again,

24   I don't know, but the agent -- if all he reviewed was the 3500

25   material and didn't -- and didn't look at the underlying source

Martinez - Cross

L9e2LluH

1    documents, whatever they may have been, in other words, the

2    witness whose 302 he was looking at related whatever their

3    understanding was, but the agent didn't then go behind that,

4    are you asking for those documents?

5        MR. MAZUREK:  Well, your Honor, if this witness in his

6    application to the Court in determining or taking seizure of

7    the Coinbase account funds indicated that there is no value to

8    this company as a result of the fraud, based on his review of

9    something that indicated that the value of the company, the

10   purchase price of the company was overvalued by over 430

11   percent, which made the company insolvent, therefore all $17

12   million in proceeds must have been the result of the fraud,

13   then I guess my answer is, yes, or I guess the government

14   has -- or in the alternative, the government is not presenting

15   any evidence here to determine how that valuation was made.  In

16   all of its briefing up to this hearing, your Honor, the

17   government has said -- and in the two oral arguments that we

18   have had on this matter -- has indicated that there is no value

19   to this company.  It was insolvent because it was overvalued by

20   over 430 percent based on the work of the forensic accountants.

21   And that's what's in paragraph 35 of this agent's

22   post-indictment seizure application.

23       If that is the basis on which they are relying to show

24   probable cause in this hearing and in this process, to say that

25   we have proven that there is no value to this legitimate

L9e2LluH                          Martinez - Cross

business that has been in operation for over 20 years and has

thousands of employees and hundreds of customers and bringing

in revenues in excess of $120 million, even given what the

government's position is on the alleged fraud, then, you know,

I guess they haven't met -- I guess my argument is they haven't

met their burden.

          THE COURT:  On your theory that the valuation has

anything to do with the *Monsanto* hearing, right?  I think, yes,

in other words, if you are saying that -- and, again, right, as

I understand the argument that you are making, is that the

valuation is relevant to a determination here in the *Monsanto*

hearing, and it's not clear to me -- well -- and the government

disputes that, in other words, they are saying that it is

not -- it is not relevant, so whether -- (a) whether I accept

the fact that it is zero, that is point number one, which they

may or may not have proven up sufficiently if they are relying

on it; (b) if you are right on the legal theory, the valuation

should be part of the analysis that I make here for the

*Monsanto* hearing -- well, let me ask the government this

question.  Are you relying on the -- again, I apologize.  I

don't have the paragraph in front of me that has the statement,

but perhaps could I ask, could I prevail on the government to

read the paragraph in question?

          MR. CHIUCHIOLO:  Your Honor, I think it is -- I just

want to make sure I am looking at the right paragraph.

Martinez - Cross

L9e2LluH

1          MR. MAZUREK:  Actually, I think you have it, your

2   Honor.  It is marked in the 3500 material, 3502-1.

3          THE COURT:  Which paragraph?

4          MR. MAZUREK:  It starts on page 14, paragraph 35

5   subpart (d), (e).

6          THE COURT:  I'm sorry did you say (b)?

7          MR. MAZUREK:  (d) as in "David," (e), and (f) as in

8   "Frank."

9          THE COURT:  All right.  I have read the paragraphs.

10          Yes.

11          MR. CHIUCHIOLO:  Your Honor, as we stated from the

12   beginning, the government is not seeking to prove the value of

13   the company in this hearing.  It is just not relevant to any of

14   the government's theories.  We didn't ask the agent on direct

15   examination a single question about valuation, which by the way

16   the grand jury has already found.  There has been a probable

17   cause determination on the overvalue -- the extent to which the

18   company is overvalued, and as per *Kaley*, matters of defense,

19   where the Court can discern that finding.  So we are not

20   seeking to prove the value.  And we made this point in our

21   briefing.  We made it during oral submission.  To the extent

22   the value of the company is relevant for the purposes that the

23   defendant is advancing, the burden is on the defense, not the

24   government, to make that finding.  That's in Section 981 on

25   offsets.  It is just -- and it is not certainly in a *Monsanto*

L9e2LluH                          Martinez - Cross

1    hearing.  It would be later on in a forfeiture proceeding,

2    where the government would have to make that showing what value

3    they legitimately have.  But for purposes of this proceeding,

4    and for wire fraud and for bank fraud, which the Second Circuit

5    has held are inherently unlawful activities, offsets don't

6    matter, the cases that Mr. Nessim cited yesterday, this

7    valuation that's continued advancement of this argument on

8    valuation of the company is simply irrelevant to this

9    proceeding.

10            THE COURT:  Okay.  As I understand it, the defense

11   isn't arguing this is an offset.  They are arguing it is

12   something different and that it goes to the core of a *Monsanto*

13   hearing.  If the defense is right, right, the government isn't

14   relying on the valuation in connection with this proceeding.

15   And again, and I'm not saying the legal argument is correct,

16   that's what it amounts to is the legal argument, that the

17   valuation is somehow relevant here, but the government isn't

18   proving -- as I understand it isn't relying on the valuation at

19   all and saying it's irrelevant.

20            MR. CHIUCHIOLO:  Correct, your Honor.  I am going to,

21   I think, in redirect ask -- given what was elicited on direct,

22   ask some questions, but as far as the work performed by the

23   company's forensic accountants, their outside advisors, I'm not

24   going to elicit that from his testimony.  It's not what we

25   prepared for and this witness doesn't have the ability to

L9e2LluH                                    Martinez – Cross

1   testify to that.

2          THE COURT:  Sure.

3          (Counsel confer)

4          MR. CHIUCHIOLO:  And, look, I think what the

5   government has established is that the investor group paid

6   $10.1 million for something it wouldn't have purchased had they

7   known about the allegations in the indictment.  And for

8   purposes of this proceeding, which is a probable cause finding,

9   we have met our burden.

10         THE COURT:  Okay.  All right.

11         Mr. Mazurek, I'm not going to -- again, based on what

12  the government has said, they are not relying on the valuation,

13  so I'm not going to direct they produce those underlying

14  documents related to the valuation.  In other words, what the

15  forensic accountants did in connection with their analysis,

16  that's referenced in paragraphs, subparagraphs on page 14 of

17  the affidavit, (d), (e), and (f).

18         MR. MAZUREK:  Okay.

19         THE COURT:  Okay?

20         MR. MAZUREK:  And your Honor, if it would help to

21  short circuit a lot of this if the government, we could just

22  have an understanding for purposes for post-hearing briefing.

23  If the government's position is that valuation is irrelevant

24  and they will not contend that there is -- that they have

25  presented any evidence as to the value of the company as of the

Martinez - Cross

L9e2LluH

1    date of the transaction, then I will -- I can shorten

2    considerably the remainder of my direct examination or

3    cross-examination.

4            THE COURT:  I guess the question I have is, it seems

5    to me there is an issue about what is in the indictment, what

6    was presented, and therefore presented to the grand jury, and

7    what the grand jury then determined based upon probable cause,

8    that would determine that there was probable cause to believe.

9    In other words, the $17 million is referenced in the

10   indictment.  I don't know whether the valuation is referenced

11   in the indictment and whether the grand jury was presented with

12   that.  So with that caveat, in other words, the government has

13   not, here today, or yesterday gone into the valuation of the

14   company and they have not -- apparently they are not relying --

15   they are not relying -- well, through the testimony they have

16   not elicited anything related to the valuation.  So I think,

17   Mr. Mazurek, you are correct in that regard and they are

18   saying, in any event, it's irrelevant to this proceeding, and

19   by that I mean the *Monsanto* hearing.

20           MR. CHIUCHIOLO:  Your Honor, and just to be clear, I

21   do, in light of the testimony that was permitted, I do intend

22   to elicit just a very brief few questions on this topic from

23   this witness.

24           THE COURT:  You are entitled on redirect to go over

25   matters that have been elicited on cross-examination.  That's

Martinez - Cross

L9e2LluH

1    fine.  Yes.

2           MR. MAZUREK:  May I continue?

3           THE COURT:  Yes.

4    BY MR. MAZUREK:

5    Q.  Agent, in the course of review of your interview notes and

6    speaking with other agents or witnesses, you understand that

7    RES continues to be an ongoing enterprise, correct?

8    A.  I believe so, yes.  Yes, yes.

9    Q.  Yes.

10          Do you have an understanding of what its current

11   revenues are?

12   A.  No.

13   Q.  Did you get any financial information about the ongoing

14   business of RES in preparation for this testimony?

15   A.  No.

16   Q.  Have you yourself interviewed members of the RES that

17   continue to work with the company?

18   A.  I don't recall if they still work there.  I'm not sure.

19   Q.  Do you still have in front of you what has been admitted in

20   evidence as a summary chart DX 9?

21          THE COURT:  Did you hand it to the agent?  I'm not

22   sure he got it.

23   Q.  This had to do with the transactions that we showed or

24   reviewed together from HR Platform to the Espheria bank

25   account, right?

L9e2LluH                         Martinez - Cross

1    A.  Yes.

2    Q.  And if you took my math as being accurate, the total amount

3    is approximately $11.2 --

4    A.  Yes.

5    Q.  -- of those transactions.

6         And based on your review of the Espheria bank

7    account -- strike that.

8         Based on your review of the Espheria bank account, you

9    know that the vast majority of the withdrawals of the Espheria

10   bank account went back to RES, to the PNC Bank account?

11   A.  Yeah, the majority of it went back to RES.

12   Q.  I mean when you say "majority," it is about 99 percent,

13   correct?

14   A.  Yes.

15   Q.  Okay.  About 99 percent of the Espheria -- the account --

16   funds in the Espheria account went back to the RES PNC Bank

17   account, correct?

18   A.  Yes.

19   Q.  And the Espheria bank account was closed as of about March

20   30, 2019?

21   A.  I don't recall, but approximately, sounds right, yes.

22   Q.  And that $11.2 that's listed as the total of the

23   HR Platform funds that went into the Espheria, those were

24   transferred to the RES PNC bank accounts as well, correct?

25   A.  Can you repeat that?  I'm sorry.

Martinez — Cross

L9e2LluH

1   Q.  All of the transfers into the Espheria account from
2   HR Platform went back to the RES PNC bank account, correct?
3           MR. CHIUCHIOLO:  Same objection to relevance.
4           THE COURT:  With the objection, I will allow it.
5   A.  All of the funds —— can you —— I'm sorry.  One more time.
6   Q.  All right.  The $11.2 million of funds that were deposited
7   into the Espheria bank account from HR Platform, I will put a
8   caveat, 99 percent of those went back to RES PNC bank account.
9   A.  Yes, most likely, yes.
10  Q.  Okay.  Thank you.  And HR Platform, the only source of the
11  funds of that 11.2 million, the only source of those funds were
12  proceeds that —— from Luis Lluberes, correct?
13  A.  Not the only source.  I think we discussed miscellaneous
14  items as well, but mostly ——
15  Q.  99 percent ——
16  A.  Yes.
17  Q.  —— correct?
18  A.  Yes.
19  Q.  99 percent, is that right?
20  A.  I don't know if the percentage is correct.
21  Q.  More or less.
22  A.  A majority.  I can't answer definitively.
23          THE COURT:  Okay.
24  A.  I don't have the numbers in front of me.
25  Q.  Okay.  Well, let me just say, yesterday you testified that

L9e2LluH                          Martinez - Cross

1  the sole source of funding of HR Platform was Luis Lluberes,

2  correct?

3  A.  Um-hmm.

4  Q.  Yes?

5  A.  I believe so, yes.

6  Q.  You testified yesterday about accounts in the name of

7  Hiring Pros, right?

8  A.  Yes.

9  Q.  And at a high level you said that that account was used for

10  purposes of receiving deposits from RES, the RES bank account,

11  right?

12  A.  Yes.

13  Q.  And then to transfer those proceeds to the Espheria bank

14  account, right?

15  A.  Yes.

16  Q.  Okay.  The outlays from RES to Hiring Pros, that would be

17  an expense on the RES company accounts, correct?

18  A.  Not necessarily, no.  You can't assume that.

19  Q.  Okay.  Well, based on your review, do you know -- did you

20  review records to indicate how RES would account for the

21  outlays to Hiring Pros?

22  A.  No.

23  Q.  Well, as part of your investigation in the case, you say

24  this is a big part of the fraud, right?

25  A.  Um-hmm.

L9e2LluH

Martinez - Cross

1   Q.  I'm sorry?

2   A.  Yes.

3   Q.  And do you know what RES would show when money was --

4   strike that.

5           The money that went from RES to Hiring Pros, we are

6   talking about hundreds of millions of dollars over a

7   two-and-a-half-year period, right?

8   A.  Yes.

9   Q.  That would be hundreds of millions of dollars in a

10  two-and-a-half-year period would be one of the biggest items on

11  the accounts of RES, correct?

12  A.  Yes.

13  Q.  And that would be something that would be noteworthy to

14  anyone looking at the accounts of RES, right?

15  A.  Yes.

16  Q.  And the only expense, based on your review of all of the

17  records and all of the interviews and F.B.I. reports that you

18  have reviewed in this case, the only real expense of that

19  magnitude that RES had was payroll expense, correct?

20  A.  Can you ask that one more time?  Are you comparing the size

21  of the account sideways to Hiring Pros --

22  Q.  No.  All I'm asking is you know that RES was a staffing

23  company?

24  A.  Yes.

25  Q.  And a staffing company means it hired temporary and

L9e2LluH                              Martinez - Cross

1   full-time employees for its customers, right?

2   A.   Yes.

3   Q.   And the payroll that had to be paid was paid out of RES,

4   correct?

5   A.   I believe so, yes.  I don't have the records.  I didn't

6   review the bank records, but I believe so.

7   Q.   At a high level, you testified yesterday -- can you explain

8   how -- what your review was of how the money went from PNC Bank

9   back into RES?

10  A.   Sure, so reviewing bank statements from Hiring Pros.

11  Q.   What did you see in the Hiring Pros?

12  A.   Incoming wires.

13  Q.   From?

14  A.   From RES.

15  Q.   Okay.  And --

16  A.   And then --

17  Q.   How -- how did, based on your review, how would RES justify

18  those, justify those outlays?

19          MR. CHIUCHIOLO:  Your Honor, objection to relevance

20  and also this has all been found by the grand jury.  It's in

21  the indictment.

22          THE COURT:  Okay.

23          MR. MAZUREK:  Well, he testified to it yesterday on

24  direct.

25          THE COURT:  You can find out whether he remembers what

Martinez - Cross

L9e2LluH

1    was accounted for.

2              MR. MAZUREK:  Can we then put on the screen DX 5?

3    This was produced by the government in their discovery, Bates

4    stamp 24442.  It's a major spreadsheet that was identified as

5    account transactions, general ledger detail from the company

6    RES, and I move for its admission, your Honor.

7              MR. CHIUCHIOLO:  No objection.

8              THE COURT:  DX 5?

9              MR. MAZUREK:  Defense Exhibit 5.

10             THE COURT:  All right.  DX 5 is admitted in evidence.

11             (Defendant's Exhibit 5 received in evidence)

12   BY MR. MAZUREK:

13   Q.  You are familiar with what a general ledger is, right?

14   A.  Yes.

15   Q.  That's a basic accounting document, correct?

16   A.  Yes.

17   Q.  It shows debits and credits of the whole company, right?

18   A.  Yes.

19   Q.  And if you look at this spreadsheet which was provided by

20   RES -- and can we put on the screen under the tab Hiring Pros

21   All Payments --

22             THE COURT:  That's --

23             MR. MAZUREK:  I'm sorry.  Account Transaction General

24   Ledger Detail.  If we could just highlight -- we are going to

25   highlight row 1862.

Martinez - Cross

L9e2LluH

1  BY MR. MAZUREK:

2  Q.  Okay.  This is one of the lines in the RES general ledger,

3  okay, Agent?

4  A.  Yes.

5  Q.  And you see the title, the account description on this

6  general ledger?

7  A.  It's not on here, but I saw the copy, yeah.

8  Q.  I'm sorry?

9  A.  It's not on the screen.

10 Q.  Do you need to see the column header again?

11 A.  No, you just asked if I see that now.  I don't.

12 Q.  Okay.  Do you remember a column description called the

13 account description?

14 A.  Yes.

15 Q.  And for line 1862, what is the description for that

16 particular line?

17 A.  "Financial."

18 Q.  I'm sorry?

19 A.  Is it financial or gross payroll service.

20         MR. CHIUCHIOLO:  Your Honor, could we ask for a

21 relevance proffer?

22         THE COURT:  Well, are you attempting to show,

23 Mr. Mazurek, that the -- certain of the cash going in to, what

24 is it, payroll --

25         MR. MAZUREK:  Payroll services.

Martinez - Cross

L9e2LluH

1          THE COURT:  -- payroll services were basically for

2     payroll, in other words --

3          MR. MAZUREK:  Very basic, but the agent has given it

4     to me, so I'm trying to refresh his memory.

5          THE COURT:  He may not have -- it's not clear to me

6     that he reviewed this document in connection with his

7     preparation.

8          MR. MAZUREK:  All I'm asking is whether the outlays of

9     the Hiring Pros, which is the basis of the high level

10    testimony, was booked as an expense out of RES and later those

11    same amounts were returned through Espheria as an accounts

12    receivable.  That is the very basic part of the testimony that

13    I am trying to -- high level part of the testimony that I am

14    trying to -- attempting to solicit here.

15          MR. CHIUCHIOLO:  Same relevance objection.

16          THE COURT:  All right.

17    Q.  So, Agent, going back to line 1862, you see an amount of

18    $542,115?

19    A.  Yes.

20    Q.  And it was booked as gross payroll service.  Do you see

21    that?

22    A.  Yes.

23    Q.  That would be an expense on the company books, correct?

24    A.  Yes.

25    Q.  And that amount, it's a bank transaction entry, you will

L9e2LluH                                    Martinez - Cross

1   have to take my proffer on that, and we tie that back to the

2   amount in the Hiring Pros' bank account.  So does that indicate

3   that the way that RES was booking the outlay to Hiring Pros was

4   as a payroll service expense?

5          MR. CHIUCHIOLO:  Objection.

6          THE COURT:  Overruled.

7          Some of the money that went to the payroll entity,

8   does that appear to be for gross payroll services?

9          THE WITNESS:  Yes.  Judging from this, yes.

10  BY MR. MAZUREK:

11  Q.  And you are familiar with the term "round trip

12  transactions," correct?

13  A.  Yes.

14  Q.  Relevant to your investigation at a high level of this

15  case, right?

16  A.  Yes.

17  Q.  And based on your review of all of the notes and interview

18  notes and case agents, you understood that the allegation in

19  the indictment here indicated that payments were taken out of

20  PNC Bank as an outlay or expense to Hiring Pros, right?

21  A.  Right.

22  Q.  And then that money was deposited into the Espheria bank

23  account, correct?

24  A.  Yes.

25  Q.  And almost all of that money returned to the RES account,

L9e2LluH                              Martinez - Cross

1   correct?

2   A.  Yes.

3   Q.  Let me ask -- let me ask this.  If we could put on the

4   screen Government Exhibit -- sorry, Defense Exhibit 4, this was

5   the previously objected to exhibit by the government of the

6   consultant's information from the RES company.

7          MR. MAZUREK:  Your Honor, I ask for the conditional

8   admission of this exhibit.

9          THE COURT:  In other words, subject to the

10  government's objection that this was prepared by an outside

11  consultant and the agent, as I understand it -- well, I don't

12  know you asked whether, Mr. Mazurek, the agent had reviewed

13  this in connection --

14         MR. MAZUREK:  Let me ask this, your Honor.  Just for

15  the purpose -- well, I will --

16         THE COURT:  I will accept it as a document that the

17  government produced, that the government described that it was

18  from an analysis done from forensic accountants when they were

19  doing the -- doing the analysis, in other words, and that it

20  doesn't necessarily include all of the -- and I can't remember

21  what the comment was.

22         MR. CHIUCHIOLO:  Your Honor, it doesn't include

23  essentially when the wheels stopped, it doesn't include what

24  the loss was of the bank.

25         THE COURT:  Okay.

L9e2LluH                            Martinez - Cross

1          MR. MAZUREK:  We are not talking about the loss of the

2     bank here, and I'm not even asking this agent to stipulate as

3     to the accuracy of the data on this document.  I am really

4     using it to see if it helps him in recalling the information

5     that he had about these two different accounts.

6          THE COURT:  Okay.  Then why don't you ask whatever

7     question you were going to ask.

8     BY MR. MAZUREK:

9     Q.  Okay.  In preparing for your testimony, you have testified

10    about the high level of what we are going to call the round

11    trip transactions, right?

12    A.  Yes.

13    Q.  As you sit here right now, do you have an understanding of

14    the quantity of dollars that went from RES to Hiring Pros?

15    A.  Approximate amount.  North of 100 million.

16    Q.  North of 100 million.

17          And the amount of money that went from the Espheria

18    bank account into RES?

19    A.  I don't recall exactly.

20    Q.  If I were to show you something, would it help to refresh

21    your recollection on this approximate amount?

22    A.  Depends on what it is.

23    Q.  Well, you have on your screen a report that it was alleged

24    to be done by the advisors to the investor group and includes

25    amounts outbound to Hiring Pros and inbound from Espheria.  Do

L9e2LluH

Martinez - Cross

1    you see that?

2    A.  Yes.

3    Q.  And there is a total from January 17 to March 2020.  Do you

4    see that?

5    A.  Yes.

6    Q.  And the outbound to Hiring Pros from RES is identified as

7    approximately $120 million, right?

8    A.  Yes.

9    Q.  And the inbound from Espheria to RES is approximately $120

10   million, correct?

11   A.  Yes.

12   Q.  Is that consistent with your memory of your view of all of

13   the information that you had in the investigation of this case?

14   A.  Approximately, yes.

15   Q.  Okay.  And based on your accounting experience, Agent, you

16   understand -- you understand what a profit margin is?

17   A.  Yes.

18   Q.  And you understand that a profit margin -- a gross profit

19   margin is determined by the revenue minus the variable

20   expenses, correct?  On a high level?

21   A.  Yes.

22   Q.  And that profit margin, if -- receivables, inflated

23   receivables would inflate the total revenue numbers of the

24   company, correct?

25                THE COURT:  I'm sorry.  You are asking would inflated

Martinez - Cross

L9e2LluH

1   receivables correlate to inflated sales of the company?

2           MR. MAZUREK:  Yes.

3   A.  Most likely, yes.

4   Q.  And that's what you found in your investigation in this

5   case, right?

6   A.  I didn't look at the sales side.  I was looking at the

7   accounts receivable side of the investigation.

8   Q.  Okay.  But inflated receivables eventually, if they are

9   collected upon, become inflated sales, correct?

10  A.  No, it's not how it works.  Inflated -- once the receivable

11  is recorded, at the same time you would recognize revenue.

12  Q.  Yes.

13  A.  Um-hmm.

14  Q.  And so --

15  A.  So they have them at the same time.

16  Q.  I'm sorry?

17  A.  They have them at the same time.

18  Q.  Okay.  So based on your investigation in this case,

19  inflated -- you believe that the numbers that were reported to

20  RES were -- and revenues were inflated, correct?

21  A.  I'm not sure.  I know the receivables were inflated.

22  Q.  Okay, the receivables were inflated.

23          If the receivables were inflated by a certain

24  percentage and the company had recorded inflated expenses of

25  those same amounts, would that affect the profit margin?

L9e2LluH                              Martinez - Cross

1    A.  I'm sorry.  Repeat that one more time.

2    Q.  Yes.  If the company inflated its receivables, okay, and it

3    inflated its expenses related to those or just inflated the

4    expenses in the same amount, that would have no effect on the

5    profit margin, correct?

6    A.  Yeah, if you are increasing the -- yeah, if you are

7    increasing the top one line and the bottom line, yes there

8    would be net no change.

9    Q.  Net no change.

10   A.  Right.

11            MR. MAZUREK:  I have nothing further, your Honor.

12            THE COURT:  Okay.  It is now 1:00.  How much time on

13   redirect?  I think we should probably take our break now.

14            MR. CHIUCHIOLO:  Yes, your Honor.  I think I will try

15   to cut it down over lunch, to consolidate.

16            THE COURT:  Okay.

17            (Court and court reporter confer)

18            THE COURT:  We will see each other at 1:50.

19            (Luncheon recess)

20

21

22

23

24

25

L9e2LluH                      Martinez - Redirect

                    A F T E R N O O N    S E S S I O N

                              1:55 p.m.

               THE COURT:  Agent, just to remind you, you are still

under oath.

               THE WITNESS:  Yes, sir.

               THE COURT:  Okay.  Redirect.

REDIRECT EXAMINATION

BY MR. CHIUCHIOLO:

Q.  Good afternoon.  I would like to start with the excluded

receivables, so where Mr. Mazurek started this morning.

               Special Agent Martinez, can you remind us, when Luis

Lluberes received excluded receivable payments pursuant to the

purchase agreement, did he receive those payments directly from

the customer or from RES?

A.  From RES.

Q.  And you testified to this yesterday, but what triggered RES

or the investor group to make those excluded receivable

payments to Luis Lluberes?

A.  The payments were based on remittance reports provided by

Mr. Lluberes.

Q.  Okay.  So I want to look at some of those remittance

reports, and specifically I want to spend some time on Amazon.

               Do you recall this morning Mr. Mazurek asked you a

number of questions about a $7.8 million -- excuse me, a $1.7

million payment from Amazon?

Martinez - Redirect

L9e2LluH

1    A.  Yes.

2    Q.  And that was a payment from Amazon to RES, correct?

3    A.  Yes.

4         MR. CHIUCHIOLO:  Mr. Levine, can you please publish

5    Defense Exhibit 1.

6    Q.  Special Agent Martinez, this is the RES bank statement that

7    was shown to you earlier this morning?

8    A.  Yes.

9    Q.  And I believe if we can look at page 4, I think that this

10   page was shown to you this morning.  Do you see the $1.78

11   million payment on May 10?

12   A.  Yes.

13   Q.  And you were asked a number of questions about this

14   payment.  Do you recall that?

15   A.  Yes.

16   Q.  And right below the payment, I think it was established

17   this money, this $1.78 million, it came from Amazon, right?

18   A.  Yes.

19   Q.  And this is part of the excluded receivable payment --

20   A.  Yes.

21   Q.  -- right?

22        And I believe you were asked some questions about the

23   reference number to the right, which ends in 55810.  Do I have

24   that right?

25   A.  Yes.

Martinez – Redirect

L9e2LluH

1   Q.  And I think that what you were shown then was Defense

2   Exhibit 2.  We don't have to pull it up.  But that was the big

3   spreadsheet.  Were you able to use the reference number to find

4   the associated purchase orders or invoice numbers with that

5   reference number?

6   A.  Yes.

7   Q.  And I think a few examples were highlighted, but there were

8   a bunch of invoice numbers associated with this $1.78 million

9   payment from Amazon, right?

10  A.  Yes.

11  Q.  And then we looked at Government Exhibit 50, which was the

12  purchase agreement.  Do you recall that?

13  A.  Yes.

14  Q.  And specifically we looked at table 5.15, which lists all

15  of the excluded receivables.

16          Do you recall that?

17  A.  Yes.

18  Q.  And I think Mr. Mazurek walked you through a couple of

19  examples, and they were examples only, but it was established

20  that the invoice numbers, a few of those invoice numbers

21  associated with this $1.78 million payment were excluded

22  receivables.

23  A.  Yes.

24  Q.  Okay.  And I think the ultimate point of the line of

25  questioning was Amazon made that payment to RES, not Espheria,

L9e2LluH                            Martinez - Redirect

1    correct?

2    A.  Correct.

3            MR. CHIUCHIOLO:  So I want to turn to the remittance

4    report.  Mr. Levine, can you please publish what has been

5    premarked for identification as Government Exhibit 59.

6    Q.  What type of document is this?

7    A.  This is an e-mail, appears to be from Maria Lopez to Moises

8    Lluberes, Moises_L@resourceemployment.com.

9    Q.  And it looks like there are several attachments?

10   A.  Yes.

11           MR. CHIUCHIOLO:  The government will proffer it

12   obtained this document from RES.  It offers it into evidence.

13           MR. MAZUREK:  No objection pending connection to the

14   cross-examination.

15           THE COURT:  Well, the Pactiv remittance, you asked

16   about Pactiv, right?

17           MR. MAZUREK:  This was produced last night, so --

18           THE COURT:  All right, well, again, as I pointed to, I

19   will allow Government Exhibit 59 as admitted in evidence with

20   the understanding that this is a *Monsanto* hearing.  Go ahead.

21           (Government's Exhibit 59 received in evidence)

22   BY MR. CHIUCHIOLO:

23   Q.  What I want to do is focus on the Amazon remittance, but

24   this is an e-mail from Maria Lopez to Moises Lluberes.  It is

25   dated May 17, 2018?

Martinez — Redirect

L9e2LluH

MR. MAZUREK:  May I ask, has this witness ever seen this document before?

THE WITNESS:  Yes.

THE COURT:  Okay?

MR. MAZUREK:  Okay.

BY MR. MAZUREK:

Q.  Okay.  You were shown this in preparation for your hearing today.

A.  Yes.

Q.  All right.  And you see the e-mail says, "Hello, Moises. Please see attached.  Amazon and Pactiv remittance advice" -- "advise."  It's a typo, but you see what it says?

A.  Yes.

Q.  I want to look at page 5.  I want to look at the Amazon remittance.  Okay.

Do you see the top line "payment made to Resource Employment Solutions, LLC"?

A.  Yes.

Q.  What is the payment date?

A.  May 10, 2018.

Q.  And what is the payment amount?

A.  $1,782 -- approximately 1.7 million.

Q.  And does that payment amount match the incoming wire we just looked at in Defense Exhibit 1, RES bank statement?

A.  Yes, I believe so.

L9e2LluH                          Martinez - Redirect

1   Q.  Then we can scroll through, but we see a bunch of invoice

2   numbers and amounts paid.  Do you see that?

3   A.  Yes.

4   Q.  And I think specifically one of the invoice numbers that

5   Mr. Mazurek showed you this morning, I think it is on page 6 of

6   this exhibit, just using this one as an example, is for $26,320

7   and it was invoice number 92454.

8              Do you see that?

9   A.  Yes.

10  Q.  I think that's one of the ones we looked at this morning or

11  Mr. Mazurek showed you on Government Exhibit 50 to show this is

12  an excluded receivable.  Correct?

13  A.  I believe so, yes.

14  Q.  Okay.  Can we go back to the -- staying on this exhibit,

15  page 5.  I want to leave this exhibit on the left side of the

16  screen and I want to pull up Government Exhibit 62 on the right

17  side of the screen.

18             What type of document is Government Exhibit 62?

19  A.  This is an e-mail from Maria Aguilar@resourceemployment.com

20  to moises_l@resourceemployment.com, and also copied is

21  Maria.Lopez@resourceemployment.com.

22  Q.  You see the subject line "Remittance Advice"?

23  A.  Yes.

24             MR. CHIUCHIOLO:  The government will proffer it

25  obtained this document from RES.  It offers Government Exhibit

Martinez - Redirect

L9e2LluH

1    62.

2         MR. MAZUREK:  No objection.

3         THE COURT:  Government Exhibit 62 is admitted in

4    evidence.

5              (Government's Exhibit 62 received in evidence)

6    BY MR. CHIUCHIOLO:

7    Q.  You said the document, e-mail, is from Maria Aguilar.  It

8    is to Moises Lluberes, copying Maria Lopez.  Those are all

9    defendants in this case, correct?

10   A.  Yes.

11   Q.  And the date is May 9, 2018.  Do you see that?

12   A.  Yes.

13   Q.  That's one day before the $1.78 million from Amazon?

14   A.  Yes.

15   Q.  And you see the text at the body of the e-mail from Maria

16   Aguilar is "YAY" with a bunch of exclamation marks?

17   A.  Yes.

18   Q.  Then scrolling down to the next e-mail, who is this e-mail

19   from?

20   A.  This is from Amazon accounts payable.  It looks like their

21   standard, their generic e-mail address.

22   Q.  And it is to Maria Hewitt, correct?

23   A.  Yes.

24   Q.  Let's scroll down so we can see the -- yes, it is right

25   there.  Can you compare the payment amounts on Government's

L9e2LluH                    Martinez – Redirect

1    Exhibits 62 and 59 and let us know if they are the same?

2    A.   Yes, they are the same.

3    Q.   And what about the payment numbers?  Payment number

4    beginning with 239.

5    A.   They are not the same.

6    Q.   But the amount, it's the exact same, right?

7    A.   Yes.

8    Q.   I am going to try to make this easier.  I'm going to hand

9    up a hard copy of Government Exhibit 62.

10            MR. MAZUREK:  Your Honor, may I ask for a brief *voir*

11   *dire* on the payment number?

12            THE COURT:  Okay.  Let me just ask, where would I find

13   the payment number that you are referencing?

14            MR. CHIUCHIOLO:  I was looking at the payment numbers,

15   so there is a payment number beginning with 239635 on

16   Government Exhibit 59 and 7352 on Government Exhibit 62.

17            THE COURT:  Okay.

18            MR. CHIUCHIOLO:  I think the witness testified that

19   the payment numbers are different but the payment amounts are

20   the exact same.

21            THE COURT:  Are the same.

22            Mr. Mazurek, do you want a brief *voir dire*?

23            MR. MAZUREK:  Yes, please.

24            THE COURT:  Okay.

25   *VOIR DIRE* EXAMINATION

Martinez - Redirect

L9e2LluH

BY MR. MAZUREK:

1  Q.  Agent, you said you reviewed these documents, Government

2  Exhibit, I guess -- what number? -- 56 and 62 in preparation

3  for your testimony?

4          MR. CHIUCHIOLO:  59.

5  Q.  I'm sorry.  59 and 62 for your testimony.

6  A.  Yes.

7  Q.  You reviewed those documents prior to your testimony

8  yesterday?

9  A.  Yes.

10  Q.  And were these documents shown to you by the prosecutors?

11  A.  Yes.

12  Q.  In preparation for --

13  A.  But prosecution team.

14  Q.  By the prosecution team.

15          And it was for the purposes of determining issues

16  related --

17          MR. CHIUCHIOLO:  Your Honor, I'm going to object.

18  This is not *voir dire*?

19          THE COURT:  I thought you were asking about the

20  numbers.

21          MR. MAZUREK:  Well, I will ask that, but I am a little

22  concerned because these materials were not produced prior to

23  the hearing.  If these were things that this witness had

24  reviewed or discussed with the agents as a result -- in

L9e2LluH                            Martinez - Redirect

1    preparation for testimony, it should have been produced as 26.2

2    material.  But that being aside, I will ask about the numbers.

3              THE COURT:  Okay.

4              MR. CHIUCHIOLO:  Just for the record, these documents

5    were produced about a year ago.

6              MR. MAZUREK:  So was a terabyte of data, but it was

7    with respect to specifically this hearing.

8              THE COURT:  Well, let me ask this.  Mr. Mazurek, when

9    did you produce the defense exhibit?

10             MR. MAZUREK:  Sunday, after we reviewed the

11   government's 26 exhibits and materials which were produced on

12   Friday.

13             THE COURT:  And let me ask the government, was this

14   something that was reviewed by the agent before or after that?

15   Do you recall?

16             MR. CHIUCHIOLO:  I showed these documents -- I don't

17   recall a specific date that I showed the agent the documents.

18             THE COURT:  All right.  Why don't we proceed?

19   Mr. Mazurek, obviously there can be recross on them.

20   BY MR. MAZUREK:

21   Q.  Agent, on these two documents that are on the screen, did

22   you obtain any information about these documents from other

23   sources other than just reading them yourself?

24   A.  Oh, I believe I compared these documents to bank statements

25   in preparation of this hearing.

Martinez - Redirect

L9e2LluH

1   Q.  Do you have any independent knowledge of the -- or outside

2   knowledge of what is meant by "payment number" on either of

3   these documents?

4   A.  Can you define independent knowledge?  Like are you --

5   Q.  Any information.

6   A.  Are you speaking of in terms of my experience?

7   Q.  No, information relating to these two documents as to what

8   the title payment number means on either of these documents.

9   A.  Independent, like was I provided independent on these

10  specific payment numbers?  I guess I'm just trying to gauge,

11  are you asking based on my experience do I understand that --

12  what these payment numbers represent?  Or can you rephrase the

13  question?

14  Q.  I will rephrase the question?

15  A.  Sorry.

16  Q.  In preparation for your testimony, the prosecution team

17  reviewed Exhibits 59 and 26 with you, right?

18  A.  Yes.

19  Q.  You had a chance to review the information on these two

20  exhibits on your own, right?

21  A.  Yes.

22  Q.  There is, on Exhibit 59, a series of topics and information

23  provided on Bates stamp number 83701, beginning with "Payment

24  made to Resource Employment Solutions."  Do you see that?

25  A.  Yes.

Martinez - Redirect

L9e2LluH

1   Q.   There is a supplier number.  Do you see that?

2   A.   Yes.

3   Q.   A supplier site name.  Do you see that?

4   A.   Yes.

5   Q.   A payment number.  Do you see that?

6   A.   Yes.

7   Q.   Payment date?

8          MR. CHIUCHIOLO:  Your Honor, this is

9   cross-examination.

10          THE COURT:  Yeah, I'm not sure --

11          MR. MAZUREK:  Okay.

12   Q.  Do you have any information as to what fields that are

13   referred to in Government Exhibit 59 within the context of RES

14   or Amazon?

15          MR. CHIUCHIOLO:  Your Honor, the document speaks for

16   itself.  It lists what those fields are.  I will withdraw my

17   questions about the payment number if that's what we are hung

18   up on, but --

19          THE COURT:  Mr. Mazurek can go into it.  It is not

20   appropriate *voir dire* at this time.  I will allow you to

21   recross.

22          MR. MAZUREK:  Okay.  Thank you.

23          MR. CHIUCHIOLO:  So I think this will be easier, if I

24   may approach the witness.

25   BY MR. CHIUCHIOLO:

L9e2LluH                          Martinez - Redirect

1   Q.  I'm going to hand you a hard copy of Government Exhibit 62,

2   although I may need to ask for it back.

3           So Mr. Levine, on Government Exhibit 59, can we go

4   back to I think it was the invoice that we were previously

5   looking at, the 26,000 -- it's a couple of pages down, 26,000.

6   It is page 2 on top, 26,320.

7           That was one of the invoices that you were shown this

8   morning.  You went through the various documents leading to

9   Government Exhibit 50, correct?

10  A.  Yes.

11          MR. MAZUREK:  I'm sorry.  I'm lost as to what document

12  we are looking at.

13          MR. NESSIM:  It's on the screen.

14          THE COURT:  Exhibit 59, it is the invoice that was on

15  the third page, excuse me, fourth page, and it is 92454.

16  That's the invoice number.

17  Q.  And you saw that invoice number on Government Exhibit 50

18  this morning, right?

19  A.  I believe so, yes.

20  Q.  And to establish it was an excluded receivable that Luis

21  was entitled to fund the agreement and that it was paid for by

22  Amazon, correct?

23  A.  Yes.

24  Q.  Using Government Exhibit 62, which is the advice that came

25  from Amazon with the matching number, see if you can find

Martinez - Redirect

L9e2LluH

1   invoice number 92454.

2   A.  Bear with me one second.

3   Q.  Take your time.

4          (Pause)

5   A.  No, I cannot.

6   Q.  And in preparing for your testimony today, did you

7   previously compare the invoice numbers listed on Government

8   Exhibit 62 with the invoice numbers set forth in schedule 5.15

9   of the purchase agreement, which is Government Exhibit 50?

10  A.  Yes.

11  Q.  And based on that, what did you -- what did you determine?

12  A.  I saw several instances of payments that were applied and,

13  in my opinion, inappropriately to excluded receivables.

14  Q.  Did any of these invoice numbers on Government Exhibit 62

15  appear in the purchase agreement?

16  A.  I don't believe so.

17  Q.  But the purchase -- the invoice numbers that appear on 59,

18  those were in the purchase agreement, correct?

19  A.  Yes.

20  Q.  Does it appear that the invoice numbers were altered in the

21  remittance that was sent to --

22          MR. MAZUREK:  Objection.  Lack of foundation.

23          THE COURT:  Yes, why don't you rephrase the question.

24          MR. CHIUCHIOLO:  Sure, your Honor.

25          Mr. Levine, if we can go back to the total amounts,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Martinez — Redirect

L9e2LluH

1   the 1.78 million on both remittances.  Just scroll up.

2   BY MR. CHIUCHIOLO:

3   Q.  Again, those payment amounts are identical, correct?

4   A.  That's correct.

5   Q.  But the invoice numbers are different.

6   A.  Correct.

7   Q.  And the invoice numbers that appear on 59, that's the Maria

8   Lopez Moises document, those are the ones that appear in the

9   purchase agreement, right?

10  A.  Yes.

11  Q.  Government Exhibit 62, the one that actually came from

12  Amazon, those invoice numbers do not appear in the purchase

13  agreement, correct?

14  A.  That's correct.

15          MR. CHIUCHIOLO:  Okay.  You can take those down.

16          So I would like to take a look at just some examples

17  of other remittances.  Mr. Levine, can you please publish

18  what's been remarked for identification as Government Exhibit

19  61.

20  BY MR. CHIUCHIOLO:

21  Q.  Special Agent Martinez, do you recognize this document?

22  A.  Yes.

23  Q.  What is it?

24  A.  It appears to be a remittance report on DHL letterhead.

25          MR. CHIUCHIOLO:  And I can proffer that the

L9e2LluH                          Martinez - Redirect

1   government obtained this document pursuant to a subpoena from

2   RES.

3           The government would offer Government Exhibit 61 into

4   evidence.

5           MR. MAZUREK:  No objection.

6           THE COURT:  Okay.  Government Exhibit 61 is admitted

7   in evidence.

8           (Government's Exhibit 61 received in evidence)

9   BY MR. CHIUCHIOLO:

10  Q.  Looking at the payment date, can you tell us what it is?

11  A.  Sure.  The payment date listed is May 25, 2018.

12  Q.  And turning to page -- by the way, looking at the doc

13  number here, do you see some of these numbers appear with 9,

14  some of them begin with 2?  What has the F.B.I. learned

15  specifically with respect to invoices that begin with number

16  2?

17  A.  We have learned that invoices beginning with the number 2

18  were invoices that were fictitiously -- yeah, fictitiously

19  created to give the perception of accounts receivable --

20  receivables that did not really exist.

21  Q.  And was the fraud limited to the two series invoices, if I

22  can use that name, or did it go beyond that?

23          MR. MAZUREK:  Objection.  Lack of foundation.

24  Q.  Well, have you seen instances in which there appear to

25  be -- I think we are going to go through it, but have you seen

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Martinez – Redirect

L9e2LluH

1    instances in which non-two series invoices were also

2    fraudulent?

3    A.   Yes.

4    Q.   Okay.  And so, again, you said the date was May 25, 2018.

5    Turning to page 3 of this PDF, it's the same date, what is the

6    total payment amount listed here?

7    A.   $372,242.22.

8            MR. CHIUCHIOLO:  So Mr. Levine, I'm going to ask you

9    to leave this exhibit up on the left side of the screen and

10   display Government Exhibit 1 on the right side of the screen.

11   Q.   And do you recognize Government Exhibit 1?

12   A.   Yes.

13   Q.   What is it?

14   A.   These are Bank of America account statements for Espheria

15   LLC, in the name of Espheria LLC.

16           MR. CHIUCHIOLO:  Mr. Levine, can you please display

17   page 1 of Exhibit 91?

18   Q.   Special Agent Martinez, do you see the withdrawal from the

19   Espheria bank account on May 25, 2018, listed here for

20   $372,242.22?

21   A.   Yes.

22   Q.   Does that amount match the amount listed on the DHL

23   account -- remittance?

24   A.   Yes.

25   Q.   And the date matches?

Martinez - Redirect

L9e2LluH

1    A.  Yes.

2    Q.  On Government Exhibit 61, if you turn to page 4, what's the

3    payment date here?

4    A.  May 29, 2018.

5    Q.  And scrolling down to the remittance amount, what's the

6    total of the remittance amount?

7    A.  $282,200.79.

8    Q.  Looking over to the right side of your screen, do you see a

9    corresponding withdrawal from the Espheria bank account on May

10   29, 2018?

11   A.  Yes.

12   Q.  Have you seen other examples of this from DHL remittances?

13   A.  I believe so, yes.

14        MR. CHIUCHIOLO:  Mr. Levine, can you please display

15   what has been premarked for identification as Government

16   Exhibit 56.

17   Q.  What type of document is this?

18   A.  This is an e-mail from Maria Lopez to ML --

19   Moises_L@resourceemployment.com.

20   Q.  And does there appear to be some attachments?

21   A.  Yes.

22        MR. CHIUCHIOLO:  The government will proffer this is a

23   document obtained pursuant to a subpoena from RES.  The

24   government moves or offers Government Exhibit 56.

25        MR. MAZUREK:  No objection.

L9e2LluH                          Martinez – Redirect

1        THE COURT:  All right.  Government Exhibit 56 admitted

2   in evidence.

3             (Government's Exhibit 56 received in evidence)

4        MR. CHIUCHIOLO:  Mr. Levine, can you display page 3.

5   Q.  Does this appear to be a remittance on Pactiv letterhead.

6   A.  Yes.

7   Q.  And what is the date of the remittance?

8   A.  May 22, 2018.

9   Q.  And the payment amount?

10  A.  Approximately $293,000.

11       MR. CHIUCHIOLO:  Mr. Levine, can we display Government

12  Exhibit 1 on the right side of the screen again.  And, I'm

13  sorry, can we -- page 91.

14       THE COURT:  What's the Bates number?

15       MR. CHIUCHIOLO:  Of page 891?  I can tell you --

16  A.  I don't see -- they are not --

17       MR. CHIUCHIOLO:  I'm sorry, your Honor.  I'm trying to

18  make it easier for Mr. Levine who can't control it for Bates

19  number.  I can read them for you into the record.

20       THE COURT:  Yes, just so it's clear when I go back and

21  look at the transcript where we are talking about.

22       MR. CHIUCHIOLO:  Okay.  Are we at --

23       MR. LEVINE:  One second.  Sorry.

24       MR. CHIUCHIOLO:  Okay.  So page 91 of Government

25  Exhibit 1 is Bates USAO 29345.

Martinez - Redirect

L9e2LluH

1          THE COURT:  Okay.  Go ahead.

2     BY MR. CHIUCHIOLO:

3     Q.  And my question is, using Government Exhibit 1, the

4     Espheria bank account statement, do you see a corresponding

5     withdrawal from the Espheria bank account for $293,306.51?

6     A.  Yes.

7     Q.  And that matches the date of May 22, 2018?

8     A.  Yes.

9          MR. CHIUCHIOLO:  Turning to page 7 -- you can leave

10    both exhibits up.  Turn to page 7 of Government Exhibit 56.

11         And your Honor, I understand there will be

12    submissions, so I have cut down on this.  I just want to go

13    through a few examples.

14         THE COURT:  Understood.

15    BY MR. CHIUCHIOLO:

16    Q.  Special Agent Martinez, the date of this remittance on

17    Government Exhibit 56?

18    A.  May 22, 2018.

19    Q.  And what's the total payment number?

20    A.  The amount is approximately $277,000.

21    Q.  Do you see a corresponding withdrawal on May 22, on

22    Government Exhibit 1, which is the Espheria bank account, for

23    $277,257.46?

24    A.  Yes.

25    Q.  Let's replace Government Exhibit 56 on the left with what

L9e2LluH                          Martinez – Redirect

1   has been premarked for identification as Government Exhibit 58.

2         What type of document is this?

3   A.  It appears to be an e-mail from Maria Lopez to

4   Moises_L@resourceemployment.com.

5   Q.  And what is the attachment title?

6   A.  AR excluded backup doc, PDF.

7         MR. CHIUCHIOLO:  Again, your Honor, the government

8   would proffer that it obtained Government Exhibit 58 pursuant

9   to a subpoena from Resources Employment Solutions.  The

10  government offers Government Exhibit 58.

11        MR. MAZUREK:  No objection.

12        THE COURT:  All right.  Government Exhibit 58 admitted

13  in evidence.

14        (Government's Exhibit 58 received in evidence)

15        MR. CHIUCHIOLO:  We will look at one or two more

16  examples.  Mr. Levine, can you please display page 7 on

17  Government Exhibit 58.

18  BY MR. CHIUCHIOLO:

19  Q.  What is the date of this remittance?

20  A.  I believe it is May 25, 2018.

21  Q.  Okay.  And what is the total payment amount?

22  A.  It appears to be $165,131.35.

23  Q.  Looking to the right side of your screen, which is

24  Government Exhibit 1, do you see a corresponding withdrawal

25  from the Espheria account on May 24, 2018?

L9e2LluH                              Martinez - Redirect

1    A.  Yes.

2            MR. CHIUCHIOLO:  Mr. Levine, if you can just highlight

3    that.  Thank you.

4    Q.  Turning to page 8 of Government Exhibit 58, what is the

5    date of this remittance?

6    A.  May 17, 2018.

7    Q.  And what is the total payment amount?

8    A.  $148,104.92.

9    Q.  If you can scroll up a page, to page 90 on Government

10   Exhibit 1, which for the record is USAO 29344, do you see a

11   corresponding withdrawal from Espheria to RES on May 7, 2018?

12   A.  On May 17, yes.

13           THE COURT:  You said May 7.

14           MR. CHIUCHIOLO:  I'm sorry, May 17.

15           THE COURT:  The agent corrected you.

16           MR. CHIUCHIOLO:  We can take those documents down.

17   Q.  Special Agent Martinez you were asked a number of questions

18   on cross-examination about the value of RES.  Do you recall

19   that?

20   A.  Yes.

21   Q.  I just want to ask you a few brief follow-up questions.

22           MR. CHIUCHIOLO:  Mr. Levine, can we look at Government

23   Exhibit 50, which is the purchase agreement in evidence.  And

24   if we can look at page 6 of the PDF, which is page 2 of the

25   document, and I will read the Bates number in a second, that is

L9e2LluH                          Martinez - Redirect

1    182399.  And I want to focus on section 2.1(i)(A).

2    Q.  I believe you described this section yesterday as laying

3    out the formula for determining how much the acquisition group

4    paid Luis Lluberes for RES.  Do I have that right?

5    A.  Yes.

6    Q.  And the starting point here is -- in section 2.1, the

7    starting point is about $66 million, is that right?

8    A.  That's correct.

9    Q.  Do you know how the buyers and the seller reached that

10   valuation?  Do you have any knowledge about that?

11   A.  No.

12   Q.  Special Agent Martinez, are you familiar with the term

13   earning before interest, taxes, depreciation, and amortization,

14   or EBITDA?

15   A.  Yes.

16   Q.  And this is way outside of my wheelhouse, but do I have

17   this right that EBITDA is essentially a proxy for cash, it

18   tells you how much cash the business is producing?

19   A.  Yes.

20   Q.  And I don't want a CPA lecture here, but generally, just

21   based on your experience, how would one go about determining

22   the EBITDA of a business?

23   A.  So, again, it is your earnings, so net sales less your cost

24   of goods sold.  So you exclude a bunch of other -- a bunch of

25   different line items that you would include on your financial

L9e2LluH                              Martinez - Redirect

1    statement, so if you explain interest depreciation and taxes to

2    get like a true cash flow picture in terms of -- so cash flow

3    coming in rather than like a financial statement number.  Does

4    that help?

5    Q.  And how would -- if you were going to determine the EBITDA

6    of a particular business, what would you have to look at to

7    arrive at that number?

8    A.  To determine the EBITDA, I would probably have to look at

9    the financial statements and the underlying records.

10   Q.  Do you know where the investor group obtained the financial

11   statements of RES prior to the acquisition if you know?

12   A.  I believe they obtained them from the CEO.

13   Q.  Okay.  So let's look at the purchase agreement, Government

14   Exhibit 50, and I want to turn to page 13 of the PDF, which is

15   page 9.  It appears as page 9 of the document and it is Bates

16   00182406.  Are we on the same page?

17   A.  Yes.

18   Q.  Do you see Article III representations and warranties of

19   the seller, toward the bottom in bold?

20   A.  Yes.

21   Q.  And it begins, "a material inducement to the buyer to enter

22   into and perform its obligations under this agreement, the

23   seller represents and warrants to the buyer as set forth

24   below."  Do you see that?

25   A.  Yes.

Martinez - Redirect

L9e2LluH

1  Q.  I want to turn to section 3.5 of Article III which is on

2  page 16 of the PDF.  And that is Bates 00182409.  Do you see

3  section 3.5(a) at the top it says "schedule 3.5(a) attaches

4  true, correct, and complete copies of the following financial

5  statements" and then it lists a bunch of different financial

6  statements.  Do you see that?

7  A.  Yes.

8  Q.  And it lists -- it includes 2017 financial statements.

9          MR. CHIUCHIOLO:  Mr. Levine, can you please display

10  page 36 of the PDF.  You know what?  I'm sorry.  I need to --

11  we need to look at Defense Exhibit 8, which is the document

12  that contains some of the statutes or schedules.  Now turn to

13  page 8.  It is the disclosure schedule at the top.

14  Q.  It says here "schedule 3.5 financial statements"?

15  A.  Yes.

16          MR. CHIUCHIOLO:  And can you please display page 36 of

17  the PDF, Mr. Levine?  Okay.

18  Q.  See where it says "income statement" at the top?

19  A.  Yes.

20  Q.  Just very generally, high level, what's an income

21  statement?

22  A.  An income statement highlights a company's revenues and

23  their expenses.

24  Q.  And for what time period is this income statement?

25  A.  So from January through December 2017.

L9e2LluH                         Martinez - Redirect

1    Q.   Okay.   That's the calendar year before the acquisition,

2    correct?

3    A.   That's correct.

4    Q.   And do you see where it says "gross profit"?

5    A.   Yes.

6    Q.   What's the gross profit listed there?

7    A.   Gross profit listed is approximately $25 million.

8    Q.   You were asked some questions on cross-examination about

9    how you arrive at gross profits?

10   A.   Yes.

11   Q.   What's the total income listed?

12   A.   Total income is listed at $165 -- approximately $165

13   million, 166 million.

14   Q.   Special Agent Martinez, do you recall that you testified

15   yesterday that on March 30, 2020, a lawyer from Moises and Luis

16   Lluberes sent a letter to the investor group that disclosed

17   certain false statements to the bank?

18   A.   Yes.

19   Q.   As part of your work in this investigation, did you learn

20   of a call that occurred the following day, on March 31, 2020,

21   between Moises Lluberes and others, including members of the

22   investor group?

23   A.   Yes.

24   Q.   During that conversation, what statements, if any, did the

25   defendant make about RES's actual income?

L9e2LluH                              Martinez - Redirect

1    A.  I don't recall --

2              MR. MAZUREK:  Your Honor, I'm going to object now

3    because I think now we are going into issues of what if the

4    offense was in fact committed.  This is probable cause relating

5    to whether the government has evidence that there was bank

6    fraud --

7              MR. CHIUCHIOLO:  Your Honor, this is in response

8    to --

9              THE COURT:  Whoa, whoa.

10             MR. MAZUREK:  -- as opposed to a determination of what

11   value the company had at the time of the -- that the proceeds

12   were provided pursuant to the acquisition agreement.

13             MR. CHIUCHIOLO:  Your Honor, there were a number of

14   questions right before we broke for lunch about the gross

15   profit of the company.  I believe there was through questioning

16   and argument that, yeah, well, the receivables may have been

17   really inflated, but the revenues were also really inflated, so

18   no harm, no foul, and tend to establish through this witness

19   that in fact there was a material misrepresentation made to the

20   investor group about the total income of the company, which

21   does relate to the value of the company.  Again, we did not

22   want to elicit any testimony about value --

23             THE COURT:  No.  Objection overruled.  Sorry.  Sorry

24   to step on you.  Objection overruled.  You can continue.

25             MR. CHIUCHIOLO:  Okay.

L9e2LluH                          Martinez - Redirect

1   BY MR. CHIUCHIOLO:

2   Q.  During that conversation on May 31, 2020, in sum and

3   substance, what did Moises Lluberes say about total revenues or

4   income?

5   A.  I believe, if I remember correctly, that they were

6   overstated by approximately 40 -- revenues, right?

7   Q.  Yes.

8   A.  40 to $60 million.  And if I get the number incorrect, my

9   apologies, but the revenues are overstated by a material

10  amount.

11             MR. MAZUREK:  Your Honor, move to strike the

12  representation of 40 to 60 million based on speculation.

13             THE COURT:  Well, let me ask, Agent, is it your

14  recollection it was more than ten million?

15             THE WITNESS:  Yes.

16             THE COURT:  More than 20 million?

17             THE WITNESS:  Yes.

18             THE COURT:  More than 30 million?

19             THE WITNESS:  Yes.

20             THE COURT:  And more than 40 million or you are not

21  sure?

22             THE WITNESS:  I believe it was at least 40 million.

23             THE COURT:  Okay.  All right.

24  BY MR. CHIUCHIOLO:

25  Q.  Do you recall --

L9e2LluH                         Martinez - Redirect

1          THE COURT:  And so I will allow it up to 40 million.

2   Well, let me ask.

3          MR. MAZUREK:  Where does this come from?

4          THE COURT:  Agent -- that's what I was going to ask.

5          So, Agent, is it based upon your review of 3500

6   material?

7          THE WITNESS:  Through interview 302s of one of the

8   case agents.

9          THE COURT:  Okay.

10  BY MR. CHIUCHIOLO:

11  Q.  You were also asked questions -- well, do you recall if

12  Moises Lluberes, based upon your review of those 302s, if

13  Moises Lluberes stated that the actual revenues were about 120

14  million?

15         MR. MAZUREK:  Objection.  Leading.

16         THE COURT:  I will allow it.  Overruled.

17  A.  I believe so, yes.

18  Q.  Okay.  And 120 million is a lot different than 165 million,

19  correct?

20  A.  Yes.

21  Q.  In fact, the difference exceeds the gross profit listed on

22  this income statement, correct?

23  A.  Yes.

24  Q.  You were asked during cross-examination if you were aware

25  if RES is currently a going concern.  Do you recall that

214

Martinez - Redirect

L9e2LluH

1    question?

2    A.  I believe so, yes.

3    Q.  Is it fair to say that you are not knowledgeable on how

4    much additional money the additional investor group and victim

5    had to put in into RES?

6              MR. MAZUREK:  Objection leading.

7    A.  Yes I am unaware.

8              THE COURT:  Yes, it is leading.  Sustained.  A couple

9    of things to that question, and I may or may not have had a

10   conversation with my law clerk during the break, from the point

11   of time when the fraud is discovered and whether or not it is

12   still a going concern, there are a lot of questions just like

13   that, was money pumped in and everything else.  So I, from my

14   perspective --

15             MR. CHIUCHIOLO:  I can withdraw it.

16             THE COURT:  I am just saying I can't assess even if

17   it's a going concern now, I don't -- and assuming valuation is

18   an issue, I can't -- I don't think that there is anything that

19   is in the record before me to show how the company may or may

20   not have been sustained during that time period and --

21             MR. CHIUCHIOLO:  Fair enough.

22             THE COURT:  So I understand the question from the

23   defense, and, yes, it's a going -- and it may be somewhat

24   relevant, but unless I know the answer to other questions, I

25   can't say exactly what that says about the valuation.

Martinez - Recross

L9e2LluH

1        MR. CHIUCHIOLO:  Understood.  One moment, your Honor.

2        (Counsel confer)

3        MR. CHIUCHIOLO:  No further questions, your Honor.

4        THE COURT:  Okay.  Recross.

5        MR. MAZUREK:  Thank you, Judge.

6    RECROSS EXAMINATION

7    BY MR. MAZUREK:

8    Q.  Okay.  So -- oh, just a moment for audiovisual.

9        Agent, you were just asked a lot of questions about

10   Government Exhibits 56 through 65, which are a series of

11   e-mails and schedules attached to e-mails, right?

12   A.  Yes.

13   Q.  And I think you testified that you reviewed these in

14   preparation for your testimony, correct?

15   A.  I don't believe I reviewed every single one, no.

16   Q.  Okay.  You reviewed 59 and 62 which we talked about at

17   length.

18   A.  Can you pull them up?  I'm sorry.

19   Q.  I will show -- it will be easier to show them to you.

20   These are the two relating to Amazon.  Do you have them in

21   front of you?

22   A.  I don't.

23   Q.  Here is 62.  I seem to be missing my copy.  Oh, here is 59.

24        MR. MAZUREK:  May I approach, your Honor?

25        THE COURT:  You may.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L9e2LluH                              Martinez - Recross

1   BY MR. MAZUREK:

2   Q.   Are these, Government Exhibits 59 and 62, documents that

3   you reviewed prior to your testimony?

4   A.   Yes.

5   Q.   And they relate to Amazon receivables I think you testified

6   about, right?

7   A.   Yes.

8   Q.   And you were asked a series of questions by the prosecutor

9   on redirect examination about the contents of these e-mails,

10  right?

11  A.   Yes.

12  Q.   Now, let me ask, with respect to -- let's start with

13  Government Exhibit 59, can we look at the top of the e-mail.

14  This appears to be an e-mail between Moises Lluberes and Maria

15  Lopez, correct?

16  A.   Yes.

17  Q.   Okay.  And your understanding is this was obtained through

18  either government subpoena or the production by the company,

19  correct?

20  A.   Correct.

21  Q.   This e-mail does not have any communications with anyone

22  else in the Resource Employment company, correct?

23  A.   I don't believe so, no.

24  Q.   It is just between Ms. Lopez and Mr. Moises Lluberes,

25  right?

L9e2LluH                          Martinez — Recross

1    A.   Yes.

2    Q.   Now, this document appears to have a number of attachments.

3    I don't have the actual e-mail.  I just have what was produced.

4    So you see some information with the letterhead of Pactiv in

5    the next two pages.  Do you see that?

6    A.   Yes.

7    Q.   And then there is, starting on Bates page number 3701,

8    there is what the government asked you to look at as starting

9    as —— on the top of the page "please do not respond to this

10   e-mail."  Do you see that?

11   A.   Yes.

12   Q.   And you were asked to compare a bunch of numbers on this

13   document, right?

14   A.   Yes.

15   Q.   Do you know who —— where this attachment —— starting at

16   3701 to 3703, you don't know the source of this document other

17   than as an attachment to this e-mail, correct?

18   A.   Yes.

19   Q.   And you see different titles of columns on this, on this

20   data that you were asked to look at, including the column

21   entitled invoice number, right?

22   A.   Yes.

23   Q.   And then there is a number of invoices that begin —— or are

24   five-digit numbers, right?

25   A.   Yes.

Martinez - Recross

L9e2LluH

1    Q.  You didn't --

2                THE COURT:  Just to be clear, there is a five-digit

3    number and then some of them have letters.  In other words,

4    there are only a handful, but if you flip over, just to be

5    clear.  So go ahead, Mr. Mazurek.

6    BY MR. MAZUREK:

7    Q.  You did not check or obtain RES invoices that matched this

8    numbering, did you, the numbers listed here?

9    A.  I don't believe so, no.

10   Q.  Are you familiar with -- withdrawn.

11               You were asked questions about the payment number

12   that's identified in the middle of this page, right, ending in

13   the numbers 175?

14   A.  Yes.

15   Q.  You don't know what that refers to within RES or Amazon, do

16   you?

17   A.  No.

18   Q.  You see the payment amount of $1.782 million listed there?

19   A.  Yes.

20   Q.  And you know that on May 10, in the RES bank account, a

21   payment was made by Amazon in that same amount, right?

22   A.  Yes, I believe so.

23   Q.  There are also, in the columns listed on this document, at

24   3701, Bates number, there is invoice description, you see that?

25   A.  Yes.

Martinez - Recross

L9e2LluH

1   Q.  Some say BOS5, some say CDG5, DLA5, EWR5.  You have no idea

2   what that designation is, do you?

3   A.  No, I don't.

4   Q.  You have no knowledge as to whether the information listed

5   here is somehow information related to internal data kept by

6   RES relating to Amazon invoices, do you?

7   A.  Can you repeat the question?

8   Q.  You have no knowledge as to whether the information listed

9   as an attachment to this e-mail is information that is just

10  internal reporting by RES?

11  A.  Yeah, I don't.

12  Q.  Okay.  You were asked questions about a particular number,

13  an entry on this e-mail, dated January 11, 2018, and I am

14  referring now to Bates number 3702, that had the number 92454

15  next to it.  Do you see that?

16  A.  Yes.

17  Q.  And then there is a description under invoice description

18  as IVSA.  Do you see that?

19  A.  Yes.

20  Q.  Now, if we could go back, can we now show on the screen

21  what has been admitted into evidence -- one moment, your

22  Honor -- DX 2, which you were asked about on cross-examination

23  and again on redirect, and it's highlighted on your screen.

24  See that?

25  A.  Yes.

L9e2LluH                              Martinez - Recross

1   Q.  Next to the -- do you see under one of the columns it is

2   called "document number," it is the fourth column to the left

3   on your screen?

4   A.  Yes.

5   Q.  And that you see a 92454 number identified?

6   A.  Yes.

7   Q.  You have no idea what the column title document number

8   refers to in RES's reporting, do you?

9   A.  As previously stated during my testimony, it could mean --

10  Q.  Yes or no, do you know what it means?

11  A.  Specifically, no.  I suggest that it could be -- could

12  mean --

13          MR. MAZUREK:  Move to strike, your Honor.

14          THE COURT:  No, I will allow it.  He previously

15  testified about it.  In other words, when you asked him the

16  first time he had previously testified on examination --

17          MR. MAZUREK:  What he believed it to be?

18          THE COURT:  Yes.  He said based, upon his information,

19  but yes.  He doesn't know what it is, as you have elicited.

20          MR. MAZUREK:  Okay.

21  BY MR. MAZUREK:

22  Q.  The column to the right of document number is customer PO

23  number, right?  And you offered testimony on cross-examination

24  about that number.

25  A.  Yes.

Martinez - Recross

L9e2LluH

1    Q.  You understand PO stands for purchase order, right?

2    A.  Yes.

3    Q.  And this is usually something that would be generated by

4    the customer as opposed to the provider of the service,

5    correct?

6    A.  Yes.

7    Q.  And there is a number associated there, correct?

8    A.  Yes.

9    Q.  Did you review customer PO numbers from Amazon prior to

10   your testimony today?

11   A.  I do not believe so.

12   Q.  And a customer PO number is not identified in the

13   Government Exhibit 59 which you -- that we were just reviewing,

14   correct?

15   A.  That's correct.

16              MR. MAZUREK:  Just a moment, your Honor.

17              THE COURT:  Okay.

18   Q.  Now I'm going to ask that you display Government Exhibit

19   50, schedule 5.15.  And if we go about midway down the page

20   under the customer PO number 16-00825094, do you see that?

21   A.  Yes.

22   Q.  And under -- on that line, is that an excludable receivable

23   that's identified in schedule 5.15?

24   A.  I believe so, yes.

25   Q.  And that matches the purchase order that we saw on the

1  remittance report, correct?

2  A.  Was it on the remittance report.

3  Q.  DX 2?

4  A.  I'm sorry.

5  Q.  In DX 2, spreadsheet line 87?

6  A.  This was an internally created document, right?

7  Q.  I'm asking whether the number matched.

8  A.  Right, but you called it a remittance report, I believe.

9  Q.  Okay.  DX 2, under Amazon Excluded and identification of

10  the PO number on line 87?

11  A.  So the number on Government Exhibit -- Defense Exhibit 2

12  matches that PO number, yes.

13  Q.  With the schedule for the excluded receivable?

14  A.  Yes.

15  Q.  And you didn't have a chance to review any purchase orders

16  in your preparation of your testimony?

17  A.  I don't believe so, no.

18  Q.  And the purchase order would be something that would come

19  from the customer, not from RES, correct?

20  A.  Usually, yes.

21  Q.  Okay.

22          MR. CHIUCHIOLO:  Your Honor, just to reiterate the

23  government's objection with the spreadsheet, it was created by

24  the defendant, so to rely on it for this purpose, the

25  government would submit, would be inappropriate.

Martinez - Recross

L9e2LluH

1      THE COURT:  Understood.  Well, what I would say is

2   it -- I will accept it with the understanding that it's a

3   document that was created by the defendant subject to -- not

4   subject to but in understanding the allegations in the

5   indictment.

6   BY MR. MAZUREK:

7   Q.  Let me ask you this.  DX 2, Agent, the spreadsheet that we

8   have been looking at, do you have any personal knowledge as to

9   whether this spreadsheet was available, to whom it was

10  available at RES during the time frame involved here from May

11  through December of 2018?

12  A.  No, I don't.

13  Q.  Do you have any idea whether it was used by people other

14  than Moises and Luis Lluberes?

15  A.  No, I don't.

16  Q.  What is the basis of your knowledge that this spreadsheet,

17  DX 2, was available or was something that Moises and Luis

18  Lluberes had?

19  A.  There is no basis.  I can't assume it.

20  Q.  Now, you were asked questions about the financial

21  statements of RES that were attached in the schedule to the

22  purchase agreement, right?

23  A.  Yes.

24  Q.  And before I get there, just to be clear, you were also

25  asked questions about how the cash consideration was

L9e2LluH                        Martinez - Recross

1  determined, the purchase price of RES, right?

2  A.  Yes.

3  Q.  And that purchase price was based on a valuation of 49

4  percent of the company, correct?

5  A.  I believe so, yes.

6  Q.  51 percent was retained by Luis Lluberes as part -- sorry

7  it's the opposite, 49 percent was retained by Luis Lluberes as

8  a result of the transaction, correct?

9  A.  I believe so.

10 Q.  And that was -- and he retained an exchanged equity in that

11 amount based on the purchase agreement?

12 A.  That I'm not sure.

13 Q.  Okay.  But if we could go to GX 50 and section 2.1, the

14 consideration for the purchase. and specifically if you can

15 look at 2.1(a)(i)(F) and do you see an entry for the exchanged

16 equity valued at $17,150,000?

17 A.  Yes.

18 Q.  So that was the amount of the value of the exchanged equity

19 that the parties agreed to for Luis Lluberes's retention of 49

20 percent of the shares of the new RES?

21 A.  Yes.

22 Q.  Now let's talk about the profit on the financial statements

23 in DX 8 that you were asked to look at, specifically the income

24 statement from January through December of 2017.  Do you see

25 that?

Martinez - Recross

L9e2LluH

1  A.  Yes.

2  Q.  And based on your investigation of the case and your

3  understanding talking to people, case agents, people,

4  witnesses, you know that Union Capital, the purchaser of the

5  company, had hired outside accounting firm KPMG to perform a

6  valuation of the company prior to its purchase?

7  A.  I'm not sure who they obtained to do a prepurchase

8  valuation but I know that they hired a firm.

9  Q.  An outside accounting firm to do a complete valuation,

10  right?

11  A.  I believe so.

12        THE COURT:  A what?

13  Q.  An outside accounting firm to do a purchase valuation of

14  the company.

15  A.  I believe so, yes.

16  Q.  And part of the report that was issued by that outside

17  accounting firm was the determination of what the value of --

18  what that accounting firm believed the value was after due

19  diligence to report to the potential buyer.

20  A.  I'm not sure.  I didn't review that report.

21  Q.  You didn't review it?

22  A.  The report provided by the external auditor, no.

23  Q.  But you heard about it from --

24  A.  Yes.

25  Q.  -- witnesses at Union Capital?

Martinez – Recross

L9e2LluH

1    A.  Yes, not from Union Capital, either through discussions

2    with the prosecution team and my co-case agents or maybe in

3    interviews.  I can't recall.

4    Q.  And your understanding was, based upon that report, Union

5    Capital continued to want to go through with the transaction.

6    A.  I believe so, yes.

7    Q.  Okay.  And that report would include *pro forma* financial

8    statements of the company.

9    A.  Do I know if it included that?

10   Q.  Yes.

11          MR. CHIUCHIOLO:  Your Honor, objection, given the

12   witness's testimony that he did not see the report.

13   Q.  Well, did you --

14          THE COURT:  I will allow a limited amount, since he

15   did review or speak with people who may have, so I will allow a

16   limited amount.

17          But ask your next question.

18          MR. MAZUREK:  Okay.

19   BY MR. MAZUREK:

20   Q.  And based on your conversations with people from the

21   investor group, you understood that that outside accounting

22   firm had its own financial statement presented to Union

23   Capital.

24   A.  I did not have any conversations directly with the

25   investor --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L9e2LluH                     Martinez - Recross

1    Q.  With agents who did have conversations?

2    A.  That *pro forma* financial statements were created?

3    Q.  Yes.

4    A.  I'm not sure.

5    Q.  Okay.

6    A.  I just know that an auditor was hired pre-valuation.

7    Q.  And that included a financial valuation?

8    A.  I believe so yes.

9    Q.  So now I am going to ask you to turn your attention to the

10   income statement that you were asked about on redirect, and

11   that's for the period of January through December 2017.  Do you

12   see that?

13   A.  Yes.

14   Q.  And you were asked questions about the service sales in

15   the amounts of 165 million that's reported there.  Do you see

16   that?

17   A.  Yes.

18   Q.  Now, you were -- you recall reading a report about a

19   conversation that Moises Lluberes allegedly gave where he said

20   that that amount was inflated?

21   A.  Yes.

22   Q.  You have -- you are relying, again, on statements that were

23   made by another agent recorded in the F.B.I. 302 report?

24   A.  Well, statements from I believe it is either the investor

25   group that were recorded by the agent, but the agent did not

Martinez - Recross

L9e2LluH

1    make those statements.  The agent recorded the statements --

2    Q.  Recorded the statements on an F.B.I. report.

3    A.  Yes.

4    Q.  You did not review -- you only reviewed that report and

5    that's what you are basing your testimony on today?

6    A.  I believe a couple of 302s of interviews.  I believe at

7    least two 302s or F.B.I. reports with conversations with the

8    investor group.

9    Q.  Okay.  And so you are basing your testimony of the

10   inflation of the revenues on reading those reports, yes?

11   A.  Based on that, yes, and discussions with the rest of the

12   investigators.

13   Q.  Now --

14   A.  And review of supporting documents.  I'm sorry.

15   Q.  Okay.  I'm just asking about the conversation --

16   A.  Sure.

17   Q.  -- you testified about.

18   A.  Okay.

19   Q.  Do you have any knowledge of whether that conversation had

20   to do with an annualized inflation of revenue or a snapshot in

21   time or do you have any context within which to understand

22   where that statement allegedly came from or referred to?

23   A.  I don't remember whether they analyzed it or whether it was

24   up to a certain point in time.

25   Q.  Then you were asked questions about how the income

L9e2LluH                              Martinez - Recross

1   statement -- how the inflated revenues would affect the gross

2   profit line on the income statement of $25 million.  Do you

3   remember that?

4   A.  Yes.

5   Q.  And that gross profit line basically is revenues minus cost

6   of goods sold, right?

7   A.  Yes.

8   Q.  And in a staffing firm, the cost of goods sold of payroll

9   expense, right?

10  A.  Yes, yeah.

11  Q.  That was the largest expense by far, correct?

12  A.  Yes.

13  Q.  And that would average where here it is about $138 million

14  direct labor cost.  Do you see that?

15  A.  Yes.

16  Q.  Plus the 1.69 for the payroll service?

17  A.  Yes.

18  Q.  So a total of about $140 million, right?

19  A.  Yes.

20  Q.  Now, based on your earlier testimony today, you testified

21  that if expenses relating to inflated receivables matched the

22  inflated receivable, that it will have a net zero effect on

23  gross profit, remember that?

24  A.  Yes.

25  Q.  So if expenses or labor costs were taken out at the same

L9e2LluH                          Martinez - Redirect

1    level of the inflated revenues, the gross profit would remain

2    the same.

3    A.   Yes.

4    Q.   So the $25 million would be correctly reported here even if

5    both revenues and costs were inflated the same amount.

6    A.   Well, let me backtrack one second here.  So I don't think

7    there is a -- can I have one second to think about this?

8             MR. MAZUREK:  Your Honor, I will withdraw the

9    question.

10            THE COURT:  All right.  You don't have to answer.

11            THE WITNESS:  No?  I -- okay.

12            MR. MAZUREK:  Nothing further.

13            MR. CHIUCHIOLO:  Your Honor, just one very quick

14   question.

15            THE COURT:  Yes.

16   REDIRECT EXAMINATION

17   BY MR. CHIUCHIOLO:

18   Q.   Special Agent Martinez, based on your review of those

19   F.B.I. 302s, your conversations with your co-case agents, in

20   sum and substance, what did members of the investor group who

21   were interviewed by the F.B.I. say about whether they would

22   have purchased RES had they known of the fraud alleged in the

23   indictment?

24            MR. MAZUREK:  Objection.

25            THE COURT:  I will allow it.  Overruled.

L9e2LluH                              Kudirka - Direct

1   A.  They would not have made the investment.

2                MR. CHIUCHIOLO:  No further questions.

3                THE COURT:  Okay.  All right.  I think, I mean I may

4   be wrong, but I think that -- let me ask, is that in the

5   indictment?  I can't remember if it's in the indictment.

6                MR. CHIUCHIOLO:  I don't recall.  I don't know for

7   sure.

8                THE COURT:  All right.  Thank you, agent.  You can

9   step down.

10               THE WITNESS:  Thank you, your Honor.

11               (Witness excused)

12               THE COURT:  Government's next witness?

13               MR. NESSIM:  The government calls Special Agent

14  Elizabeth Kudirka.

15   ELIZABETH KUDIRKA,

16        called as a witness by the government,

17        having been duly sworn, testified as follows:

18  DIRECT EXAMINATION

19  BY MR. NESSIM:

20  Q.  Good afternoon.

21  A.  Good afternoon.

22  Q.  You have been waiting outside for a long time, so nice to

23  see you on the witness stand.

24               Where do you work?

25  A.  The F.B.I.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L9e2LluH                          Kudirka - Direct

1   Q.  Can you just please stays state your name for the record?

2   A.  Sure, Elizabeth Kudirka.

3   Q.  Where do you work, Special Agent Kudirka?

4   A.  F.B.I.

5   Q.  What's your title?

6   A.  Special agent.

7   Q.  How long have you been a special agent at the F.B.I.?

8   A.  Since 2018.

9   Q.  Are you assigned to a particular squad?

10  A.  Yes.

11  Q.  What squad is that?

12  A.  C40 money laundering facilitation.

13  Q.  And what are some of the types of cases that you work on in

14  your work as a special agent on C40?

15  A.  I worked money laundering facilitation cases that have

16  involved business e-mail compromise schemes, romance fraud

17  schemes, cryptocurrency investigations involving money

18  laundering.

19  Q.  Turning specifically to cryptocurrency, in your time as an

20  F.B.I. agent, have you learned about cryptocurrency?

21  A.  Yes.

22  Q.  And what are some of the ways that you have learned about

23  cryptocurrency?

24  A.  Through my own casework.  I have also taken courses on it.

25  I have had conversations with other F.B.I. employees about

L9e2LluH                           Kudirka - Direct

1   cryptocurrency.  I have interviewed folks that work in the

2   cryptocurrency space, and I have had conversations with people

3   who work at cryptocurrency exchanges and businesses.

4   Q.  So to speak generally, what is cryptocurrency?

5   A.  Cryptocurrency is a type of digital money that, rather than

6   being issued by a central authority, like a government or a

7   business, it is managed and created through a distributed

8   network and transactions are recorded on that network.

9   Q.  And what are other terms for that network?

10  A.  The blockchain.

11  Q.  And what is the blockchain?

12  A.  The blockchain is a distributed ledger that keeps a running

13  record of all of the transactions that have occurred for that

14  particular currency.

15  Q.  Is the blockchain publicly available or is it proprietary

16  or confidential?

17  A.  It is publicly available.

18  Q.  So how can someone use the blockchain to learn about

19  certain transactions on a particular cryptocurrency?

20  A.  There are websites that allow you to look up specific

21  transactions or specific addresses to see what kind of activity

22  they have or transactions that have occurred.

23  Q.  And what is a cryptocurrency exchange?

24  A.  A cryptocurrency exchange is kind of an onramp to get into

25  the crypto space.  They typically will take your fiat currency

L9e2LluH                              Kudirka - Direct

1    and allow you to buy and sell cryptocurrencies.

2    Q.  Are there many varieties of cryptocurrency?

3    A.  Yes.

4    Q.  And what are some of the most well known varieties?

5    A.  Bitcoin, Ether, Bitcoin Cash, Litecoin.  There is over

6    11,000 of them.

7    Q.  In your training and experience, have you found that

8    cryptocurrency is -- has been used by people involved in

9    illegal activity?

10   A.  Yes.

11   Q.  And what are some of the features of cryptocurrency that

12   make it appealing to people involved in illegal activity?

13   A.  It's pseudoanonymous.  It is -- transactions occur pretty

14   quickly, they -- it's easily transportable, it has value, and

15   there is a marketplace for it.

16   Q.  Did there come a time when you reviewed cryptocurrency

17   records related to Moises and Luis Lluberes?

18   A.  Yes.

19   Q.  So I want to turn your attention to a few of these.

20          Mr. Levine, can you please pull up Government Exhibit

21   20 and publish it.  And just scroll up through the document,

22   please.

23          Do you recognize this?

24   A.  Yes.

25   Q.  What is it?

L9e2LluH                        Kudirka - Direct

1   A.  It's a custodian of records declaration in the KYC photos

2   of I believe Moises Lluberes.

3   Q.  What's KYC?

4   A.  "Know Your Customer."

5   Q.  Were these records produced by Coinbase?

6   A.  Yes.

7   Q.  What is Coinbase specifically?

8   A.  Coinbase is a U.S.-based cryptocurrency exchange.

9   Q.  And let's look at Government Exhibit 21, please.  What is

10  this?

11  A.  These are Coinbase records for Moises Lluberes's account

12  there.

13  Q.  And this is produced pursuant to subpoena?

14  A.  Yes.

15  Q.  And were the prior records we just looked at also produced

16  pursuant to subpoena?

17  A.  Yes.

18  Q.  Let's pull up Government Exhibit 22.  Can we scroll to the

19  top.

20          What's this?

21  A.  These are Luis Lluberes's Coinbase records.

22  Q.  And were these also produced by Coinbase pursuant to

23  subpoena?

24  A.  Yes.

25  Q.  Did you review the declaration of the custodian of records

Kudirka - Direct

L9e2LluH

1    for these documents?

2    A.   Yes.

3    Q.   Does it say, in substance, that these were all true and

4    accurate business records of Coinbase?

5    A.   Yes.

6            MR. NESSIM:  The government would offer Government

7    Exhibits 20, 21, and 22?

8            MS. HARAMATI:  No objection, your Honor.

9            THE COURT:  All right.  Government Exhibits 20, 21,

10   and 22 are admitted.

11           (Government's Exhibits 20, 21 and 22 received in

12   evidence)

13           MR. NESSIM:  You can take that down for now,

14   Mr. Levine.  Thank you.

15   BY MR. NESSIM:

16   Q.   You mentioned that Coinbase is a U.S.-based cryptocurrency

17   exchange?

18   A.   Yes.

19   Q.   Generally speaking, at a very high level, how does the user

20   use Coinbase?

21   A.   You open up an account just like you would any bank

22   account.  You provide to them information identifying yourself,

23   in Coinbase's situation you are providing them your name, date

24   of birth, your Social Security number, photos of yourself,

25   photos of your IDs, you are also providing your bank account

Kudirka - Direct

L9e2LluH

1    information to them.

2    Q.  Are you familiar with the term "wallet"?

3    A.  Yes.

4    Q.  What is a wallet in a cryptocurrency context?

5    A.  At a very high level, a wallet is where you keep your

6    public and private keys or -- I'm sorry, your public address

7    that you can transact cryptocurrencies through.

8    Q.  What does that mean in a practical sense?

9    A.  This is where you can send and receive cryptocurrencies.

10   Q.  And are wallets specific to the variety of currency or are

11   they specific to an account or at what level of generality is a

12   wallet classified?

13   A.  A wallet is typically controlled by one person or one

14   entity, but it can contain within it multiple addresses for

15   different cryptocurrencies.

16   Q.  Now, are you familiar with the term Coinbase Pro?

17   A.  Yes.

18   Q.  What is that?

19   A.  It is a portion of Coinbase's business that allows Coinbase

20   users to trade cryptocurrencies amongst themselves and that

21   trading is typically intended for a more advanced trader.

22            MR. NESSIM:  Let's turn back to Government Exhibit 21,

23   that Excel sheet.  Sorry, Mr. Levine.

24   Q.  So let's just look at row 4.  What's the name of the user

25   of this account?

Kudirka - Direct

L9e2LluH

1    A.  Moises Lluberes.

2    Q.  And looking at row six, when was this contract created?

3    A.  On November 30, 2017, 9:45 p.m., Pacific standard time.

4    Q.  And let's scroll down to row 58.  What is -- if you could

5    just expand -- well, it may not.  What is does this section

6    show?

7    A.  These are the bank accounts associated with Moises

8    Lluberes's Coinbase account.

9    Q.  And what are the bank accounts that are associated with

10   it?

11   A.  There is a Chase Premier Checking account, there is a Bank

12   of America account and a SunTrust Essential Savings account.

13   Q.  What does it mean for a bank account to be associated with

14   a Coinbase account?

15   A.  It means these are the only bank accounts that would be

16   able to deposit to Coinbase or the user would be able to

17   withdraw funds from their Coinbase account to these particular

18   accounts.

19   Q.  If you look at the Bank of America account number, it is

20   sort of a garbled Excel number.

21            Mr. Levine, can you select that cell?

22            Is there an actual account number provided?

23   A.  Yes.

24   Q.  In an actual data field?

25   A.  Yes.

Kudirka - Direct

L9e2LluH

1    Q.  And where can you see that?

2    A.  In the function bar at the top, right there.

3    Q.  Ending in 7466?

4    A.  Yes.

5    Q.  Mr. Levine, let's jump down to row 1104.

6            So what does this section of the return show?

7    A.  These were transactions that occurred within Mr. Moises

8    Lluberes's Coinbase.com account.

9    Q.  So we will just go column by column and just identify the

10   type of information contained here.

11   A.  Sure.

12   Q.  So time stamp, what does that show?

13   A.  The date and time of the particular transaction.

14   Q.  And account name?

15   A.  That is which cryptocurrency wallet was used for that

16   transaction.

17   Q.  And so just as an example, are you -- do you know what LTC

18   wallet means?

19   A.  Yes that's a Litecoin wallet.

20   Q.  And what's Litecoin?

21   A.  It's a type of cryptocurrency.

22   Q.  And what does BTC wallet mean?

23   A.  Bitcoin wallet.

24   Q.  If you see down at row 1133, there is USD wallet?

25   A.  Um-hmm.

Kudirka - Direct

L9e2LluH

1    Q.  What is the USD wallet?

2    A.  That is U.S. dollars.

3    Q.  And what information is reflected in the type of

4    transaction column?

5    A.  That is whether it is a buy, a sell, a transfer, a send,

6    receive or a deposit or withdrawal transaction.

7    Q.  And what is the status column?

8    A.  That is whether or not the transaction has been completed.

9    Q.  And the balance column?

10   A.  That is the running balance for that particular wallet

11   after that transaction has occurred.

12   Q.  And amount?

13   A.  That is the amount of the transaction.

14   Q.  Currency?

15   A.  That is the currency that that transaction was conducted

16   in.

17   Q.  And then "to"?

18   A.  The "to" column represents where the particular

19   transaction was going to.  In some instances it is internal

20   Coinbase accounts.  In some instances it is an external

21   currency wallet.

22          MR. NESSIM:  Can you just expand column H just to get

23   the full thread of those addresses.

24   Q.  So do you see that some of these transactions seem not to

25   have a "to" field at all?

Kudirka - Direct

L9e2LluH

1    A.  Yes.

2    Q.  What, if anything, does that indicate?

3    A.  That indicates that the transaction is being received by

4    Moises Lluberes's account.

5    Q.  And then what's the notes section?

6    A.  This is a note that can be filled in by the customer of

7    Coinbase or Coinbase itself.  It's just whatever notation the

8    user would like to include related to the transaction.

9    Q.  And EQUIV USD, column J?

10   A.  That is the equivalent value of the transaction in U.S.

11   dollars.

12   Q.  And what determines the value of a cryptocurrency in U.S.

13   dollars at a given point in time?

14   A.  Whatever the market price is at that time, whatever people

15   are willing to pay for that particular currency.

16   Q.  So it fluctuates?

17   A.  It does.

18   Q.  And then column K, Coinbase ID, what's that?

19   A.  That is a Coinbase transaction ID.

20   Q.  And what is transaction ID?

21   A.  This is just a Coinbase internal control for them to be

22   able to manage all of the transactions that they are

23   processing.

24   Q.  And what is transaction hash?

25   A.  A transaction hash is assigned to a transaction that is

Kudirka - Direct

occurring on the blockchain.  So if you were to send funds

externally from its account, you would receive a transaction

hash for that transaction.

Q.  So what does it indicate, if anything, for rows where there

is no transaction hash?

A.  The transaction occurred internally for -- to Coinbase's

business.

Q.  And then column M, the last column, payment method details,

what does that show?

A.  That shows what was used to pay for the transaction,

whether that be a debit card, a bank account, a wire, or a

particular wallet within the Coinbase account.

Q.  Okay.  We are going to come back to some of these

transactions; but, Mr. Levine, let's quickly jump down to row

2076.

　　　　　What is this section of the return?

A.  These are Coinbase Pro transactions.

Q.  Have you reviewed this return?

A.  Yes.

Q.  Based on your review, do you know whether or not

Mr. Lluberes transferred any money directly into or directly

out of his Coinbase Pro account?

A.  No.

Q.  No, you don't know to ---

A.  I'm sorry.  Could you repeat the question.

Kudirka – Direct

L9e2LluH

1   Q.  So I guess to what extent did you observe any cash deposits

2   directly from an outside financial institution to the Coinbase

3   Pro platform for this user's account?

4   A.  There were no direct deposits from a cash account into the

5   Coinbase Pro account.

6   Q.  And what about direct withdrawals from the Coinbase

7   Pro account?

8   A.  There were no direct withdrawals from the Coinbase

9   Pro account.

10          MR. NESSIM:  Mr. Levine, let's go back up to the

11  general section that is at row 1106.

12  Q.  So just quickly looking at some of these transactions

13  between the top row 1106 and row 1132, do you see those?

14  A.  Yes.

15  Q.  What's the time period of those transactions?

16  A.  December 14, 2017, to May 11, 2018.

17  Q.  And turning to the Equivalent USD column of those

18  transactions in column J --

19  A.  Yes.

20  Q.  -- how would you characterize the relative value of those

21  transactions?

22  A.  These are relatively small transactions.

23  Q.  Now let's look at the transaction at row 1133.  So what is

24  this transaction?

25  A.  This is a May 11, 2018, deposit into the USD wallet.

L9e2LluH                    Kudirka - Direct

1          MR. NESSIM:  Mr. Levine, can you scroll to the last

2    column.

3    Q.  Where is that deposit funded from?

4    A.  It's a bank wire from an account ending in 2861.

5          MR. NESSIM:  Mr. Levine, let's publish Government

6    Exhibit 101, please.

7    Q.  Have you reviewed this document in advance of your

8    testimony today?

9    A.  Yes.

10   Q.  What sort of information does it contain?

11   A.  This is a chart of major Bitcoin transactions in Moises

12   Lluberes's Coinbase account.

13   Q.  And is it a summary of information contained in the

14   Coinbase records that we just referenced?

15   A.  Yes.

16   Q.  Does it contain summary information from any other types of

17   record?

18   A.  Yes.

19   Q.  What record is that?

20   A.  It also contains information from Moises Lluberes's

21   Coinbase account and information obtained from a blockchain

22   explorer.

23   Q.  You just said it also contains information from Moises

24   Lluberes --

25   A.  I'm sorry Luis Lluberes.

Kudirka - Direct

L9e2LluH

1    Q.  Okay.  And a blockchain explorer.  What is a blockchain

2    explorer?

3    A.  It is a website that allows you to look up specific

4    transactions that occurred on the Bitcoin blockchain.

5    Q.  Is that just a way to access certain portions of the

6    blockchain that's incredibly large but publicly available

7    and --

8    A.  Correct.

9            MR. NESSIM:  The government offers Government Exhibit

10   101.

11           MS. HARAMATI:  No objection.

12           THE COURT:  Okay.  Government Exhibit 101 is admitted

13   in evidence.

14           (Government's Exhibit 101 received in evidence)

15   BY MR. NESSIM:

16   Q.  Turning to the top, what's the information contained on

17   this exhibit?

18   A.  It's the date, description of the transaction, and

19   approximate running dollar amount for the inputs and outputs of

20   Moises Lluberes's Coinbase account.

21   Q.  And as to that third column, is that a -- to what extent,

22   if at all, is that figure different from the actual value of

23   currency -- of the assets in the cryptocurrency account at a

24   given point in time?

25   A.  This just covers the inputs and outputs of the accounts,

L9e2LluH                           Kudirka - Direct

1  and the value of the cryptocurrency that's held in the account

2  will fluctuate with the market prices.

3  Q.  And the first row starts at what date?

4  A.  May 11, 2018.

5  Q.  And we just mentioned earlier transactions.  This summary

6  chart does not take into consideration those earlier

7  transactions, right?

8  A.  Correct.

9  Q.  So this first transaction here, what happens here?

10  A.  This is a May 11, 2018, deposit of approximately $24,990

11  into Moises Lluberes Coinbase account from a JPMorgan Chase

12  account ending in 2861.

13  Q.  And looking at the next couple of rows, what are the

14  certain bank accounts that this Coinbase account is being

15  funded from?

16  A.  The JPMorgan Chase account ending in 2861 and a Bank of

17  America account ending in 7466.

18  Q.  Turning your attention to February 27, to -- can we just go

19  down to the second page for a second, to March 5, 2020, there

20  are a number of withdrawals from the Coinbase account?

21  A.  Yes.

22  Q.  Where does that money go?

23  A.  The JPMorgan Chase account ending in 2861 and the Bank of

24  America account ending in 7466.

25  Q.  Understanding what you just testified to, that the third

L9e2LluH                          Kudirka – Direct

1    column is not the actual value, but it's a sort of proxy --

2    A.  Yes.

3    Q.  -- about how much more or less is left in the account by

4    the end of those withdrawals?

5    A.  About $36,904.64.

6    Q.  And then between March 28, 2020 and April 10, 2020, what

7    takes place?

8    A.  Moises Lluberes receives three transactions of about

9    25.4757 Bitcoin which was worth approximately $165,000 at the

10   time from Luis Lluberes's Coinbase account.

11              MR. NESSIM:  Mr. Levine, I'm sorry to jump back to

12   Excel, but can we look at Government Exhibit 22 for a moment.

13   Q.  And whose account is this?

14   A.  Luis Lluberes.

15   Q.  In row 6, when was it created?

16   A.  May 10, 2018, at 11:01 p.m. Pacific time.

17   Q.  And row 57, what is the associated bank account?

18   A.  A Bank of America account ending in 4068.

19              MR. NESSIM:  Mr. Levine, can we pull up Exhibit 4

20   without going back to Trial Director, or do we need to --

21              MR. LEVINE:  Exhibit what?

22              MR. NESSIM:  4.

23              MR. LEVINE:  Yes.

24              MR. NESSIM:  Actually I will use a hard copy.  It's

25   all right.  I got it.

L9e2LluH                              Kudirka - Direct

1    Q.  You have before you -- you should have on your screen

2    what's already in evidence as Government Exhibit 4.

3    A.  Yes.

4    Q.  What are the last four digits of that account?

5    A.  7764.

6    Q.  And what's the name of the account?

7    A.  HR Platform Consulting Group, LLC.

8    Q.  And what's the bank?

9    A.  Bank of America.

10           MR. NESSIM:  Mr. Levine, you can take that down and go

11   back to Government Exhibit 22.

12           I meant to do Government Exhibit 5.

13   Q.  What's the last four digits of this bank account?

14   A.  The checking account is 4068 and the savings account is

15   4487.

16   Q.  And that's -- who is the account name?

17   A.  Luis Lluberes.

18   Q.  Back to 22, were you able to -- those transactions we just

19   mentioned on the summary chart, were you able to see both ends

20   of these Coinbase transactions in both Luis Lluberes and Moises

21   Lluberes's Coinbase return?

22   A.  Yes.

23           MR. NESSIM:  Mr. Levine, let's go back to 101, please.

24   BY MR. NESSIM:

25   Q.  Between March 28, 2020 and April 11, 2020, what happened

L9e2LluH                         Kudirka - Direct

1    there?

2    A.   There are seven transactions out of Moises Lluberes's

3    Coinbase account worth approximately 29 Bitcoin, approximately

4    187,000, U.S. dollars, to seven different external wallet

5    addresses.

6              MR. NESSIM:   Mr. Levine, can we go to Government

7    Exhibit 21, please, and let's go to row 1414.

8    Q.   So is this the first of those transactions that are

9    included in the summary chart?

10   A.   1414, no.

11   Q.   Oh.

12   A.   1415.

13   Q.   Oh, excuse me, 1415.

14   A.   Yes.

15   Q.   And, sorry, what does 1414 show?

16   A.   That is just a transfer for out of the Coinbase proportion

17   of the account into the regular Coinbase.com account.

18   Q.   And 1415, how do you know that that's an external transfer?

19   A.   Column H contains a number -- a random string of --

20   alphanumeric string of characters that start with bc1.

21   Q.   And what does that indicate?

22   A.   It indicates that it was a Bitcoin wallet address.

23   Q.   And turning to the transaction hash column, which I think

24   is column L, off the screen, what does the fact that there is a

25   transaction hash there indicate?

Kudirka - Direct

1    A.  It means there is an external transfer into or out of the

2    Coinbase account.

3    Q.  And what is an external wallet?

4    A.  It is a wallet that is not housed on any sort of exchange

5    or at least it's a wallet that I can't attribute to another

6    exchange for the tools available to me.

7    Q.  Based on your training and experience what are some of the

8    reasons that someone might use an external wallet?

9    A.  It could be that it's a cold storage wallet and their

10   cryptocurrency is more secure there.  It could be they just

11   don't want it on a service like Coinbase or other exchanges to

12   safeguard it.  It could be in an effort to conceal.  There is a

13   variety of reasons.

14   Q.  And what is a cold storage that you mentioned?

15   A.  Cold storage takes your cryptocurrency holdings offline and

16   it makes them less susceptible to theft.

17        MR. NESSIM:  Okay.  Mr. Levine, let's go back to

18   Government Exhibit 101.  Where we left off, we were at sort of

19   the top of this page, March 28 to April 11, the seven

20   transactions.

21        THE COURT:  Mr. Nessim, would it be okay, I actually

22   have a civil conference at 3:30 that my law clerk just reminded

23   me about.  Could we take a break now and continue?  The civil

24   conference shouldn't last more than 15 minutes.

25        MR. NESSIM:  Sure.  I don't have many much longer in

L9e2LluH                              Kudirka - Direct

1    my direct, but that's --

2              THE COURT:  If you could, because I have parties that

3    are probably waiting on the telephone.

4              MR. NESSIM:  Absolutely.

5              THE COURT:  Okay.  Thank you.

6              You may step down.

7              THE WITNESS:  Thank you, your Honor.

8              (Recess)

9              THE COURT:  Okay.  Agent, I just remind you that you

10   are under oath.

11             THE WITNESS:  Yes.

12             THE COURT:  You may inquire.

13             MR. NESSIM:  Thank you.

14   BY MR. NESSIM:

15   Q.  Special Agent Kudirka, where we left off we were running

16   sort of back to the March 28 to April 11 seven transactions to

17   external wallets row.

18   A.  Yes.

19   Q.  Do you see that here?

20   A.  Yes.

21   Q.  And then there are a couple, you know, transactions

22   reflected there and actually what is the approximate

23   inflow/outflow tally by that point?

24   A.  $15,064.

25   Q.  Jumping down to June 16, 2020, what happened there?

Kudirka - Direct

L9e2LluH

1   A.  Moises Lluberes receives about 5.5 Bitcoin worth, about

2   $52,000, as part of a transfer from three external wallets.

3   These were the same wallets that were involved in the

4   transactions from March 28, 2020 to April 11, 2020.

5   Q.  Then July 27, 2020, what's happening there?

6   A.  There are two different transactions that occur that day,

7   totaling 12.2 Bitcoin, worth approximately $261,000, from four

8   of the external wallets involved in the March 28, 2020 to April

9   11, 2020 transactions, as well as change addresses from

10  previous transactions that are part of that group of external

11  wallets.

12  Q.  I'm going to go into a little bit of detail on what that

13  means.  But before I do, so basically -- so what's the

14  relationship between -- at a high level, between the March 28

15  to April 11, 2020 withdrawals and the July 16 and July 27

16  deposits?

17  A.  Nearly all of the money that was withdrawn from the

18  Coinbase account is returned to the Coinbase account.

19  Q.  And we will go into a little bit of detail as to how you

20  know it is the same money, but is your testimony that's from

21  the same wallet?

22  A.  Yes.

23          MR. NESSIM:  Mr. Levine, if you could please -- this

24  is going to be a little tricky with the screen, but can we get

25  Government Exhibit 21 up on the screen, and let's go down to

L9e2LluH                    Kudirka - Direct

1    the 1415 row.  Okay.  And then if you could just pull it to the

2    side, hopefully retaining as much information as possible, can

3    you also pull up Government Exhibit 23.

4    Q.  Do you recognize Government Exhibit 23?

5    A.  Yes.

6    Q.  And does it contain screenshots of blockchain.com?

7    A.  Yes.

8    Q.  Did you create those screenshots?

9    A.  Yes.

10   Q.  And just the information, the text on top of it, did you

11   input that text?

12   A.  Yes.

13   Q.  And blockchain.com for -- what does the screenshot reflect

14   on blockchain.com?

15   A.  This is the Bitcoin blockchain explorer portion of

16   blockchain.com.

17   Q.  Okay.  It's a fair and accurate representation of the

18   information you obtained in searching the Bitcoin?

19   A.  Yes.

20            MR. NESSIM:  The government offers Government Exhibit

21   23.

22            MS. HARAMATI:  No objection.

23            THE COURT:  Government Exhibit 23 is admitted in

24   evidence.

25            (Government's Exhibit 23 received in evidence)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Kudirka - Direct

L9e2LluH

1          MR. NESSIM:  Mr. Levine, if you could please go to

2    Government Exhibit 1415.

3    BY MR. NESSIM:

4    Q.  So here that -- so what's the amount of that transaction

5    that was sent out?

6    A.  .25 Bitcoin.

7    Q.  So row H, what's reflected in row -- column H, excuse me?

8    A.  That is the address, the external address that the .25

9    Bitcoin was sent to from Moises Lluberes's Coinbase account.

10   Q.  And turning your attention to Government Exhibit 23, so

11   what -- hold on.

12          Let's scroll down, excuse me, I think it is 1437.  Oh,

13   sorry.  It is -- yes, it's 1439.  Excuse me.  Oh, I'm sorry,

14   1438.  "Receive."

15          What is the amount of Bitcoin involved in that

16   transaction?

17   A.  5.5 Bitcoin.

18          MR. NESSIM:  Mr. Levine, can you scroll over to

19   column -- I think it's J, the transaction hash, or K, excuse

20   me.  Oh sorry, L.

21   Q.  What is the transaction hash there?

22   A.  It's in column L.  It starts with 31bc.

23   Q.  And what did you do with this transaction hash in the

24   Bitcoin Explorer?

25   A.  I copied that transaction hash and dropped it into the

Kudirka - Direct

L9e2LluH

1    search bar that's in the upper right-hand corner of the

2    screenshot in Exhibit 23.

3    Q.  And what did you learn about that Bitcoin transaction using

4    that transaction hash?

5    A.  I am able to see which wallets are part of the input of

6    that transaction, as well as the output wallets, in addition to

7    the amounts of the transaction and the fee paid in the

8    transaction.

9    Q.  So there are three wallets here that seem to be the input

10   wallets?

11   A.  Correct.

12   Q.  Do you recognize those wallets?

13   A.  Yes.

14   Q.  And how do you recognize them?

15   A.  They are wallets that received funds which you can see in

16   the transaction record in Mr. Lluberes's Coinbase records.

17   Q.  Those are the external accounts that you are mentioned a

18   moment ago?

19   A.  Correct.

20   Q.  And what, if anything, does it mean to you that multiple

21   wallets were used to complete a single transaction?

22   A.  They are likely controlled by one entity because the

23   private key for each of these would need to be under the

24   control of a single person or entity.

25   Q.  What do you call this type of transaction?  Or what do you

L9e2LluH                    Kudirka - Direct

1  call this type of combination of wallets?

2  A.  Oh, co-spending.

3  Q.  And is it possible or not if the wallets are owned by

4  different persons?

5  A.  It is highly unlikely.  There are very unique situations

6  where it is possible, but it's highly unlikely.

7  Q.  And looking at the outputs of this transaction, you just

8  testified that 5.5 Bitcoin returns to the account?

9  A.  Yes.

10 Q.  And where is that reflected in the blockchain?

11 A.  The address that starts with 33h is listed as a deposit

12 address in Moises Lluberes's Coinbase account.

13 Q.  And what is the remaining address that's one of the two

14 outputs of this transaction, 2.988 Bitcoin?

15 A.  It is a change address for the transaction.

16 Q.  What is a change address?

17 A.  When you are spending Bitcoin, you cannot just spend -- you

18 cannot just send a specific amount.  You have to send

19 everything, and then you receive back your change.  It would be

20 just like if you used cash to purchase a cup of coffee and you

21 only had a five dollar bill but the coffee only cost three

22 dollars.

23 Q.  So a new wallet is created to hold that change?

24 A.  Sometimes a new wallet is created -- it was in this

25 situation -- but you could also have the change come back to an

Kudirka - Direct

L9e2LluH

1   original wallet.

2   Q.  Let's scroll down on Government Exhibit 23 to the third

3   snapshot or actually just really quickly on this one.

4            What is this?

5   A.  This is the first transaction that occurred on 7/27/2020 of

6   funds being sent to Moises Lluberes's Coinbase account.

7            MR. NESSIM:  Mr. Levine, can we go to 21, it's a

8   four-Bitcoin transaction, please.  Scroll over to the left.

9   Scroll down just a few rows.  I think it is row 1444.

10  A.  Yes.

11  Q.  So there are four Bitcoin here.  It's transferred into

12  Mr. Lluberes's account?

13  A.  Correct.

14  Q.  And then is that another change wallet that's created

15  through the transaction?

16  A.  Correct.

17            MR. NESSIM:  Mr. Levine, let's scroll down to the last

18  screenshot in Government Exhibit 23.

19  Q.  And again, how did you obtain this information about the

20  blockchain?

21  A.  I took a transaction hash for -- out of Mr. Lluberes's

22  Coinbase return and put it in the search bar of this Bitcoin --

23  block explorer.

24  Q.  Is that specifically for what's at row 1448 of the Excel

25  spreadsheet, the receipt of the 19.2 Bitcoin?

L9e2LluH                      Kudirka - Direct

1  A.  Could we just scroll over so I could see that column?  Yes.

2  Q.  I'm sorry.  What are you comparing, just --

3  A.  The transaction hash in column L to the transaction hash

4  that's listed above the inputs on the screenshot.

5  Q.  That's above sort of the text in blue on the left?

6  A.  Correct.

7  Q.  997F8, bunch of numbers and letters?

8  A.  Yes.

9  Q.  And so what is the inputs to this transaction or how do you

10  recognize those inputs?

11  A.  These are some of the wallets that had received funds from

12  the external transfers Mr. Lluberes has conducted out of his

13  Coinbase account earlier in addition to the two change

14  addresses that were generated in the past transactions.

15  Q.  Okay.  And this transaction itself created a changed change

16  address, correct?

17  A.  Yes.

18          MR. NESSIM:  We will go back to Government Exhibit

19  101, please, Mr. Levine.

20  Q.  But generally speaking, you observed that the Bitcoin that

21  went out to those external wallets were returned?

22  A.  Correct.

23  Q.  And then in September 2020, there are a series of deposits.

24  What account were those deposits from?

25  A.  This is a SunTrust account ending in 7576.

259

Kudirka - Direct

L9e2LluH

1  Q.  And by the end of those transactions, September 23, 2020,

2  what is the approximate level of input into the account that

3  you observed as reflected in the summary chart?

4  A.  $340,148.07.

5       MR. NESSIM:  One moment.

6       (Counsel confer)

7       MR. NESSIM:  No further questions.

8       THE COURT:  Okay.  Cross-examination.

9       MS. HARAMATI:  We are just going to get the

10  audiovisual equipment set up.

11       THE COURT:  Okay.

12       MR. MAZUREK:  Judge, we will take a moment, during

13  this break, to just put on the record what we had talked about

14  at the last break --

15       THE COURT:  Yes.

16       MR. MAZUREK:  -- which is, I have conferred with my

17  client, Moises Lluberes, and advised him that he has the right

18  to be here for the remainder of this proceeding, and he

19  voluntarily agrees to waive his appearance to the remainder of

20  the proceeding so that he could make his flight back to

21  Florida, and so we are proceeding without his presence at this

22  stage.

23       THE COURT:  Okay.  And just so the record is clear,

24  after we came back from the break, Mr. Lluberes had already

25  left and we had discussed off the record counsel's consulting

Kudirka - Cross

L9e2LluH

1    with his client about whether he wanted to stay or leave, and

2    that's what resulted in counsel's statement to me now.

3              MR. MAZUREK:  Thanks, Judge.

4              THE COURT:  Thank you.

5              MS. HARAMATI:  Good afternoon, Agent.

6              THE WITNESS:  Good afternoon.

7              MS. HARAMATI:  Your Honor, may I inquire?

8              THE COURT:  You may.

9    CROSS-EXAMINATION

10   BY MS. HARAMATI:

11   Q.  Agent, this crypto is very opaque.  I'm just going to start

12   by reviewing a few basics that you went over in your direct

13   examination.  Okay.

14             Starting with, Ms. Pasricha, if we could have on the

15   screen GX 21, which was previously admitted in evidence, if you

16   could please just go to column H and -- to the right.

17             Column H, as you see, is the "to" column, and I

18   believe you testified that when the "to" column is populated,

19   that reflects the wallet ID where -- involved in the

20   transaction is that accurate?

21   A.  It is not necessarily a wallet ID.  It could be an internal

22   Coinbase identifier or a wallet ID.

23   Q.  What do you mean by an internal Coinbase identifier?

24   A.  Coinbase has its own internal controls that they use to

25   identify destinations.

L9e2LluH                         Kudirka - Cross

Q.  Okay.  And you are not familiar with what those internal controls specifically correspond to?

A.  Correct.

Q.  Looking at this spreadsheet that you testified you reviewed in your testimony earlier this afternoon, are you aware or can you tell from looking at this which items in this "to" column reflect specific wallets and which are internal Coinbase IDs?

A.  It is commonly known amongst folks that are involved in cryptocurrency that a Bitcoin address can start with bc1.  That is -- I know that to be a Bitcoin wallet.

Q.  Okay.  So let me ask you this.

        Ms. Pasricha, I think we are on row -- you have your cursor on 1439.  Can you please just scroll to the left and let's go back to column A.

        So 1439, just this is as an example, is a transaction involving Bitcoin, right?

A.  Correct.

Q.  That is based on column B, account name, BTC wallet.

A.  Correct.

Q.  And the amount, if you look at column F, is 5.5 Bitcoins were in this transaction?

A.  Correct.

Q.  And on the "to," that is a 546ba, etc., number?

A.  Correct.

Q.  So this Bitcoin transaction did not involve a bc1 address.

Kudirka - Cross

L9e2LluH

1   A.  Correct.

2   Q.  But other Bitcoin transactions can involve bc addresses,

3   the "to" column, you testified earlier, I think just a moment

4   ago, that it's commonly known as Bitcoin wallets start with bc1

5   or bc addresses.

6   A.  Correct.

7   Q.  But that doesn't mean that all Bitcoin wallets start with

8   bc.  Is that accurate?

9   A.  Correct.

10  Q.  And so do you have an understanding in this Bitcoin

11  transaction what this 5 -- this number -- alphanumeric code in

12  the "to" line actually means?

13  A.  Well, this particular transfer is a transfer to his

14  Coinbase Pro account.

15  Q.  And how do you know that?

16  A.  I compared the transactions within the exchange transaction

17  portion of this return, and found this transaction there.

18  Q.  Okay.  But the specific meaning of this "to" line, you are

19  not certain what that specific alphanumeric character means?

20  A.  In our consultation with Coinbase, that is an internal

21  control mechanism.

22  Q.  Okay.  Thank you.

23          Ms. Pasricha, if you could just scroll to the

24  following columns to the right.

25          And if you look, in column K, you testified that the

Kudirka - Cross

L9e2LluH

1  Coinbase ID is also another identifier internal to the Coinbase

2  platform.

3  A.  Correct.

4  Q.  What did you say that that internal identifier identified?

5  A.  That corresponds to a specific transaction.

6  Q.  Corresponds to a specific transaction.  And that is a

7  transaction that happens on this Coinbase platform?

8  A.  Correct.

9  Q.  And if somebody were to receive funds from another platform

10 into their Coinbase -- their Coinbase wallet, would that

11 include a Coinbase ID?

12 A.  It would include a transaction hash.  But based on these

13 records it would also include a Coinbase transaction ID.

14 Q.  Just going just on the prior line, line L, you see a

15 transaction hash.  You testified that that is an identifier of

16 the specific transaction.

17 A.  Correct.

18 Q.  Just a few more foundational questions.

19          A few moments ago in your direct testimony, you

20 testified about Government Exhibit 23.  Do you still have that?

21 Do you have a paper record of that or --

22 A.  I do not.

23          MS. HARAMATI:  Ms. Pasricha, would you be able to put

24 that up?

25          (Pause)

Kudirka - Cross

L9e2LluH

MS. HARAMATI:  Just one moment, your Honor.

THE COURT:  Yes.

(Pause)

BY MS. HARAMATI:

Q.  Agent, you testified with respect to this government exhibit that you inputted into the bit blockchain search bar the transaction hash and you were able to look at the various wallets that were involved is that accurate.

A.  In that particular transaction, yes.

Q.  In that particular transaction.  Now, you also testified that you were able to compare the wallets involved in this June 16, 2020, transaction, as an example, with wallets that were used in prior transactions, right?

A.  Yes.

Q.  And I believe you also testified that there were change addresses that were generated with each transaction.  Is that accurate?

A.  I can't recall right now if I said with each transaction, but this particular transaction I am looking at right now does have a change address.

Q.  Let me ask you this:  You had testified earlier multiple reasons why individuals, you know, invest in Bitcoin or put their money in cryptocurrency.  Do you remember that testimony?

A.  I did not testify to that.

Q.  I believe that you testified that people use cryptocurrency

Kudirka - Cross

L9e2LluH

1   to -- some people use cryptocurrency as an investment, people

2   use cryptocurrency to -- I believe you said that they could

3   want to use it in order to hide their money, and I believe you

4   also testified that people use cryptocurrency to invest their

5   money in a place that's secure.

6   A.  I did not testify to that.

7   Q.  Okay.  Well, let me ask you this, then.  Is it true that

8   the purpose of the blockchain is to maintain security of crypto

9   transactions?

10  A.  It maintains the security of the record of the

11  transactions.

12  Q.  Okay.  And one of the functions of crypto wallets is that

13  they are highly secure.  Is that accurate?

14  A.  That is very dependent on the type of wallet being used.

15  Q.  Just going back to the basics, I believe you testified a

16  little bit earlier about wallets used on crypto exchanges

17  generally.

18  A.  Correct.

19  Q.  And this is maybe very basic, but my basic understanding is

20  that if you have a wallet, you have a public key, which I think

21  you testified was -- if this is accurate -- analogous to a bank

22  account number --

23  A.  Correct.

24  Q.  -- very roughly, and a private key which is maybe analogous

25  to your passcode to your bank account?

Kudirka - Cross

L9e2LluH

1    A.  That's a fair assessment, yes.

2    Q.  Now, is it accurate to say that public keys change, the

3    numbers change frequently on many crypto platforms in order to

4    maintain that security?

5    A.  I'm not sure I'm understanding the question.  Could you

6    please rephrase it?

7    Q.  Sure.  Unlike a bank account number, which is a static

8    number, a public key changes over time.  It does not remain the

9    same just because the same person has the same wallet.  Is that

10   accurate?

11   A.  No.

12   Q.  Isn't it true that public keys frequently change, don't

13   maintain the same public key?

14   A.  You could choose to create a new public key if you wanted,

15   yes.

16   Q.  And some accounts also automatically change the public key.

17   A.  With each transaction, yes.

18   Q.  Okay.  With each transaction the public key can be changed?

19   A.  It could be, yes.

20   Q.  And the public key is the identifier.

21   A.  Correct.

22   Q.  Okay.  So let me ask you this:  You had testified --

23   Mr. Nessim mentioned the concept of a cold wallet.

24   A.  Correct.

25   Q.  Do you remember that?

Kudirka - Cross

1          Okay.  So you, I think, testified that a cold wallet

2   is a way of storing cryptocurrency offline.

3   A.  Yes.

4   Q.  And the purpose of a cold wallet is to maintain security of

5   cryptocurrency?

6   A.  Correct.

7   Q.  Not connected to the Internet, it's not vulnerable to

8   hackers.  Is that roughly accurate?

9   A.  It's less vulnerable.

10  Q.  Okay.  Less vulnerable, but it's a security measure broadly

11  speaking?

12  A.  Yes.

13  Q.  So a person -- also on the basics, a person who purchases

14  cryptocurrency on an exchange like Coinbase can remove that

15  currency from the exchange and put it into a cold wallet?

16  A.  Yes.

17  Q.  And later if they want to transact with that currency, they

18  can reimport it into their Coinbase wallet?

19  A.  Correct.

20  Q.  Now, in the Coinbase records -- Ms. Pasricha, would you put

21  up GX 21 -- but generally speaking in the Coinbase records, you

22  mentioned that a Coinbase ID is generated each time there is a

23  transaction on the platform.

24  A.  Correct.

25  Q.  So if someone were to reimport currency on to their

Kudirka - Cross

L9e2LluH

Coinbase -- into their Coinbase wallet, that would have a

Coinbase ID?

A.  Correct.

Q.  Okay.  Okay.  Great.  Let me ask you this:  Are you -- with

respect to currency purchased and put in cold wallets,

theoretically speaking, a person could purchase cryptocurrency

in one exchange and then put it in an account that they have in

another exchange some other time, is that right?

A.  Could you repeat the question?  I'm sorry.

Q.  If a person has a crypto wallet on a specific exchange,

they can purchase currency on that exchange, correct?

A.  Yes.

Q.  And they can subsequently put that in a cold wallet --

A.  Correct.

Q.  -- taking it out of that wallet on that exchange.

A.  Correct.

Q.  And from that cold wallet, they can then at some later

point redeposit that cryptocurrency into another wallet that

they have.

A.  Correct.

Q.  And they could also redeposit it on a different exchange --

A.  Correct.

Q.  -- right?  Because Coinbase is not the only cryptocurrency

exchange.

A.  Correct.

Kudirka - Cross

L9e2LluH

Q.  Okay.  So and if you were -- if a person were to do that, you would not necessarily be able to trace where they had initially -- let me withdraw that and rephrase the question.

Upon importing that cold wallet cryptocurrency back on to the exchange, you would not necessarily be able to determine where that cryptocurrency was purchased.

A.  Can you repeat the question one more time, please.

Q.  In the transaction when a person is reimporting their cryptocurrency from a cold wallet, you would not -- I'm looking at that specific importation transaction on the exchange.  You would not be able to determine where the cryptocurrency that had been stored in the cold wallet had been purchased?

A.  That is incorrect.

Q.  Okay.  But you would not be able -- can you explain that?

A.  Sure.  When -- you can -- on blockchain explorers, you can also look up every transaction that a single wallet has been involved in, which would then show you all of the transactions.  So if you had money from exchange A theoretically that you put into your wallet that happens to be a cold storage wallet, when those funds are withdrawn, whether that be to another exchange, not exchange A, or you send that to a friend or you send that anywhere, you are still going to see that chain of transactions occurring.  That wallet address is going -- that address is going to have that transactional history to it when you look at it in a block explorer.  So you are able to follow those funds.

Kudirka - Cross

L9e2LluH

Q. Okay. Now, let me ask you this. I understand that, based on Government Exhibit 23, that you did some work following the funds involved in this June 16 transaction and the July 27 transactions in Moises Lluberes's accounts?

A. Yes.

Q. Did you do that same work for the other transactions in his accounts, in his accounts that you just testified about on direct?

A. I'm not sure I'm understanding the question. Could you repeat it?

Q. You gave some testimony about following the history of the transactions in Moises Lluberes's Coinbase account on June 16 and July 27, 2020. Remember that?

A. Yes.

Q. Did you do -- but you didn't do the same work tracing the step by step of the transactions, the other transactions that you had pointed to in his account in Government Exhibit 101.

A. Could you clarify which transactions you are referencing specifically?

Q. I am asking about any of the others. Government Exhibit 23 only includes printouts of three transactions.

A. The inflow -- I also put in the inflow of Bitcoin into Moises Lluberes Coinbase account, as well.

Q. The funds, you mean. The funds?

A. I'm not sure what -- I'm sorry. I'm not following.

Kudirka - Cross

L9e2LluH

1   Q.  The U.S. dollars that funded the account, you mean?

2   A.  In my statement that I just made, I was referencing the

3   Bitcoin transactions.

4   Q.  The Bitcoin transactions.  Okay.

5            Changing topics for a second, you testified, going

6   back to Government Exhibit 23 -- would you be able to put that

7   back on the screen, Mr. Levine?

8            Agent, you testified -- if you could please turn to

9   page 3.  Thank you so much.

10            You testified that the multiple wallets here in blue

11   were an indication of what's called co-spending, is that right?

12   A.  The wallets that are on the left-hand side, it is five

13   wallets, are co-spending in this transaction, yes.

14   Q.  And I believe you gave some testimony that it would be --

15   might be a paraphrase, but very uncommon for co-spending to

16   occur amongst different people?

17   A.  Correct.

18   Q.  So ordinarily co-spending you are saying would be just an

19   indication of one --

20   A.  One entity.

21   Q.  One entity.  Fair enough.

22            But just as a technical matter, in order to co-spend,

23   a single individual would need just the private key or the

24   password for each of those wallets involved, is that right?

25   A.  Correct.

Kudirka - Cross

L9e2LluH

1  Q.  Okay.  So there is nothing technically prohibitive of one

2  person, let's say, getting together with other people to

3  co-spend.  All they need is the password.

4  A.  It would have to be a highly coordinated event for it to

5  receive the same transaction hash, to all happen in one

6  transaction.

7  Q.  Okay.  I understand.  But it certainly is possible.

8  A.  There is a very slim chance of that happening, yes.

9          THE COURT:  Let me ask, Agent, have you ever -- when

10  you say there is a slim chance, have you ever seen that in your

11  experience?

12          THE WITNESS:  No.

13          MS. HARAMATI:  One moment, your Honor.

14          THE COURT:  Sure.

15          (Counsel confer)

16  BY MS. HARAMATI:

17  Q.  Agent, just going back to the cold wallet concept that we

18  talked about a little bit earlier -- Ms. Pasricha, if you could

19  put back up Government Exhibit 21.

20          Agent, this is Government Exhibit 21, which you looked

21  at before, Moises Lluberes's Coinbase account record.  Can you

22  say from looking at just from your review of this whether

23  Mr. Lluberes had any cold wallets where he stored his

24  cryptocurrency?

25  A.  I cannot speak to that, no.  I don't know.

Kudirka - Redirect

L9e2LluH

1   Q.  And going back to -- if we could just turn to GX 22.  This

2   is GX 22, which is the Coinbase account record of Luis

3   Lluberes.  Right?

4   A.  Yes.

5   Q.  And you reviewed some of this also in your direct

6   testimony.

7   A.  Yes.

8   Q.  And based on your review of GX 22 in your expertise, would

9   you specifically be able to say whether -- withdrawn.  Withdraw

10  that question.

11          Based on your review of GX 22, in your experience, you

12  also wouldn't be able to say that Luis Lluberes had -- whether

13  Luis Lluberes had any cold wallets connected to his account?

14  A.  I cannot speak to that.

15          MS. HARAMATI:  Nothing further, your Honor.

16          THE COURT:  Okay.  Any redirect?

17          MR. NESSIM:  Very briefly.

18          Mr. Levine, could you please pull up Government

19  Exhibit 1.  Actually first let's pull up 23.

20  REDIRECT EXAMINATION

21  BY MR. NESSIM:

22  Q.  Special Agent Kudirka, can these transactions -- I guess

23  why is it that when you see this transaction it uses three

24  different Bitcoin wallets?  Why is there a change account

25  created rather than the change just remaining in the wallet

274

L9e2LluH

Kudirka - Redirect

1    with the excess capital?

2    A.  That is a feature of some wallet softwares.  It is

3    encouraged in the crypto space to generate a new address for a

4    change address as trying to enhance that anonymity aspect of

5    cryptocurrency.

6    Q.  You testified on direct about how you observed the

7    transfers, and this is Government Exhibit 101 on the second

8    page -- we can leave this up for now, but between the end of

9    March and early April 2020, there were the seven transfers to

10   those external addresses of which these are three of them,

11   right?

12   A.  Correct.

13   Q.  And then you also testified that you saw the Bitcoin return

14   from the same addresses in mid June and late July of 2020?

15   A.  From those addresses on the change addresses, yes.

16   Q.  There were some questions on cross-examination about how

17   you might not know -- well, you said that you would be able to

18   know actually if the money was invested on another crypto

19   exchange?

20   A.  Yes.

21   Q.  But based on the behavior that you see with these wallets,

22   if hypothetically this was invested on a crypto exchange, would

23   it be possible to withdraw it into the same wallet that it came

24   from?

25   A.  Yes.

Kudirka - Redirect

L9e2LluH

1  Q.  Of these wallets included?

2  A.  You could receive your funds back into these wallets from a

3  second crypto exchange, yes.

4  Q.  So even though a change account is created, these wallets

5  are still -- they still exist, they just have a zero balance?

6  A.  Correct.

7  Q.  Okay.  Let's go to Government Exhibit 101, please.

8        There were some questions about whether you had

9  explored the Bitcoin -- the blockchain for other transactions

10  coming in and out of Moises Lluberes's Coinbase account?

11  A.  Correct.

12  Q.  If you can just take a look at this page, and then we will

13  turn to the next page.  Can you just count the number of

14  transactions in either direction that involve Bitcoin rather

15  than cash?

16  A.  Sure.  Could you scroll the next page?  There is none on

17  this page.

18        There are three transactions between March 28, 2020

19  and April 10 of 2020.  There are seven transactions in the

20  opposite direction between March 28, 2020 and April 11, 2020.

21  There are two more transactions between April 11, 2020 and June

22  22, 2020, and then one transaction on June 16 and then two

23  transactions on July 27.  So that would be what?  My math is a

24  little slow.  15 transactions total it looks like.

25  Q.  I think you were counting out two transactions from April

Kudirka - Redirect

L9e2LluH

1  11 to June 22.  Are those cash or --

2  A.  Oh, there should only be 13.  I'm sorry.

3  Q.  Okay.  And of those 13, which did you testify to using in

4  the blockchain explorer to find out more information about the

5  transaction?

6  A.  I used the blockchain explorer for the three transactions

7  that are listed in the other exhibit.  I used other proprietary

8  tools that are available to me to look at every single

9  transaction.

10  Q.  I guess the question is, for the March 28, 2020, the April

11  10, 2020 transactions of Moises Lluberes receiving

12  approximately $165,000 in Bitcoin from Luis Lluberes's Coinbase

13  account --

14  A.  Yes.

15  Q.  -- did you need to go to a blockchain explorer to learn

16  what account that had come from?

17  A.  No.  I had Luis Lluberes's Coinbase records.

18  Q.  And the other Bitcoin transactions that are remaining are

19  the ones that you did discuss having consulted the blockchain

20  explorer for, right?

21  A.  Correct.

22          (Counsel confer)

23  Q.  So for the external accounts that we talked about a lot, do

24  you know that that money came out and then came back?

25  A.  Yes.

Kudirka - Recross

L9e2LluH

1   Q.  And how do you know that?

2   A.  Because I traced the cryptocurrency through the tools that

3   are available to me.

4        MR. NESSIM:  No further questions.

5        MR. MAZUREK:  One second, your Honor.

6        THE COURT:  Sure.

7        (Counsel confer)

8        THE COURT:  Just to be clear, when you say the tools

9   that are available, basically, using the hashes, you can trace

10  each -- basically transaction to transaction and see when it

11  comes and where it goes?

12       THE WITNESS:  Yes.  The tools that are available to

13  me.  I can look at it either through the address and see that

14  history or through the transaction hashes.

15       THE COURT:  Okay.

16       (Counsel confer)

17       MS. HARAMATI:  Just very briefly, your Honor.

18       THE COURT:  Yes, go ahead.

19  RECROSS EXAMINATION

20  BY MS. HARAMATI:

21  Q.  Agent, let me ask you this.  Did you check whether Luis

22  Lluberes had crypto accounts on other exchanges?

23  A.  No.

24  Q.  And did you check whether Moises Lluberes had crypto

25  accounts on other exchanges?

L9e2LluH

1   A.  No.

2   Q.  Just a moment ago on redirect, you testified that you

3   traced the trans-- the transaction funds involved -- reflected

4   in Moises Lluberes Coinbase records through the tools available

5   to you?

6   A.  Correct.

7   Q.  That's in addition to the blockchain searches that you did

8   for those three transactions.

9   A.  Correct.

10  Q.  Now, let me ask you this.  Did you do the same for the

11  transactions reflected on Luis Lluberes's Coinbase account?

12  A.  Yes.

13  Q.  Okay.

14          MS. HARAMATI:  Nothing further.

15          THE COURT:  Okay.

16          MR. NESSIM:  No re-redirect.

17          THE COURT:  Okay.  Thank you very much, agent.  You

18  can step down.

19          THE WITNESS:  Thank you, your Honor.

20          (Witness excused)

21          THE COURT:  No other witnesses, right?

22          MR. NESSIM:  That's correct.

23          THE COURT:  The parties need to meet and confer to

24  make sure that the government agrees to the ticking and tieing

25  that the defense was raising in the testimony with

L9e2LluH

Agent Martinez.

1            But once you do that, what I would like you to do is,

2    within a week, propose a schedule for me for post-hearing

3    briefing.  You know, assuming that I hope between now and then

4    you can confirm that and then let me know either that you have

5    confirmed what -- I think they were on DX 8 and 9.

6            MR. MAZUREK:  9 and 10.

7            THE COURT:  9 and 10, thank you, and as well I think

8    there may -- well, whatever testimony needs to be -- whatever

9    needs to be confirmed, you can do that.  Would the end of next

10   week, would that work?  I don't know what -- obviously, I know

11   that there is a holiday coming up, but --

12           MS. HARAMATI:  Your Honor, I think we can certainly

13   meet and confer in that period of time, and I think we can set

14   a briefing schedule now.  I don't expect it to be

15   controversial.

16           THE COURT:  Why don't you consult and then we can put

17   it on the record.

18           (Counsel confer)

19           MR. NESSIM:  Your Honor, I don't know that we will be

20   able to agree on a schedule.

21           THE COURT:  You mean right now or --

22           MR. MAZUREK:  Ever.

23           THE COURT:  Let me hear the disagreement.

24           MR. NESSIM:  So our view is that this briefing can be

25

L9e2LluH

1    accomplished relatively quickly and that it doesn't need to be

2    incredibly voluminous, particularly considering there are

3    submissions already, it is just a summary of what the parties

4    believe they presented at this hearing and the governing law.

5    We think that we can file that within two weeks.

6          And we are particularly cognizant of the need for

7    efficiency here, given that there are three other defendants in

8    this case, you know, there are motions, pretrial motions that

9    are going to be filed by the other parties.  I don't think the

10   pretrial motions will be filed for Mr. Moises Lluberes until

11   this issue is resolved.  And so putting this out to the end of

12   the year, which is to have it be fully briefed, would mean that

13   the schedule for all the defendants is totally off.  And so we

14   believe that, given what is at issue here, we can turn this

15   around very quickly.

16          THE COURT:  Okay.  I take it from your comment,

17   Mr. Mazurek -- well, let me hear from the defense.  Sorry.

18          MR. MAZUREK:  Yes.  What we are proposing, your Honor,

19   is really to have everything fully briefed within 30 days,

20   submit simultaneous briefing by October 12, which is the day

21   after the October 11 holiday, and then have any replies by

22   October 22.

23          THE COURT:  Okay.  So just so that I have -- what's

24   the first date for the --

25          MR. MAZUREK:  The first date we will get back to the

L9e2LluH

1    Court after the meet-and-confer and have all of the evidence

2    under -- you know have agreement on the evidence, the state of

3    the evidence by Friday, the 24th of September, next week, by

4    the end of next week, and then to have simultaneous briefing

5    submitted no later than October 12 on the post-hearing

6    briefing, and then any replies on the post-hearing briefing

7    filed by Friday, October 22.

8         THE COURT:  Okay.  And the government proposes two

9    weeks, is that correct?

10        MR. NESSIM:  Yeah.  We would propose agreement on

11   meet-and-confer within a week, which is the 21st, submissions

12   at the same time on the 28th, and then a week for replies,

13   which will put us on October 5.  And obviously, give or take,

14   we are not tacked to those specific dates, but that's the sort

15   of time frame we think is appropriate.

16        THE COURT:  I guess, and I don't just remember when

17   the briefing is due for the other defendants on their

18   motions --

19        MR. NESSIM:  I think it is the end of October was the

20   date, but I should have it in my calendar before I comment.

21        THE COURT:  While you are looking, Mr. Mazurek, do you

22   know if there are any -- and you may not know.  Do you know if

23   there are any other motions that the defendants will be making

24   that you will just simply be joining, like "me too" type

25   things, or you don't know one way or the other.

L9e2LluH

1          MR. MAZUREK:  I don't know one way or the other.

2          And Judge, just perhaps to put this on everyone's

3   radar, depending on the outcome of this hearing, obviously, you

4   know, we would -- it would be very difficult for us to remain

5   on this case.  It would be an incredible hardship to remain on

6   this case without any possibility of compensation from the

7   client.  On the other hand, we have done a tremendous amount of

8   work on this case, as you can tell from the preparation for

9   this hearing, and it would be, I think, an extreme waste to

10  everyone, including the Court and the government, for us to

11  suddenly -- for Mr. Moises Lluberes to start all over again

12  with new representation.

13         THE COURT:  No, no.  I thought, and I may be

14  misremembering or it may not have actually happened, would --

15  and, again, I'm not prejudging what's going to happen here, but

16  assuming that your motion, the motion fails, in other words,

17  that I find that the government has met its burden, would you

18  be -- in that instance, would you be making an application to

19  continue to represent Mr. Moises Lluberes through the CJA or

20  would that not be the case?

21         MR. MAZUREK:  I haven't completed my negotiations with

22  my partnership on that, but I will tell you personally I think

23  it would be best for the client and the interests of justice,

24  and so I am working hard to make that happen.

25         THE COURT:  Understood.  Understood.  I think I know

L9e2LluH

1    what -- so, look, I will -- I mean, I know it may delay any --

2    if I decide -- I guess what I would say is if I decide that the

3    government has met its burden that it may be that we have to

4    start over.  And by "start over" I mean get new counsel for

5    Mr. Moises Lluberes, which will put him on a different track

6    already, you know, and I will have to consider what I will do

7    at that stage, because counsel will then have to get all the

8    records, get up to speed, and figure out whether or not there

9    are any motions that would be made at that juncture, obviously

10   with consulting current counsel, if that's the case, in other

11   words, to get a totally new lawyer.  So I am inclined to give

12   the time, you know, that Mr. Mazurek has outlined, and I

13   understand it may -- it may -- what it may end up -- it may end

14   up on the back end, Mr. Mazurek, if I decide that the

15   government has not met its burden, that you are going to have a

16   pretty tight schedule in terms of your pretrial motions, just

17   so -- just to put it out there.  I don't want -- I don't want

18   slippage for the whole case just as a result of this.

19   Recognizing that there may be -- it may be some, but let's --

20   and if you could, because it impacts, obviously, have the

21   conversation with your partnership and see what they -- what

22   you are able to come up with, because I'm going to need to know

23   obviously, and your client, if we are going to need to go that

24   route if the government has met its burden.  All right?

25              MR. MAZUREK:  Yes.  I will have an answer.  Obviously

L9e2LluH

1    we have done tremendous amounts of work.

2          THE COURT:  No.  I completely understand that, and I

3    think, and I am not sure, and I'm not saying that I am going to

4    do this, but there are times, I think, when some of my

5    colleagues have basically said, well, that's all well and good,

6    you started to represent him, but you are right it is

7    inefficient, you need to stay as CJA counsel.  Look, and if you

8    are not on -- I don't remember, Mr. Mazurek, are you?

9          MR. MAZUREK:  I was.  I am no longer.

10         THE COURT:  So we would have to get approval anyway,

11   but I will have to think about that.

12         Mr. Nessim.

13         MR. NESSIM:  Your Honor, if the Court is going to -- I

14   mean with the elongated schedule, then I think we should

15   consider whether it makes sense to put Mr. Moises Lluberes's

16   counsel on the motion schedule of everyone.  They remain the

17   counsel of record.  They have had discovery for more than a

18   year.  They are obviously willing to put in a huge amount of

19   work in a situation where it is somewhat contingent.  There are

20   at least two possibilities where they may remain on case --

21   either we don't meet our burden or they get CJA funding.  I

22   don't see how this should be a delay tactic to avoid --

23         MR. MAZUREK:  Your Honor, this is not a delay tactic.

24   I mean, it is very hard for me to continue to put in the time

25   that we are putting in to a non-compensated case and still have

L9e2LluH

1   my other caseload.  And if in fact you find that the government

2   has met its burden to prevent us from getting access to the

3   bail money for legal fees and we are converted potentially to

4   the CJA panel, we will work with alacrity to get up to speed on

5   the motion filings.  But I don't want to be in a situation

6   where I am not, in my mind, being effective to my client with

7   respect to pretrial motions because we have been put into this

8   position of having prolonged litigation related to legal fees

9   when -- because that's an initial matter that absolutely needs

10  to be resolved.

11          THE COURT:  I guess what I would say is the following.

12  Look, I think as we have discussed, I think, in a prior

13  conference, no matter what happens here, if Mr. Lluberes is

14  going to continue with your representation past the phase of

15  motions, the money is going to have to come from somewhere.

16  Right?  In other words, as I understand it, there is not --

17  there wouldn't be sufficient monies through trial is I guess

18  what I will say.

19          MR. MAZUREK:  That is correct.

20          THE COURT:  So the initial, just so -- the initial

21  motions are coming in at the end of the month.

22          MR. NESSIM:  The beginning of November.  November 1 I

23  think is the date.

24          THE COURT:  All right.  And remind me, just, the dates

25  that you are talking about now, Mr. Mazurek.

L9e2LluH

1        MR. MAZUREK:  Yes.  For simultaneous submissions,

2   Tuesday, October 12, and for any replies by Friday, October 22.

3        THE COURT:  I am going to maintain my ruling.  I will

4   allow that schedule.  But no slippage.  We are not giving

5   anybody anymore time than that.

6        MR. MAZUREK:  Thank you, your Honor.

7        THE COURT:  So, okay.  All right.  And Mr. Mazurek I

8   think relatively soon after I issue my decision on the -- from

9   this *Monsanto* hearing, I expect to hear from you basically

10  immediately.  In other words, I don't think there is

11  anything -- the discussions can occur in advance of the

12  decision paths.  There are only several of them.  If you

13  prevail, in other words, if the government fails to meet its

14  burden, the monies aren't going to be forthcoming.  So I

15  think -- and I will probably, in the decision itself, indicate

16  that I want to be advised within days or a week of whether or

17  not you are going to continue to represent Mr. Lluberes and

18  what the position is.  Because I need to know to decide what I

19  am going to do in connection with that.

20       MR. MAZUREK:  Okay.  When you say whether we will

21  continue to represent him, meaning we will be making an

22  application, if the government meets its burden, to convert our

23  representation to a CJA representation?

24       THE COURT:  That's correct.

25       MR. MAZUREK:  Okay.

L9e2LluH

1          THE COURT:  That's correct.

2          MR. MAZUREK:  Understood.

3          THE COURT:  All right.  Is there anything else?

4          MR. CHIUCHIOLO:  Not from the government, your Honor.

5          THE COURT:  All right.  From the defense?

6          MR. MAZUREK:  No, your Honor.

7          THE COURT:  All right.  Thank you very much.  We will

8   stand adjourned.

9          MR. NESSIM:  Thank you, your Honor.

10                           oOo

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25